**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **KERRY M. SPENCER,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )  **Case No. 2:16-cv-01877-AMM** |
| | ) |
| **TERRY RAYBON, Warden of** | ) |
| **William C. Holman Correctional** | ) |
| **Facility,** | ) |
| | ) |
| **Respondent.** | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Alabama prisoner Kerry M. Spencer petitions this court for a writ of habeas

corpus under 28 U.S.C. § 2254, challenging his capital murder convictions and death

sentence in the Circuit Court of Jefferson County, Alabama in connection with his

murder of three Birmingham police officers and his attempted murder of a fourth

officer. Doc. 1. Mr. Spencer alleges that multiple constitutional violations require

the reversal of his convictions and sentence and requests discovery and an

evidentiary hearing. *See id*. The petition is fully briefed. Docs. 1, 18, 19, 21.[1] Mr.

Spencer has not established that he is entitled to relief. For the reasons explained

---

[1] After briefing closed, the court directed the substitution of Warden Terry Raybon
for the former Commissioner of the Alabama Department of Corrections, Jefferson
Dunn. Doc. 26 at 2.

below, the court **DENIES** Mr. Spencer's request for habeas relief and **DISMISSES** his Section 2254 petition.

# TABLE OF CONTENTS

I. BACKGROUND ...................................................................................6

   A. Criminal Conduct, Conviction, and Sentence..................................6

   B. Procedural History ...........................................................................22

II. STANDARD OF REVIEW..............................................................24

   A. Sections 2254(d) and (e) ...................................................................25

   B. The Procedural Default Doctrine....................................................28

   C. Burden of Proof and Heightened Pleading Requirements ......................32

   D. Claims Dismissed Pursuant to Rules 32.3, 32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure ...........................................33

   E. Ineffective Assistance of Counsel ...................................................35

III. ANALYSIS .......................................................................................38

   A. Ineffective Assistance Of Counsel Claims .......................................38

      1. Guilt Phase Ineffectiveness................................................38

         i. Failure To Object to Prejudicial Atmosphere ........................39

         ii. Failure To Object to Victim Impact Clothing and Accessories..............48

         iii. Counsel's Pretrial Commentary To Local Media ...................53

         iv. Failure To Move For Change In Venue....................................58

         v. Failure To Conduct Adequate Voir Dire..................................66

         vi. Failure To Investigate And Present Viable Defense Theory ...................84

         vii. Failure To Investigate And Present Expert Testimony Supporting Manslaughter Charge Based On Voluntary Intoxication........................93

         viii. Failure To Have Thorough Mental Evaluation By Competent Expert 103

         ix. Failure To Object To Introducing Evidence of Prior Bad Acts............110

         x. Failure To Subpoena "Key" Witness.......................................110

         xi. Failure To Argue Governmental Interference With Material Defense Witness .................................................................................118

xii. Failure To Object To The Trial Court's Failure To Instruct Jury On Both Voluntary Intoxication And Manslaughter Defense .............................122

xiii. Failure To Ensure Complete Appellate Record .................................138

xiv. Guilt-Phase Error Cumulative Effect .................................................139

**2. Penalty Phase And Sentencing Ineffectiveness**................................141

i. Failure To Investigate And Present Mitigation Evidence During Penalty Phase.................................................................................................141

ii. Failure To Challenge Aggravating Factors.........................................153

iii. Failure To Object To Double-Counting As Element Of Charge And In Aggravation .........................................................................................159

iv. Failure To Object To Death Sentence As Disproportionate .................160

v. Failure To Object To Improper Victim Impact Evidence During Judicial Sentencing ...........................................................................................161

vi. Failure To Object To Improperly Considered Evidence.......................165

vii. Penalty-Phase Error Cumulative Effect...............................................170

**3. Direct Appeal – Ineffective Assistance Of Counsel**.........................171

**B. Substantive Claims** .................................................................................182

**1. Alabama's Capital Sentencing Process Does Not Violate *Ring v. Arizona***.......................................................................................182

**2. Trial Court Erred By Refusing To Instruct On Lesser Included Offenses**.................................................................................188

i. Refusal To Charge Jury On Voluntary Intoxication And Manslaughter 188

ii. Refusal To Charge Jury on Provocation Manslaughter .........................194

iii. Refusal To Charge Jury on Self-Defense.............................................197

**3. Prosecution's Alleged Interference With Mr. Spencer's Right To Present Evidence In His Defense**.......................................................201

**4. Alabama's Method Of Execution** ...................................................213

**5.** **The Cumulative Effect Of The Alleged Errors Does Not Entitle Mr. Spencer To Habeas Relief** ..................................................214

**IV.** **DISCOVERY & EVIDENTIARY HEARING** ......................................215

**V.** **CONCLUSION** ..........................................................................217

## I. BACKGROUND

### A. Criminal Conduct, Conviction, and Sentence

On July 17, 2004, Birmingham Police Officers Carlos Owen, Harley A. Chisolm III, and Charles R. Bennett were shot and killed while executing an arrest warrant on Nathaniel Woods at an apartment complex where Mr. Woods and Mr. Spencer maintained a drug dealing operation in Ensley, Alabama. *See Spencer v. State*, 58 So. 3d 215, 220–23 (Ala. Crim. App. 2008) ("*Spencer I*"). A fourth Birmingham Police Officer, Michael Collins, was also shot, survived, and testified at Mr. Spencer's trial. *Id.*; *see generally* Docs. 17-22 and 17-23. Mr. Spencer was tried and convicted of capital murder and sentenced to death. *Spencer I*, So. 3d at 254. Likewise, Mr. Woods was tried and convicted of capital murder; the State executed him in 2020. *See id.* at 221 n.3; Case No. 2:16-cv-01758-LSC-JEO, Docs. 50, 51.

Around 10:00 am on the morning of July 17, 2004, Officer Owen notified dispatch that he was getting out of his patrol vehicle to investigate suspicious activity in Ensley on the 1600 block of 18th Street. *Spencer I*, 58 So. 3d at 220; *see, e.g.*, Doc. 17-23 at 5–7. Officer Collins overheard the dispatch call and went to the address identified to provide backup to Officer Owen. *Spencer I*, 58 So. 3d at 220. Officer Collins drove his patrol vehicle to the back of the apartment complex where he saw Officer Owen talking with a then unidentified, Black male through a screened

door. *Id.*; Doc. 17-23 at 9. Officer Collins later learned from Officer Owen that the man behind the screened door was Nathaniel Woods. *Spencer I*, 58 So. 3d at 221.

On scene, Officer Collins witnessed Mr. Woods's behavior toward Officer Owen. Mr. Woods yelled profanities at the officers, including "Fuck the police." *Spencer I*, 58 So. 3d at 220 (quoting Doc. 17-23 at 14). Mr. Woods taunted Officer Owen, saying, "[Y]ou hide behind that badge and gun. I'll fuck you up. Take that badge and gun off, I'll fuck you up." *Id.* (quoting Doc. 17-23 at 17). In response, Officer Owen removed his badge but quickly put it back on when Carolyn Slaughter, a resident of the adjoining apartment, approached. *Id.* at 220. While Ms. Slaughter and Officer Owen talked, Officer Collins saw movement in one of the apartment unit's back windows. *Spencer I*, 58 So. 3d at 221; *see also* Doc. 17-23 at 14–15. Officer Collins was unable to see the person through the glass but heard someone yell "Fuck the police" from the other side of this back window. *Spencer I*, 58 So. 3d at 221 (quoting Doc. 17-23 at 18); Doc. 17-23 at 18–19.

In addition to Mr. Woods, Travis Dumas lived at the apartment on 18th Street as of July 17, 2004. *Spencer I*, 58 So. 3d at 223 (citing Doc. 17-24 at 7–8). Mr. Dumas was one of many State witnesses who testified at Mr. Spencer's trial. Specifically, Mr. Dumas testified that Mr. Woods, Mr. Spencer, and another person he called "the doorman" also lived in the apartment. Doc. 17-24 at 7–8. Mr. Dumas said that he lived there for almost three weeks and was aware of the police presence

in the area, but had not seen officers at the apartment before the morning of the shootings. *Spencer I*, 58 So. 3d at 223. Mr. Dumas testified that people frequently came and went from the apartment because they were selling crack cocaine out of the apartment. Doc. 17-24 at 9. Mr. Dumas was the assistant doorman, which he explained meant that it was his responsibility to control the flow of people coming and going from the apartment, while selling them drugs. *Id.* at 9–10.

Mr. Dumas spent the night of July 16, 2004, at the apartment. *Spencer I*, 58 So. 3d at 223. Mr. Dumas recalled about eight or nine people slept at the apartment that night. Doc. 17-24 at 11. The next morning, Mr. Dumas was awoken by a bang on the front door. Doc. 17-24 at 12; *Spencer I*, 58 So. 3d at 223. Mr. Dumas ran from where he was sleeping towards the back door because he believed that the police were going to raid the home, but he did not leave because there were police officers at the back door. Doc. 17-24 at 12–14. Mr. Dumas made his way back towards the front and saw Mr. Woods standing at that door, arguing with police officers. *Spencer I*, 58 So. 3d at 223. Mr. Dumas also recalled hearing Mr. Spencer yelling at the officers and overheard one officer say that they would "be back." *Id.* (quoting Doc. 17-24 at 22).

Mr. Dumas testified that Mr. Spencer said that he was going to "bust" the officers if they returned, which Mr. Dumas believed to mean "shoot" the officers. *Id.* (quoting Doc. 17-24 at 23). But Mr. Dumas said that he did not take Mr.

Spencer's comment seriously. *Id.* During his testimony, Mr. Dumas identified the SKS rifle used in the shootings on July 17, 2004, as the gun Mr. Spencer bought and live-fired the night before. *Id.* Mr. Dumas recalled that Mr. Spencer "essentially kept it in his possession from the time he purchased it until the shootings the following day." *Id.*

When Officer Collins returned to his patrol vehicle, and having learned Mr. Woods's identity, he entered his name into the onboard computer to determine if there were any open arrest warrants for Mr. Woods. *Id.* at 221. Officer Collins checked city files first before running Mr. Woods's name though the National Crime Information Center ("NCIC") database. Doc. 17-23 at 22–24. Officer Collins's search of the NCIC database indicated that Mr. Woods had an arrest warrant. *See id.*; *see also Spencer I*, 58 So. 3d at 221. Additional testimony adduced and evidence admitted at trial confirmed that Mr. Woods had an active outstanding warrant with the City of Fairfield for assault in the third degree. Doc. 17-15 at 9–10; Doc. 17-24 at 110–11; *see also* Doc. 17-24 at 189 (indicating Mr. Woods's warrant was issued for misdemeanor assault). The officers obtained a printout from the NCIC of the outstanding charges against Mr. Woods along with his photograph. *See* Doc. 17-23 at 38, 102–03, 112; Doc. 17-24 at 136–37.

Officer Collins testified that he, Officer Owen, Officer Bennett, and Officer Chisolm went back to the apartment to execute the arrest warrant. *Spencer I*, 58 So.

3d at 221. Upon arrival, the officers split into groups of two, with Officers Chisolm and Bennett covering the front and Officers Owen and Collins covering the back. *Id.* By the time they reached their positions, Officer Collins remembered that Mr. Woods was waiting for them on the other side of the screened door. *Id.*

Officer Owen told Mr. Woods that he had an active arrest warrant, and Mr. Woods began cursing, denied the existence of a warrant, and demanded to be shown "'the papers.'" *Id.* (quoting Doc. 17-23 at 111); *see also* Doc. 17-23 at 36. Officer Chisolm left his station at the front of the apartment to show Mr. Woods a printed copy of the arrest warrant from the NCIC. *Spencer I*, 58 So. 3d at 221. Mr. Woods again cursed at the three officers before running away from the door and into the apartment. *Id.* Officer Chisolm was the first to pursue Mr. Woods with Officer Owen close behind and Officer Collins further back. *Id.* The officers did not have their service weapons drawn upon entry, and Officer Collins testified that he never saw any officer draw their gun while he was inside the apartment. *Id.* at 222.

When Officer Collins caught up, reaching the apartment's kitchen, Officer Collins saw Officer Chisolm holding Mr. Woods down to place him in handcuffs. *Id.* at 221–22. Officer Collins believed Officer Chisolm had Mr. Woods in custody, as Mr. Woods was yelling: "I give up. I give up. Just don't spray me with that mace." *Id.* at 221–22 (quoting Doc. 17-23 at 41). Officer Collins then heard Officer Bennett, who was waiting by the front entrance of the apartment, radio in confirmation that

"'[t]hey [were] coming out the front.'" *Spencer I*, 58 So. 3d at 222 (quoting Doc. 17-23 at 41).

Mr. Woods, Officer Chisolm, and Officer Owen were blocking Officer Collins's path to the front door, so he went to the back door to run around the perimeter and provide backup to Officer Bennett. *Spencer I*, 58 So. 3d at 222. Just as Officer Collins was approaching the back door, he heard gunshots and "felt a slap on his side" where his weapon remained holstered. *Id.*

After hearing the gunshots, Officer Collins was stunned while trying to find cover and radio-in a "shots fired" call. *Id.*; Doc. 23-17 at 45. Officer Collins was aware that there were bullets coming out the back door of the apartment and ran for cover behind his patrol car. *Spencer I*, 58 So. 3d at 222; Doc. 23-17 at 46. Once barricaded, Officer Collins put out a "double aught" call over the radio. *Spencer I*, 58 So. 3d at 222; Doc. 23-17 at 47. A "double aught" means an officer down and requires precinct-wide assistance, activating a citywide emergency response. *See Spencer I*, 58 So. 3d at 222.

Officer Collins stayed sheltered behind his patrol car as bullets struck his vehicle. *Id.* Officer Collins testified that at one point, he remembered looking towards the apartment and seeing a man shooting towards him from the threshold of the back door. *Id.* Officer Collins identified Mr. Spencer as that man. *Id.* Officer Collins then crawled to the other end of his car and saw that the man in the doorway

was gone. Doc. 17-23 at 50–51. So Officer Collins put out over the radio a description of Mr. Woods and the man from the doorway. *Id.* at 51. Officer Collins suffered a gunshot to his leg, and his holster was damaged, from which he "later found a metal fragment in his pants pocket." *Spencer I*, 58 So. 3d at 222.

Many of the first responders to Officer Collins's double aught call testified at Mr. Spencer's trial, including Officers Hugh Butler, Fred Alexander, and Terrance Hardin, as well as Sergeants Ruben C. Parker and James Blanton. *See id.* at 222–23. Officer Butler testified that when he walked towards the front door of the apartment he saw Officer Bennett lying on the ground with his "'eyes wide open, his pupils . . . blown,'" and "'a hole in his face with a little bit of smoke coming out of it.'" *Id.* at 222 (quoting Doc. 17-23 at 158). And Officer Butler recalled that as he and other officers entered the apartment, they saw both Officers Owen and Chisolm lying on the floor, "pretty obviously dead." *Spencer I*, 58 So. 3d at 222 (quoting Doc. 17–23 at 170); Doc. 17-23 at 160–61; *see also* Doc. 17-23 at 195, 198 (testimony of responding paramedic Thomas Edward Lindsey, Jr.). Officer Butler added that he and the responding officers found an SKS assault rifle outside the front door of the apartment and saw in plain view multiple other weapons located throughout the apartment. *Spencer I*, 58 So. 3d at 222; *see also* Doc. 17-23 at 159–61.

Officer Alexander testified that he radioed in that there was an officer down near the front door and two more officers down inside. *Spencer I*, 58 So. 3d at 222–

23. Officer Hardin testified that he secured the SKS rifle because it was lying on the ground next to Officer Bennett's body and then helped to clear the apartment. *Id.* at 223. Further testimony established that the responding officers made a sweep of the apartment to ensure it was clear before establishing a perimeter around the crime scene both to preserve evidence and limit the geographical search for suspects. *Id.*

While the crime scene was being documented, officer search groups canvassed the neighborhood for the suspects. *Id.* Sergeant James Blanton oversaw one of these groups, heard that another group located a suspect hiding in a neighbor's attic, and went with his group to assist in the arrest. *Id.* Sergeant Blanton identified Mr. Spencer as the man found in the attic and said that he was taken into custody without further incident. *Id.*

That afternoon, Detective Jody Jacobs took a statement from Mr. Spencer after Mr. Spencer knowingly waived his *Miranda* rights. *Id.* at 225. Mr. Spencer initially denied being at the crime scene and having any involvement in the shootings. *Id.* Mr. Spencer explained that he was hiding in that attic only because he had two outstanding arrest warrants and didn't want to go to jail and was aware that there were officers canvassing the neighborhood. *Id.* However, Mr. Spencer's recollection of events changed after he learned that an eyewitness identified him as the gunman. *Id.* After recounting his version of the day's events, Mr. Spencer confessed to shooting Officers Owen, Chisolm, and Bennett. *Id.* Mr. Spencer also

admitted to detectives that before fleeing the apartment, he went to the back of the apartment and fired additional rounds towards an officer taking cover by his police car. *Id.*

At trial, Mr. Spencer testified in his own defense. *Id.* at 226–28; Doc. 17-27 at 152–202; Doc. 17-28 at 3–24. After providing his recollection of the morning encounter with police officers, Mr. Spencer told the jury that because of the police scrutiny, he and Mr. Woods had decided not to sell any drugs that day. Doc. 17-27 at 163–81; *Spencer I*, 58 So. 3d at 226–27. Mr. Spencer testified that instead, he and Mr. Woods had planned to wait for the police shift change and leave the apartment at 3:00 p.m. to avoid being seen by the police. Doc. 17-27 at 182; *Spencer I*, 58 So. 3d at 227. Mr. Spencer said that while he waited, he fell asleep. Doc. 17-27 at 182; *Spencer I*, 58 So. 3d at 227. Mr. Spencer testified that, while he was sleeping, his SKS rifle was next to his leg. Doc. 17-27 at 182–83; *Spencer I*, 58 So. 3d at 227. Mr. Spencer also testified that he took a Seroquel and drank a beer around ten in the morning as a sleep aid. Doc. 17-27 at 185–86; *Spencer I*, 58 So. 3d at 227.

Mr. Spencer testified that he was awoken by a "commotion" in the apartment. Doc. 17-27 at 188; *Spencer I*, 58 So. 3d at 227. According to Mr. Spencer, he got up and went to the window to see what was going on and saw the police had returned. Doc. 17-27 at 188–89; *Spencer I*, 58 So. 3d at 227. So Mr. Spencer grabbed his SKS and walked out of the bedroom just as Mr. Woods ran towards him, holding his face

14

in pain. *Spencer I*, 58 So. 3d at 227. According to Mr. Spencer, he heard something behind him and turned around. *Id.* Mr. Spencer later testified that he thought it was Officer Chisolm with his gun, so he "automatically opened fire." *Id.* (quoting Doc. 17-27 at 191).

Mr. Spencer testified that he then turned to the front door, saw another officer standing there, and shot the officer. *Id.* Mr. Spencer explained this decision to the jury as "a split second decision" because that he did not "ha[ve] time to" discern whether this officer would "shoot [him]." Doc. 17-27 at 192; *Spencer I*, 58 So. 3d at 227. So Mr. Spencer admitted to having "opened fire" but testified that it was because the officer "pulled his gun up and [Mr. Spencer] already had the weapon in [his] hand." Doc. 17-27 at 192; *Spencer I*, 58 So. 3d at 227. Mr. Spencer testified that he did not stop shooting until all the officers inside the apartment were down because he thought they would kill him based on their threats during the earlier confrontation. Doc. 17-27 at 192–93; *Spencer I*, 58 So. 3d at 227.

Mr. Spencer testified that he next went to the back door, where he saw a gun on the ground next to one of the officers. *Id.* Mr. Spencer said he picked this gun up and put it in his pocket because he did not want to be shot in the back and was unsure whether the officer was still alive. *Id.* Mr. Spencer recalled then standing in the back door watching Officer Collins run to his patrol car, and Mr. Spencer testified that he

15

allowed Officer Collins to take cover before firing "a couple of rounds into his windshield." *Id.* at 227–28 (quoting Doc. 17-27 at 197).

Mr. Spencer then testified that he carefully ran towards the front door with his SKS pointing down towards the floor. *Id.* at 228; Doc. 17-27 at 197−99. Mr. Spencer testified that Officer Bennett was lying on the ground near the front door and when Mr. Spencer passed him to leave, Officer Bennett's hand "'jumped and touched'" Mr. Spencer. *Spencer I*, 58 So. 3d at 228 (quoting Doc. 17-27 at 199). Mr. Spencer testified that this was why he fired his SKS again, calling his reaction an "automatic reflex." *Id.* (quoting Doc. 17-27 at 199). Mr. Spencer testified that he then dropped the rifle and fled. *Id.*

Mr. Spencer testified that he did not intentionally kill any of the officers, but shot them because he believed he would have been killed if he had not. *Id.* Mr. Spencer testified that he could have easily killed Officer Collins as he ran to his car but did not perceive him as a threat, so he allowed the officer to find cover before shooting at Officer Collins so that he could escape the scene. *Id.* Mr. Spencer testified that both he and Mr. Woods ran to a neighboring house where Mr. Spencer was found and arrested and, until he moved to hide in the attic, watched television with the homeowner. *Id.* Mr. Spencer's recollection of events ended with his testimony about hiding in the neighbor's attic until he surrendered to the police. *Id.*

On June 19, 2005, Mr. Spencer was convicted of four counts of capital murder and one count of attempted murder. *Id.* at 219; Doc. 17-28 at 155–56; *see also* Ala. Code §§ 13A–5–40(a)(5), (10); 13A–6–2; 13A–4–2 (1975). Specifically, the jury found Mr. Spencer guilty of three counts of capital murder for intentionally shooting and killing the three on-duty Birmingham police officers: Officers Owen, Chisolm, and Bennett. Doc. 17-28 at 155–56; *Spencer I*, 58 So. 3d at 219. The jury also found Mr. Spencer guilty of a fourth capital offense because he committed these three murders "by one act or pursuant to one scheme or course of conduct." *Spencer I*, 58 So. 3d at 219 (citing Ala. Code § 13A–5–40(a)(10) (1975)). The jury also convicted Mr. Spencer of one count of attempted murder for intentionally shooting at Officer Collins. *Id.*

After Mr. Spencer was convicted on all charges, the penalty phase of his trial began. *Id.* at 219–20. After opening arguments, the trial court granted the State's motion to incorporate for consideration during the penalty phase all the evidence presented during the guilt phase of trial. Doc. 17-1 at 110. Using this evidence, the State presented four aggravating circumstances: (1) the capital offense was committed to avoid or prevent a lawful arrest or to bring about an escape from police custody; (2) the capital offense was committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of law; (3) Mr. Spencer knowingly created a great risk of death to many persons; and (4) Mr. Spencer

intentionally caused the death of two or more persons pursuant to one scheme or course of conduct. *Id.* In mitigation, defense counsel presented testimony from Mr. Spencer's mother and uncle concerning Mr. Spencer's familial background, his non-violent character, and his family's personal pleas for mercy. *Id.* at 120; Doc. 17-28 at 176–82.

After closing arguments, the trial court charged the jury and dismissed them for deliberation. Doc. 17-1 at 120–21. The jury deliberated for more than two days and returned with the recommendation that Mr. Spencer receive a sentence of life without the possibility of parole on all four capital charges. *See* Doc. 17-29 at 18–33; Doc. 17-1 at 121. Specifically, the jury recommended that Mr. Spencer receive life without parole by a vote of nine for life without parole and three for death for murdering Officer Owen; by a vote of ten for life without parole and two for death for murdering Officer Chisolm; and recommended life without the possibility of parole by a vote of nine for life without parole and three for death for murdering Officer Bennett. *See Spencer I*, 58 So. 3d at 219–20; Doc. 17-28 at 33–34. The jury then recommended by a vote of seven for life without parole and five for death that Mr. Spencer receive life without parole for intentionally killing two or more individuals during the same course of conduct. *Spencer I*, 58 So. 3d at 220.

Pursuant to Alabama law, the trial court conducted a separate sentencing hearing. Doc. 17-1 at 102, 112. The trial court incorporated for consideration all

evidence presented during the guilt and penalty phases of trial, and the State and defense presented additional testimony. *Id.*

Specifically, the State presented victim-impact testimony from several witnesses and victim family members. *Id.* During their testimony, these witnesses offered their opinions about appropriate punishment. *Id.* at 112. The State also called to the stand Belinda Rushton (the custodian of records for the Birmingham Municipal Court) who identified multiple outstanding arrest warrants for Mr. Spencer from the City of Birmingham that were pending at the time of the murders, which warrants were admitted into evidence. *Id.* at 112, 123. The Alabama Board of Pardons and Paroles prepared a presentence report, which was made a part of the record. *Id.* at 112; Doc. 17-3 at 65–82.

To develop evidence about aggravating circumstances, the State called Fred Floyd to testify that he (along with five other people, including a child) was at a nearby barber shop at the time of the shootings. Doc. 17-1 at 122; *see* Doc. 17-29 at 44–51. Floyd testified that in reaction to the shootings, he grabbed the child and dropped to the floor of the shop along with the other customers. Doc. 17-1 at 122. The State also called Priscilla Patrick, who testified that she lived three blocks from the crime scene. *Id.* Ms. Patrick testified that she and a friend were walking up the alley behind the apartments when they heard gunfire and that they ran back to Ms. Patrick's residence. *Id.* at 122–23.

The State then called Betty Celipsey, whose home is directly behind the back of the apartment and next door to the church that was struck by one of the bullets from Mr. Spencer's rifle. *Id.* at 123. Ms. Celipsey testified that she was on the phone with her daughter when she heard the gunshots and went to her back door to look outside. *Id.* Ms. Celipsey saw a police officer standing behind a police car, so she closed her door and called her sister to tell her to lock her doors because "they were shooting at the police." *Id.*

Next, defense counsel called Mr. Spencer, where he apologized to the victims' families for his actions. Doc. 17-1 at 112. Defense counsel offered several exhibits in mitigation, including a document prepared by the Alabama Prison Project and Dr. Allen Shealy's report on his psychological evaluation of Mr. Spencer. *Id.* Dr. Shealy's report indicated that Mr. Spencer's IQ was 97 and within the average range of intelligence in the United States. *Id.* at 102. The trial court considered all the evidence before making its sentencing decision. Doc. 17-35 at 10–19; *see, e.g.*, Doc. 17-1 at 102, 126.

On September 23, 2005, the trial court sentenced Mr. Spencer to death for his capital murder convictions. Doc. 1 at 4; Doc. 17-1 at 105–06 (Original Sentencing Order). The trial court explained that the evidence established three statutory aggravating circumstances because Mr. Spencer (1) "intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct,"

Ala. Code § 13A–5–49(9); and because Mr. Spencer committed these capital offenses (2) "for the purpose of . . . preventing a lawful arrest or effecting an escape from custody," Ala. Code § 13A–5–49(5); and, (3) "to disrupt or hinder the lawful exercise of any government function or the enforcement of laws," Ala. Code § 13A–5–49(7). Doc. 17-1 at 103–04 (Original Sentencing Order); *see also* Doc. 17-1 at 124–25 (First Amended Sentencing Order); Doc. 17-35 at 2–3 (Second Amended Sentencing Order); Doc. 17-35 at 10–11 (Third Amended Sentencing Order).

The trial court found two statutory mitigating circumstances: Mr. Spencer's "age at the time of the crime[s]" and his lack of "significant history of prior criminal activity." Ala. Code §§ 13A–5–51(7) and (1); Doc. 17-1 at 125–26; Doc. 19 at 7; Doc. 17-35 at 12–13. And the trial court recited non-statutory mitigating evidence, including Mr. Spencer's background and the jury's recommendation of life without the possibility of parole. Doc. 17-1 at 126; Doc. 17-35 at 5–6; Doc. 17-35 at 13–14. The trial court weighed the aggravating and mitigating circumstances and found "beyond a reasonable doubt and to a moral certainty that the aggravating circumstances outweigh the mitigating circumstances." Doc. 17-1 at 126; Doc. 17-35 at 8–9; *see* Doc. 17-35 at 18–19.

The trial court explained that it assigned great weight to the killing of three police officers, particularly "in light of the circumstances of [their] murders. . . and the societal gravity associated with killing law enforcement officers operating within

21

their appointed duties of protecting citizens and enforcing the law," as recognized by the legislature in its "provision making such murders capital . . . in contemplation of the same." Doc. 17-35 at 18. The trial court overrode the jury's recommendation and sentenced Mr. Spencer to death. Doc. 17-1 at 105–06, 127; Doc. 17-35 at 9; Doc. 17-35 at 19.

## B. Procedural History

Mr. Spencer appealed his conviction and death sentence to the Alabama Court of Criminal Appeals. *See Spencer I*, 58 So. 3d at 215, 220. The appeals court affirmed Mr. Spencer's capital convictions but twice remanded the case for the trial court to clarify its findings about nonstatutory mitigating circumstances and its decision to override the jury's sentencing recommendation. *Id.* at 248–54. The trial court issued amended sentencing orders on May 15, 2008, and March 30, 2009.[2] *Id.*; *see* Doc. 17-35 at 2–19. On return from the second remand, the appeals court affirmed Mr. Spencer's death sentence and denied rehearing. *Spencer I*, 58 So. 3d at 215, 259.

Mr. Spencer sought further appellate review. On September 17, 2010, the Alabama Supreme Court denied certiorari without opinion. Doc. 17-36 at 79. On June 20, 2011, the United States Supreme Court also denied certiorari; that Court

---

[2] Shortly after the original sentencing order, the trial court issued an amended scheduling order in October 2005. *See generally* Doc. 17-1 at 108–27. That amended sentencing order was before the appeals court.

denied Mr. Spencer's application for rehearing on August 15, 2011. *Spencer v. Alabama*, 564 U.S. 1022 (2011); *denying reh'g*, 564 U.S. 1059.

On September 16, 2011, Mr. Spencer filed a post-conviction petition in the Circuit Court of Jefferson County (the "Rule 32 court") under Alabama Rule of Criminal Procedure 32. *See* Doc. 1 at 5; Doc. 17-37 at 169. At the request of defense counsel, the Rule 32 court twice granted Mr. Spencer leave to amend his petition. Doc. 1 at 5; *see* Doc. 17-41 at 43–44. On August 20, 2012, Mr. Spencer filed his second amended Rule 32 petition, and, on October 24, 2012, the State answered. Doc. 1 at 5; *see, e.g.*, Doc. 17-40 at 13–180; Doc. 17-41 at 46–113. Mr. Spencer also filed motions for discovery and an evidentiary hearing that the State opposed. *See* Doc. 1 at 5; *see, e.g.*, Doc. 17-41 at 119–78.

On July 5, 2013, the Rule 32 court summarily dismissed Mr. Spencer's second amended Rule 32 petition and denied Mr. Spencer's discovery and evidentiary hearing requests, holding that Mr. Spencer had not met the requirements of Rules 32.2, 32.3, 32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure. Doc. 1 at 6; Doc. 17-37 at 67–149.

On February 6, 2015, the Alabama Court of Criminal Appeals affirmed that summary dismissal. *Spencer v. State*, 201 So. 3d 573, 623 (Ala. Crim. App. 2015) ("*Spencer R.32*"). The appeals court determined that the claims in Mr. Spencer's petition were insufficiently pleaded, did not present a material issue of fact or law,

or were otherwise procedurally defaulted. *Id.* at 588–623; *see also* Rules 32.2, 32.3, 32.6(b), 32.7(d), Ala. R. Crim. P. The appeals court also affirmed the denial of Mr. Spencer's requests for an evidentiary hearing and discovery. *See generally Spencer R.32*, 201 So. 3d 573 (Ala. Crim. App. 2016); *id.* at 581–82, 585–86.

Mr. Spencer again sought a writ of certiorari in the Alabama Supreme Court. Doc. 1 at 6; Doc. 18 at 3.[3] The Alabama Supreme Court denied certiorari without opinion on February 19, 2016. *See* Doc. 1 at 6.

On November 21, 2016, Mr. Spencer timely filed his habeas petition in this court. Doc. 1. The respondent filed his answer and brief on August 21, 2017. Docs. 18, 19. And on November 20, 2017, Mr. Spencer filed his reply. Doc. 21.

## II.   STANDARD OF REVIEW

This action is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011).

Under Section 2254(a), a federal district court is prohibited from entertaining a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court" unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims

---

[3] Mr. Spencer also requested to supplement this petition because of the intervening Supreme Court's decision in *Hurst v. Florida*, 577 U.S. 92 (2016), which invalidated Florida's death-penalty statute concerning judicial override. *See* Doc. 1 at 6.

of "an alleged defect in a [state] collateral proceeding" or related to a "state's interpretation of its own laws or rules" are not a basis for federal relief under Section 2254. *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325–26 (11th Cir. 2010) (internal quotation marks and citations omitted).

## A.    Sections 2254(d) and (e)

AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks and citation omitted). To grant habeas relief, this court must find not only that the constitutional claims are meritorious, but also that the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1–2); *see also Boyd v. Allen,* 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting Section 2254(d)).

The petitioner bears the burden to establish that a habeas claim triggers Section 2254(d)(1) or (d)(2). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). "[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791

(11th Cir. 2006). A state court's decision is contrary to "clearly established precedents if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005).

On the other hand, to determine whether a state court's decision is an "unreasonable application" of clearly established federal law, "[t]he pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "For purposes of [Section] 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself." *Id.* "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (internal quotation marks omitted) (quoting *Yarborough*, 541 U.S. at 664).

Whether a state court's application of federal law was unreasonable involves a "substantially higher threshold" than a correctness threshold. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "Ultimately, before a federal court may grant habeas relief under [Section] 2254(d), 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Guzman*, 663 F.3d at 1346 (quoting *Harrington*, 562 U.S. at 103). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, [Section] 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Finally, a state court's factual determination is presumptively correct under Section 2254(e)(1). "[T]he petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward v. Hall*, 592 F.3d 1144, 1155–56 (11th Cir. 2010) (alterations in original) (quoting 28 U.S.C. § 2254(e)(1)).

Additionally, a habeas petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S. 849, 856 (1994). "[T]he petition must 'specify all the grounds for relief available to the

petitioner' and 'state the facts supporting each ground.'" *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Rules Governing § 2254 Cases, Rule 2(c)).

The burden of proof is on the habeas petitioner "to establish his right to habeas relief" by "prov[ing] all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008).

**B.      The Procedural Default Doctrine**

Under Section 2254, federal habeas petitioners must exhaust all state remedies. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). This means that "'[s]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary.'" *Pruitt v. Jones*, 348 F.3d 1355, 1358–59 (11th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

"[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (quoting *Anderson v. Harless*, 459 U.S. 4, 5–6 (1982)). "[A]n issue is exhausted if the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation to be the same as it was

presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (alterations in original) (internal quotation marks and citation omitted).

If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits. *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). A "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward*, 592 F.3d at 1156. (internal quotation marks omitted) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). And "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgement or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

In federal court, "a state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon 'adequate and independent' state grounds." *Ward*, 592 F.3d at 1156 (quoting *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995)).

The Eleventh Circuit has created a "three-part test" to determine whether "a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Id.* (internal quotation marks omitted) (quoting *Judd*, 250 F.3d at 1313). Specifically, the Eleventh Circuit has instructed that a procedural ruling rests on

"'adequate and independent' state grounds" when: (1) the last reasoned state court judgment in the case "clearly and expressly'" states the court relies on "state procedural rules to resolve the federal claim" and does so "without reaching the merits of that claim"; (2) when the state court's decision rests entirely on state law grounds and is not "intertwined with an interpretation of federal law"; and (3) when the state procedural rule invoked is "adequate, *i.e.*, firmly established and regularly followed" which is satisfied when the state rule has not been applied either "arbitrarily," or in an "unprecedented" manner. *Id.* at 1156–57 (internal quotation marks omitted).

Sometimes the doctrines of procedural default and exhaustion intertwine. For instance, if a federal petitioner's claim is unexhausted, a district court may dismiss it without prejudice or stay the cause of action to allow the petitioner to avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519–20 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999).

The procedural default doctrine is subject to equitable exceptions. "[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the

default and prejudice attributable thereto[] or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (internal quotation marks and citation omitted).

The "cause and prejudice" exception requires a petitioner to prove both cause and prejudice. *Id.* at 750. To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Objective factors that constitute cause include 'interference by officials' that makes compliance with the State's procedural rule impracticable, . . . 'a showing that the factual or legal basis for a claim was not reasonably available to counsel[,]'" as well as "constitutionally '[i]neffective assistance of counsel.'" *McCleskey v. Zant*, 499 U.S. 467, 493–94 (1991) (quoting *Murray*, 477 U.S. at 488). "Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default." *Id.* To show prejudice, a habeas petitioner must evince "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

Finally, a petitioner may escape a procedural default if he "can demonstrate a sufficient probability that [this court's] failure to review his federal claim will result

in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). To make such a showing, a petitioner must establish that either: (1) "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537 (1986) (quoting *Carrier*, 477 U.S. at 496), or (2) the petitioner shows "by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

## C.  Burden of Proof and Heightened Pleading Requirements

Federal habeas "exists only to review errors of constitutional dimension." *McFarland*, 512 U.S. at 861 (O'Connor, J., concurring in part and dissenting in part); *see also* 28 U.S.C. § 2254(a). Further, "[w]hen the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Two consequences flow from these rules.

*First*, the habeas petitioner bears the burden of (1) overcoming the presumption of "legality" that attaches to the state court conviction and sentence, and (2) establishing a factual basis to demonstrate that federal postconviction relief should be granted. *See, e.g.*, 28 U.S.C. §§ 2254(d), (e)(1); *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983) ("The burden of proof in a habeas proceeding is always

on the petitioner.").

*Second*, the habeas petitioner must meet "heightened pleading requirements." *McFarland*, 512 U.S. at 856; *Borden v. Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (holding that Section 2254 requires "fact pleading," and not merely "notice pleading"). The mere assertion of a ground for relief, without sufficient factual detail, does not satisfy the petitioner's burden of proof under Section 2254(e)(1), nor the requirements of Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts. *See also* 28 U.S.C. § 2242 (stating that an application for writ of habeas corpus "shall allege the facts concerning the applicant's commitment or detention").

A habeas petitioner must include in his statement of each claim supporting facts sufficient to justify a decision for the petitioner if the alleged facts are proven true. *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes to Rule 4, Rules Governing § 2254 Cases) (observing that a habeas petition must "state facts that point to a 'real possibility of constitutional error'").

**D.  Claims Dismissed Pursuant to Rules 32.3, 32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure**

Rule 32.3 of the Alabama Rules of Criminal Procedure provides:

> The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the

petitioner shall have the burden of disproving its existence by a preponderance of the evidence.

Ala. R. Crim. P. 32.3. Further, Rule 32.6(b) of the Alabama Rules of Criminal Procedure mandates:

> Each claim in the [Rule 32] petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.

Ala. R. Crim. P. 32.6(b). Finally, Rule 32.7(d) of the Alabama Rules of Criminal Procedure allows summary disposition of a state habeas petition if:

> the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.

Ala. R. Crim. P. 32.7(d).

"A ruling by an Alabama court under Rule 32.6(b) is also a ruling on the merits." *Borden*, 646 F.3d at 812. Under AEDPA, when a claim has been dismissed by the Alabama Court of Criminal Appeals ("ACCA") pursuant to Rule 32.6(b), federal habeas review is limited to an "examin[ation of] the reasonableness of the [ACCA's] adjudication of [a petitioner's] claims based upon the allegations

34

contained in his [Rule 32] Petition." *Id.* at 816–17 (citing *Cullen*, 563 U.S. at 181) ("We now hold that review under [Section] 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

Rule 32.6(b) includes a "heightened pleading requirement—fact pleading," *id*. at 810, and "[t]he burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one." *Hyde v. State*, 950 So. 2d 344, 356 (Ala. Crim. App. 2006).

"Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b)." *Id.* A petitioner must include "[t]he *full* factual basis for the claim" in his Rule 32 state postconviction petition. *Id.* And if the reviewing court, after assuming each fact to be true, cannot determine if relief is warranted, then the petitioner has not satisfied the burden of pleading under Rules 32.3 and 32.6(b). *Id.*

## E. Ineffective Assistance of Counsel

"[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134 (1982). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466

U.S. 668, 686 (1984). "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696.

"*Strickland* . . . provides the standard for inadequate assistance of counsel under the Sixth Amendment." *Premo v. Moore*, 562 U.S. 115, 118 (2011). "To establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.'" *Id.* at 121 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010). *Strickland* recognizes that it is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." 466 U.S. at 689.

"To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness," and "[a] court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 688–89). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Id.* at 105 (quoting *Strickland*, 466 U.S. at 690). This standard is "highly deferential," *id.* (internal quotes omitted), to the extent that "a petitioner must establish that no competent

counsel would have taken the action that his counsel did take," *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (*en banc*).

"To establish prejudice, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.'" *Knowles*, 556 U.S. at 127 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694).

"Establishing that a state court's application of *Strickland* was unreasonable under [Section] 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. This is because of the interplay between *Strickland* and Section 2254(d) that results in "double deference" on federal habeas review, which "is doubly difficult for a petitioner to overcome." *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011).

"The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Harrington*, 562 U.S. at 105. Thus, "[w]hen [Section] 2254(d) applies, the question is not whether counsel's actions were reasonable[, but] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Because Mr. Spencer has "invok[ed] one complete round of [Alabama's] established appellate review process," he has exhausted his state court remedies as

required by 28 U.S.C. § 2254(b)(1). *O'Sullivan*, 526 U.S. at 845; *see Smith v. Jones*, 256 F.3d 1135, 1141 (11th Cir. 2001); *Pruitt*, 348 F.3d at 1359. The court explains below the few instances of procedural default as appropriate.

## III. ANALYSIS

### A. Ineffective Assistance Of Counsel Claims

Mr. Spencer asserts that he is entitled to habeas relief because his trial counsel provided ineffective representation during the guilt and sentencing phases of his trial, and his appellate counsel was ineffective on direct appeal. *See* Doc. 1 at 6–128; Doc. 17-40 at 15–160. Mr. Spencer asserts fifteen reasons why his counsel was ineffective during his guilt phase and seven reasons why his counsel was ineffective at sentencing.

Mr. Spencer presented his ineffectiveness claims to the Rule 32 court in his second amended Rule 32 petition. *See generally* Doc. 17-40 at 15–160. That court dismissed those claims, and Mr. Spencer appealed. *See* Doc. 17-37 at 67–107; Doc. 17-45 at 33–160. The Alabama Court of Criminal Appeals affirmed, and Mr. Spencer now asserts that that affirmance violated Sections 2254(d)(1) and 2254(d)(2). *See Spencer R.32*, 201 So. 3d 573; Doc. 21 at 11–92.

1. Guilt Phase Ineffectiveness

The court discusses in turn each of the fifteen claims of guilt-phase ineffective assistance of counsel that Mr. Spencer raises.

At the outset, the court observes that Mr. Spencer's habeas petition fails to properly plead his *Strickland* claims in accordance with Rule 2(c) of the Rules Governing Section 2254 Petitions. Specifically, Mr. Spencer does not plead which subsection of Section 2254 entitles him to habeas relief. *See* Doc. 1 at 6–128. Instead, he relies on his reply brief to explain why he believes the state courts' adjudications of his *Strickland* claims violate Section 2254(d). *Compare* Doc. 1 at 6, *with* Doc. 21 at 11–92.

Nevertheless, as explained below, Mr. Spencer has failed to demonstrate that the affirmance of the dismissal of his Rule 32 petition was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C § 2254(d)(1). Nor has Mr. Spencer demonstrated that the ACCA ruling rested on an unreasonable determination of the facts presented. *See id.* § 2254(d)(2).

i.    *Failure To Object to Prejudicial Atmosphere*

Mr. Spencer alleges that his trial counsel undermined his right to a fair trial "by failing to litigate adequately pre-trial motions which sought to prohibit an institutional effort by the Birmingham Police Department to have uniformed police officers attend Mr. Spencer's trial in overwhelming numbers." Doc. 1 ¶ 23.

In February 2005, Mr. Spencer filed a pretrial motion to preclude law enforcement officers from wearing their uniforms to watch the trial because such a presence would create undue influence and pressure on jurors. *Id.* ¶ 24. The trial

court denied that motion but commented, "[I]f they bring 150 officers up here and want to fill up the courtroom, that's a different matter." *Id.* (citing Doc. 17-20 at 156–57).

Approximately two months later, Mr. Spencer filed another pretrial motion after his counsel purportedly obtained an internal Birmingham Police Department memo describing an "overwhelming police presence" that would fill the courtroom in addition to a visible presence outside the courthouse during trial. *Id.* ¶ 25 (quoting Doc. 17-3 at 30). At the hearing on that motion, the State argued that the memo was a hoax, while Mr. Spencer's trial counsel argued that he had obtained it from a confidential source with whom he had a recorded conversation. *Id.* ¶ 26. The case agent for Mr. Spencer's trial investigated the memo and "concluded that the memo was fraudulent based on having asked supervisors at all Birmingham police precincts whether they had seen, authorized, or disseminated it[.]" *Id.* The trial court listened to the recording *in camera* and declined to preclude the attendance of police spectators absent evidence the tape was authentic. *Id.* Mr. Spencer's trial counsel stated that he would rather withdraw the motion than reveal his source, settling for no ruling on the motion. *Id.*

Mr. Spencer asserts that "[e]ven though the threat in the memo came to fruition when trial commenced, [Mr. Spencer's] counsel made no other motion, objection, or comment about the prevalence of police spectators during the trial." *Id.*

¶ 28. He further asserts that "[t]he culpability phase was affected because the conspicuous presence of hordes of uniformed police told jurors deciding whether Mr. Spencer was guilty of capital murder . . . two, equally damaging, things — that he was exceptionally dangerous and guilty." *Id.*

According to Mr. Spencer, "[d]uring post-conviction interviews, deliberating juror, L. Burks, recalled seeing many police officers present in the courtroom for each day of the trial." *Id.* ¶ 29. And "Juror V. Raby recalled that police were present in the courtroom every day, but packed the courtroom, standing along the courtroom walls, on the day the jury announced its life recommendation." *Id.* Finally, Mr. Spencer alleges that "[t]he sentencing phase of [his] trial was also affected because . . . police presence ensured that the trial court would override the jury's life recommendation." *Id.*

Mr. Spencer raised this issue during his Rule 32 proceedings, and the ACCA wrote:

> First, Spencer argues that his trial counsel was ineffective for failing to ensure that he was not tried in an "overwhelmingly prejudicial atmosphere." (Spencer's brief, at 20.) Specifically, Spencer argues that he was prejudiced by the presence of numerous uniformed police officers in the courtroom during his trial.
>
> The circuit court stated the following when summarily dismissing this claim:
>
>> "While Spencer sets forth in great detail in the second amended Rule 32 petition his claim that an

internal police memorandum was sent out requesting an overwhelming police presence during Spencer's trial, Spencer fails to specifically plead that this police presence actually occurred during his trial. All Spencer alleges is that juror [L.B.] recalled seeing many police officers during trial and that juror [V.R.] recalled that police were present in the courtroom every day. Spencer does not set forth with any specificity the number of officers that were in the courtroom, whether the officers were in uniform, or whether the officers were armed. Spencer has not shown with specificity that the performance of his attorneys was deficient or that he was prejudiced by counsel's conduct.

> "Spencer also alleges that the police presence caused the trial court to override the jury's life without parole jury recommendation. An evidentiary hearing is not required where the police presence did not cause this Court to override the jury's life without parole sentence recommendation. In fact, this Court finds that there was not an overwhelming police presence in the courtroom during Spencer's trial."

(C. 87–88.)

The record of Spencer's trial shows that defense counsel filed a pretrial motion requesting that officers who would attend the trial as spectators be ordered not to appear in the courtroom in their uniforms. (Trial C. 352.) The State responded:

> "At this juncture, it is unknown whether or not the courtroom will be 'full' of uniformed officers, as [Spencer] speculates. Should it become necessary to diffuse what may appear to be an undue number of uniformed officers, this Honorable Court has the discretion to grant [Spencer's] motion should it become necessary to minimize the number of

uniformed officers in the courtroom at that time or to disperse them throughout the courtroom should they be seated as a group."

(Trial C. 375.) The trial court then ruled:

"I'm not going to tell a uniformed officer who is on duty that comes up here to listen to the testimony for some period of time that he cannot come into the courtroom with his uniform on. I just don't think that would be—now, if they bring 150 officers up here and want to fill up the courtroom, that's a different matter. As a general rule, I'm not going to get involved in ordering people they can't show up with a uniform on."

(Trial R. 246–47.)

In the order dismissing Spencer's postconviction petition, the circuit judge specifically found that, based on his personal knowledge of the trial, there had not been an overwhelming police presence in the courtroom. "A circuit court may summarily dismiss a Rule 32 petition without an evidentiary hearing if the judge who rules on the petition has 'personal knowledge of the actual facts underlying the allegations in the petition' and 'states the reasons for the denial in a written order.'" *Ex parte Walker,* 800 So. 2d 135, 138 (Ala. 2000) (quoting *Sheats v. State,* 556 So. 2d 1094, 1095 (Ala. Crim. App. 1989)).

Moreover, the United States Supreme Court in *Holbrook v. Flynn,* 475 U.S. 560, 571–72, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986), noted the inherent problems that arise when a "roomful" of armed uniformed guards are in a courtroom. Later, the Supreme Court in *Carey v. Musladin,* 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006), noted the distinction between the presence of uniformed guards versus the presence of uniformed spectators.

"In contrast to state-sponsored courtroom practices, the effect on a defendant's fair-trial rights of the spectator conduct to which [the defendant] objects is an open question in our jurisprudence. This Court has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial....

"Reflecting the lack of guidance from this Court, lower courts have diverged widely in their treatment of defendants' spectator-conduct claims."

549 U.S. at 76 (footnote omitted).

Recently, this Court in *Jackson v. State,* 169 So. 3d 1 (Ala. Crim. App. 2010) (opinion on return to remand), recognized that the presence of a large number of uniformed spectators may deprive a defendant of a fair trial. Adopting the analysis used by the United States Court of Appeals for the Eleventh Circuit in *Woods v. Dugger,* 923 F.2d 1454 (11th Cir. 1991), this Court stated:

"*Woods v. Dugger* was clearly specific to its circumstances. The case involved the presence of a large number of uniformed probation officers following the death of a probation officer. The Court looked to the record and found that, based on the extensive pretrial publicity, the voir dire questioning, as well as the specific circumstances of the small community involved, the presence of the uniformed officers had deprived Woods of a fair trial.

"....

"Here, there is no indication in the record that a large number of officers were present or of any prejudicial effect or influence caused by the presence of any officers. Moreover, there was no

44

objection by Jackson as to the presence of the officers; although this does not preclude review on appeal, it does weigh against a finding of prejudice. *See Ex parte Jackson,* 68 So. 3d 211, 213–14 (Ala. 2010). As previously stated, there was no showing of undue prejudice caused by pretrial publicity. *See* Issue XXXIV. The jury was necessarily aware that the victims were police officers who were on duty at the time of the offense. *See Centobie v. State,* 861 So. 2d 1111, 1127 (Ala. Crim. App. 2001) ('Considering the fact that the appellant was charged with the capital offense of killing a police officer, along with overpowering, kidnapping, and beating two law-enforcement officers and shooting a third officer, we conclude that allowing an "additional" number of law-enforcement officers to be seated in the courtroom was not an abuse of the trial court's discretion. No plain error occurred in this regard.')."

*Jackson,* 169 So. 3d at 105 (opinion on return to remand).

The State asserted in its answer to Spencer's second amended petition that "Spencer does not set forth facts to support his claim that there was a prejudicial atmosphere during his trial nor does Spencer allege that he was prejudiced by this atmosphere, as is required by *Strickland v. Washington,* 466 U.S. 668 (1984)." (C. 860.) This Court agrees. Not only did Spencer fail to plead how many and when uniformed officers were present in the courtroom, he failed to plead how he was prejudiced by the presence of those uniformed police officers. Spencer failed to plead facts, such as those discussed in *Jackson,* that would entitle him to relief on this claim. Thus, the circuit court correctly summarily dismissed this claim pursuant to Rule 32.6(b), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 587–89.

Mr. Spencer argues that this "decision was an unreasonable application of clearly established federal law and an unreasonable factual determination." Doc. 21 at 17. According to Mr. Spencer, "the CCA's decision was an unreasonable application because, to state this type of *Strickland*, claim, Mr. Spencer was only required to allege that his counsel's failure to pursue well-founded objections to violations of his right to a fair trial prejudiced him." *Id.* And, Mr. Spencer alleges, "[g]iven the specificity with which Mr. Spencer asserted the claim, the CCA's decision to the contrary was objectively unreasonable." *Id.* at 18. Mr. Spencer claims that he "met his pleading burden, by alleging that, due to counsel's failure to renew pre-trial objections, the large number of police officers present during his trial were intended to and did negatively influence jurors who saw them." *Id.* at 17. And he claims that "he identified two jurors who were so influenced." *Id.* So, Mr. Spencer concludes, "[i]n this case, the CCA's rejection of Mr. Spencer's claim was based on an unreasonable failure to consider the entire record before the court." *Id.* at 18.

Mr. Spencer has not established that the ACCA unreasonably interpreted the law in deciding this issue. In his petition, Mr. Spencer cites *Sheppard v. Maxwell*, 384 U.S. 333 (1966), *Irvin v. Dowd*, 366 U.S. 717 (1961), *Smith v. Phillips*, 455 U.S. 209 (1982), and *Rideau v. Louisiana*, 373 U.S. 723 (1963), and argues that his trial was unfair and violated his due process rights, because of the "considerable" media coverage his case received. *See* Doc. 1 ¶¶ 47–48. In those cases, defendants were

denied due process when a trial court failed to protect the defendant from the prejudicial effects of publicity surrounding the proceedings.[4] *See Sheppard*, 384 U.S. at 363; *Irvin*, 366 U.S. at 728–29; *Rideau*, 373 U.S. at 727. In his reply brief, Mr. Spencer cites *Estelle v. Williams*, which recognized that a defendant going to trial in "identifiable prison clothes" is not automatically a constitutional violation, 425 U.S. 501, 512–13 (1976), *Taylor v. Kentucky*, which held that a defendant's due process rights were infringed when a trial court refused to instruct a jury on the presumption of innocence, 436 U.S. 478, 490 (1978), and *Holbrook v. Flynn*, which held that a defendant had not carried his burden to establish that the presence of uniformed officers in a courtroom was "so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial" such that the defendant had suffered "actual prejudice," 475 U.S. 560, 572 (1986).

The ACCA did not unreasonably interpret these holdings by deferring to the trial court's finding, based on his personal knowledge, that "there was not an overwhelming police presence in the courtroom during [Mr.] Spencer's trial." *Spencer R.32*, 201 So. 3d at 588–89. Indeed, the ACCA analysis was properly focused on whether "the scene presented to jurors . . . was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial," *Holbrook*, 475

---

[4] Mr. Spencer also cites the dissenting opinion in *Smith v. Phillips*, which cannot support his claim because it is not controlling law. Doc. 1 ¶ 47.

U.S. at 572, leading that court to find that Mr. Spencer failed to plead facts that could meet the applicable prejudice standard, *Spencer R.32*, 201 So. 3d at 589. The ACCA thus reasonably applied the law by examining the risk of prejudice Mr. Spencer faced during his trial—it simply concluded that he did not meet his burden.

Nor did the ACCA unreasonably interpret the facts of Mr. Spencer's case. After Mr. Spencer's trial judge found, based on his personal observation of trial, that "there was not an overwhelming police presence in the courtroom during [Mr.] Spencer's trial," Doc. 17-37 at 89, Mr. Spencer failed to present clear and convincing evidence to the contrary. Accordingly, the ACCA reasonably relied on the trial court's finding, and Mr. Spencer is due no habeas relief on this claim.

### ii. *Failure To Object to Victim Impact Clothing and Accessories*

Mr. Spencer next contends that his "[t]rial counsel rendered prejudicial ineffective assistance by failing to object when the family members of the slain police officers sat in the spectator's gallery of the courtroom during Mr. Spencer's trial, wearing t-shirts, buttons, and jewelry with screen-printed photographs of the victims on them." Doc. 1 ¶ 30; *see id.* ¶¶ 30–32. Mr. Spencer alleges that "this behavior was a daily occurrence during the entire trial and . . . many of these individuals sat on the front row, [so] their apparel would have been readily apparent to the jurors." *Id.* "It was readily apparent to members of Mr. Spencer's family who attended the trial, including Fred and Dianne Pyles and Alicia Spencer." *Id.* Mr.

Spencer contends that "[b]ecause these visual depictions of the victims, together with the overwhelming presence of uniformed police spectators . . . , undermined Mr. Spencer's right to a fair trial, counsel should have objected." *Id.* And because the court previously affirmed that it would not allow victim impact clothing and accessories, Mr. Spencer argues that "the court would have granted the objection and the outcome of the trial would have been different." *Id.* ¶ 31.

The Alabama Court of Criminal Appeals disposed of this claim as follows:

> Spencer next argues that his trial counsel was ineffective for failing to object when members of the victims' families, during trial, wore items of clothing or buttons depicting photographs of the deceased officers.
>
> The circuit court stated the following concerning this claim:
>
>> "While Spencer alleges that family members were wearing items with the victims' pictures on them, Spencer does not identify when this actually occurred during the trial. In addition, once again, this is a matter within the judge's knowledge. Because this claim is not specifically pleaded and because this claim is without merit, Spencer's request for an evidentiary hearing on this claim is denied."
>
> (C. 89.)
>
> Spencer failed to plead when the alleged instances occurred or even if they occurred in the courtroom. Spencer also failed to plead any specific prejudice in regard to this claim, and he failed to identify any juror who was prejudiced based on his or her observation of a spectator's clothing. Spencer merely pleaded the

49

following regarding the prejudice prong of the *Strickland* test: "Spencer was prejudiced because, had counsel objected when these spectator victim impact gestures occurred, the Court would have granted the objection and the outcome of [the] trial would have been different." (C. 610.) Spencer's "bare allegation" of prejudice was not sufficient to satisfy the pleading requirements of Rule 32.6(b), Ala. R. Crim. P. Thus, this claim was correctly summarily dismissed.

Moreover, the record of Spencer's trial shows that the following discussion occurred at the beginning of voir dire examination:

> "The Court: [A]ny buttons T-shirts—I mean I've had people come up here with T-shirts with the victims' pictures on it, slogans and things, none of that is going to be allowed in the courtroom....

> "[Defense counsel]: Your Honor has ruled to preclude the T-shirts and the badges?

> "The Court: Yes."

(Trial R. 246–47.) The trial court specifically held that any clothing or buttons bearing the victims' pictures would not be allowed in the courtroom.

This claim was correctly summarily dismissed because it was insufficiently pleaded and because it failed to state a material issue of fact or law that would entitle Spencer to relief. *See* Rule 32.6(b), Ala. R. Crim. P., and Rule 32.7(d), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 589–90. Moreover, that court observed that before trial began, the "[t]rial court specifically held that any clothing or buttons bearing the victims' pictures would not be allowed in the courtroom." *Id.*

According to Mr. Spencer, the ACCA "decision [was] contrary to clearly established law, objectively unreasonable, and an unreasonable determination of the facts." Doc. 21 at 20. Mr. Spencer contends that the appeals court's conclusion is mistaken because the family members at issue consistently sat near the front of the gallery throughout trial and were visible to jurors. *Id.* at 22–23. And according to Mr. Spencer, "[h]aving pled that the victim-focused garb posed such an inherent 'unacceptable risk' because jurors could see it, Mr. Spencer was not obligated to establish which ones did." *Id.* at 21. So, Mr. Spencer contends, "in requiring Mr. Spencer to plead actual prejudice, Alabama failed to apply the relevant legal rules in deciding this claim or to apply those rules to the facts, making its decision contrary to and an unreasonable application of clearly established law." *Id.* at 22. Finally, according to Mr. Spencer, "[t]he CCA also chose to ignore most of the evidence upon which the claim relied, making its decision an unreasonable determination of the facts." *Id.* The ACCA allegedly ignored Mr. Spencer's allegations that "spectators wearing victim-impact paraphernalia 'sat in the spectator's gallery of the courtroom during Mr. Spencer's trial,' that media coverage of the trial featured photographs of these spectators, and that '[s]ince this behavior was a daily occurrence during the entire trial and because many of these individuals sat on the front row, their apparel would have been readily apparent to jurors.'" *Id.* (alteration in original) (quoting Doc. 17-40 at 22).

51

But Mr. Spencer neither argues nor establishes that the jury was influenced, let alone coerced, by victims' family members' displays. And even he acknowledges the legal deficiency of these allegations. *See, e.g.*, Doc. 21 at 20 ("Granted, the Supreme Court has not squarely addressed whether spectator conduct can violate a defendant's right to a fair trial."). Indeed, the Supreme Court confronted this issue in a similar case and said:

> In this case, a state court held that buttons displaying the victim's image worn by the victim's family during respondent's trial did not deny respondent his right to a fair trial. We must decide whether that holding was contrary to or an unreasonable application of clearly established federal law, as determined by this Court. 28 U.S.C. § 2254(d)(1). We hold that it was not.

*Carey v. Musladin*, 549 U.S. 70, 72 (2006).

Further, the ACCA ruling was not unreasonable on the facts before it. The trial court found Mr. Spencer's claim in this respect was "without merit" because the trial court's factual determination was "within the judge's knowledge" after that judge presided over Mr. Spencer's trial. *Spencer R.32*, 201 So. 3d at 590. Mr. Spencer offered no evidence, let alone clear and convincing evidence, to rebut these factual findings. *See Ward*, 592 F.3d at 1155–56; *see also* 28 U.S.C. § 2254(e)(1). Although Mr. Spencer asserts "that media coverage of the trial featured photographs of . . . spectators," Doc. 21 at 22, Mr. Spencer has not attached those photographs to his petition as evidence, nor has he provided the court other evidence of the media

coverage he describes. Accordingly, he cannot establish that the state court's factual findings were incorrect, let alone unreasonable, and he is due no habeas relief on this claim.

### iii. Counsel's Pretrial Commentary To Local Media

Mr. Spencer next contends that trial counsel's commentary to local media in the days just prior to trial prejudiced his right to an impartial jury and infringed on his right to decide for himself whether to testify. *See* Doc. 1 ¶¶ 33–44. According to Mr. Spencer, those comments included statements that Mr. Spencer would utilize a self-defense strategy and testify at trial. *Id.* ¶¶ 33–34. The attorneys "detailed [their] defense strategy[,]" which was to raise arguments about police corruption and self-defense, including with Mr. Spencer's testimony. *Id.* ¶ 34. Mr. Spencer contends that "[c]ounsel rendered deficient performance in announcing prior to trial that Mr. Spencer would testify, because the announcement foreclosed Mr. Spencer from making his own decision and also locked counsel into an ill-fated self-defense strategy that could not be proven solely with Mr. Spencer's testimony," *id.* ¶ 41, leading to the prosecution's "devastatingly effective" cross-examination of Mr. Spencer, *id.* ¶ 44.

After trial counsel made these comments to local media, the trial court held a hearing on the State's motion for a gag order. The trial court granted that motion,

though Mr. Spencer's counsel "asserted that the comments in the media were intended 'to even the playing field,' and not to influence the jury." *Id.* ¶¶ 33–35.

Mr. Spencer argues that "jurors who deliberated on [his] case were exposed to media about counsel's . . . statements." *Id.* ¶ 39. According to Mr. Spencer, the jury foreperson stated that he read The Birmingham News (where the attorneys' statements were published) and that he knew "[t]he shooter said it was self-defense." *Id.* "Thus," Mr. Spencer says, "once counsel made the decision for [him] in the media, there could be no retreat from either the self-defense strategy or Mr. Spencer being forced to take the witness stand." *Id.* ¶ 40.

When the Alabama Court of Criminal Appeals rejected this claim, it wrote:

> Spencer next argues that his "trial counsel unreasonably contributed to the prejudicial atmosphere which pervaded his trial and, in doing so, undermined his ability to decide for himself whether to testify." (Spencer's brief, at 24.) Specifically, Spencer pleaded that his attorney informed the media before trial that Spencer was going to plead self-defense and that this comment prejudiced the prospective jurors.
>
> The circuit court stated the following concerning this claim:
>
>> "While Spencer alleges that the jury foreman responded to a question on the jury questionnaire that he had heard or read that Spencer had killed three officers and that he said it was self-defense, there is nothing that indicates he heard this from Spencer's attorney the weekend before the trial. Moreover, there is no indication that any potential juror was tainted by defense counsel's statements

54

> prior to trial or that they were aware that Spencer would actually take the stand and testify in his case. Moreover, it is clear from the record that counsel made the strategic decision to argue that Spencer acted in self-defense and knew that Spencer would have to testify to present this defense. This defense was consistent with Spencer's statement to the police that he was acting in self-defense when he shot the officers. Further, Spencer has not plead[ed] how the outcome of his trial would have been different had counsel not told the media that Spencer would testify in support of claims that he was acting in self-defense. The evidence was overwhelming that Spencer shot and killed the three officers, including the fact that Spencer confessed to shooting Officer Carlos Owen, Officer Harley Chisolm, and Officer Rob Bennett.
>
> "Not only is this claim insufficiently pleaded, it also fails to present a material issue or fact of law. Rule 32.7(d), Ala. R. Crim. P."
>
> (C. 89–90.)
>
> Spencer failed to plead that any specific juror was prejudiced based on counsel's pretrial comments—he merely pleaded that jurors "were aware" of the media coverage. Spencer made a general claim of prejudice; therefore, this claim was correctly summarily dismissed because it was insufficiently pleaded. *See* Rule 32.6(b), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 590–91.

In his reply in support of his habeas petition, Mr. Spencer contends that this the ACCA "required [him] to allege more than relevant precedent requires to establish actual or inherent prejudice." Doc. 21 at 24. And, according to Mr. Spencer,

that court "ignored substantial evidence which tended to show that [he] was prejudiced by his counsel's statements to the media in at least two ways – the prejudicial impact on the jury and forcing his right to testify decision – which deprived him of a fair trial." *Id.* at 25. Mr. Spencer points to statements from the jury foreman, who responded to the jury questionnaire by stating that he generally knew about the murders and that "[t]he shooter said it was self-defense." Doc. 1 ¶ 39 (quoting Doc. 17-18 at 125).

But the foreman's response does not indicate the source of his knowledge, so it would have been speculative for the ACCA to assume that it was Mr. Spencer's attorney. More importantly, the foreman's questionnaire responses do not indicate that whatever he heard affected his ability to render a fair and impartial verdict. *See* Doc. 17-18 at 125. Mr. Spencer's conjecture in this regard is not a basis for habeas relief.

Mr. Spencer also points to other comments made by potential jurors as evidence of prevalent media coverage. Doc. 1 ¶ 38. But this falls far short of the legal standard. Mr. Spencer has not established that any juror who saw media coverage carried a fixed view of Mr. Spencer's guilt into the jury room. Federal law does not require that jurors have no outside knowledge that a particular crime occurred; it requires only that they follow the court's instructions to render a verdict based solely on the evidence at trial. *Irvin*, 366 U.S. at 722–23 ("In these days [(the

56

year 1961)] of swift, widespread, and diverse methods of communication, an important case can be expected to arouse the interest of the public . . . , and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."); *see Heath v. Jones*, 941 F.2d 1126, 1135 (11th Cir. 1991).

Further, any potential juror who indicated potential bias during *voir dire* was separately questioned. Doc. 17-22 at 56–80. And one prospective juror who indicated biases they could not set aside was struck for cause at the request of Mr. Spencer's attorney. *Id.* at 70–71. Accordingly, the record establishes no prejudice in connection with how Mr. Spencer's trial counsel addressed the media, and the court certainly cannot conclude that this is one of the "'extreme' cases" of inherent prejudice, *see Woods v. Dugger*, 923 F.2d 1454, 1459 (11th Cir. 1991).[5]

Mr. Spencer has thus failed to establish that the state court's determination of this issue was contrary to or involved an unreasonable application of clearly established federal law or was based on an unreasonable factual determination.

---

[5] Mr. Spencer also cites *Rock v. Arkansas*, 483 U.S. 44 (1987), to support his argument that he was deprived of his right to choose whether to testify on his own behalf. Doc. 21 at 24. But *Rock* held that an Arkansas rule of evidence "excluding all posthypnosis testimony infringes impermissibly on the right of a defendant to testify on his own behalf." 483 U.S. at 62. That holding is plainly inapplicable here, where no Alabama rule, evidentiary or otherwise, prohibited Mr. Spencer from choosing to testify.

### iv. Failure To Move For Change In Venue

Mr. Spencer next argues that his trial counsel was ineffective for failing to move for a change of venue even though "defense counsel knew the media coverage of the trial would be considerable." *See* Doc. 1 ¶ 48. Specifically, Mr. Spencer alleges that his "trial was the subject of inaccurate, prejudicial, saturation media coverage, violating his constitutional rights to a fair trial by a fair and impartial jury under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments." *Id.* ¶ 67.

Mr. Spencer asserts that "[i]n all, potential jurors were exposed to over 60 newspaper reports concerning the case . . . , as well as additional coverage by television and radio news stations." *Id.* ¶ 64. He further asserts that "[t]he community was saturated with victim impact evidence, graphic and prejudicial details of the shootings, and specific 'facts' to be presented at trial, many of which were later shown to be false or were never presented." *Id.* And he contends that his counsel recognized the widespread impact of the news, "[m]oving for sequestration of the jury[.]" *Id.* ¶ 48. Mr. Spencer details the various media that "saturat[ed]" the community. *See id.* ¶¶ 52–63. "Despite having seen the media coverage themselves, to the point that they felt the need to 'even the playing field,' despite being warned by the trial court of the extent of the media coverage, and despite nearly every single juror having seen, read or heard media reports of the case, defense counsel never moved for a change of venue." *Id.* ¶ 50.

In his reply, Mr. Spencer contends that "*voir dire* in this case did not consist of the careful inquiry necessary to ensure" that his jury was impartial. Doc. 21 at 30. He alleges that even though "12 of the 14 jurors (including alternates) selected had read, seen or heard media reports[,] . . . [o]nly one of the 12 — V. Raby — was individually questioned as to what she had seen, read or heard about the case." *Id.*

When the Alabama Court of Criminal Appeals upheld the Rule 32 court's rejection of this claim, it wrote:

> Spencer next argues that his trial counsel was ineffective for failing to move for a change of venue. Specifically, Spencer argues that the media coverage surrounding the case saturated the community to such an extent that prejudice was presumed and that his trial counsel was ineffective for failing to move for a change of venue.
>
> The circuit court stated the following concerning this claim:
>
>> "While it is true that Spencer sets forth dates of newspaper articles and quotes from some of these articles, none of the quotes show that the articles were not correct factually or that the articles were sensational. In addition, Spencer has not set forth with any specificity that an actual or identifiable prejudice occurred in his jury. Of the five jurors who were questioned during voir dire about the publicity, only one had a fixed opinion about Spencer's guilt and this juror was successfully challenged for cause. Spencer has not plead[ed] in his second amended Rule 32 petition that a pattern of deep and bitter prejudice existed in the community due to the pre-trial publicity or that there was a connection between the publicity generated and the existence of actual jury prejudice.

*Spurgeon v. State,* 560 So. 2d 1116 (Ala. Crim. App. 1989); *Brooks v. State,* 520 So. 2d 195 (Ala. Crim. App. 1987). In fact, Spencer has not identified one juror who was prejudiced by the pre-trial publicity."

(C. 90–91.)

This claim was correctly summarily dismissed because Spencer failed to plead how he was prejudiced; i.e., he failed to identify any juror who was biased based on the pretrial publicity. *See Moody v. State,* 95 So. 3d 827, 845 (Ala. Crim. App. 2012). As this Court recently stated when reviewing a similar claim:

> "Although Mashburn made a bare allegation that there were 'numerous' newspaper articles regarding the crimes and the trial, he failed to plead any facts regarding the nature of the articles that would indicate that the articles were biased or prejudicial. He also asserted that the newspaper articles 'saturated the community with information,' but failed to allege any specific facts in support of this conclusory statement. In addition, Mashburn made a bare assertion that 'a majority' of the venire had heard about the case, but he failed to allege how many prospective jurors had actually heard about the case and he did not identify a single juror who sat on his jury who had read or heard about the case. Contrary to Mashburn's contention, 'the existence of widespread publicity does not require a change of venue.' *McGahee v. State,* 885 So. 2d 191, 211 (Ala. Crim. App. 2003). Because Mashburn failed to allege sufficient facts in his petition indicating a reasonable probability that a change of venue would have been granted had counsel filed a motion requesting a change of venue, he failed to plead sufficient facts indicating that his trial counsel were ineffective for not moving for a change of venue.

> Therefore, summary dismissal of this claim of ineffective assistance of counsel was proper."

*Mashburn v. State,* 148 So. 3d 1094, 1129–30 (Ala. Crim. App. 2013). "This fact—that the circuit judge had personal knowledge of the answers the veniremembers gave during voir dire regarding media exposure—also supports the circuit court's summary dismissal of this claim." *Yeomans v. State,* 195 So. 3d 1018, 1033 (Ala. Crim. App. 2013).

Furthermore, in *Luong v. State,* 199 So. 3d 139 (Ala. 2014), the Alabama Supreme Court addressed Luong's claim that prejudice was presumed because the community was saturated with pretrial publicity surrounding the murder of Luong's four children. The Supreme Court noted the high threshold that is necessary to satisfy the "presumed prejudice" standard. The Court stated, in part:

> "[T]he record in this case does not establish that bias and prejudice permeated the Mobile community at the time of Luong's trial. Although the facts surrounding the offenses in this case are inflammatory, no evidence indicates that the community demanded Luong's arrest or that an underlying bias against Luong existed at the time of trial."

199 So. 3d at 150.

Here, Spencer pleaded the following in regard to this claim:

> "From the day of the shootings, Jefferson County media outlets extensively covered this case. Mr. Spencer's arrest was covered on live television, his confession was made public, as was every step of counsel's preparation for trial. Given the limits placed on the undersigned's ability to subpoena materials until this petition is filed, there is no way of knowing the exact extent of television and radio

61

> coverage of the case. However, the print-media coverage is indicative of the massive coverage. A single newspaper, The Birmingham News, carried innumerable stories on Mr. Spencer's case, from the date of the shootings on June 17, 2004, to the start of trial on June 13, 2005. The media coverage as a whole carried lurid details about the case, long before any juror heard evidence in court, presented critical pieces of information before the court was in a position to rule on admissibility, exposed potential jurors to both parties' cases before jurors were selected, and forced the defense into making a series of statements 'to even the playing field' which framed their entire case before the jury was even empaneled."

(C. 187–88.)

> Because Spencer did not plead sufficient facts to show that he would have been entitled to a change of venue he failed to plead the "full facts" that would entitle him to relief. *See* Rule 32.6(b), Ala. R. Crim. P., and *Ex parte Beckworth,* supra. Therefore, this claim was correctly summarily dismissed. *See* Rule 32.7(d), Ala. R. Crim. P.

*Spencer, R.32*, 201 So. 3d at 591–92.

Mr. Spencer now asserts that "[c]ontrary to what the [ACCA] held, no clearly established Supreme Court precedent requires a petitioner to establish a specific juror was biased to make out a presumed prejudice claim." Doc. 21 at 28. In other words, Mr. Spencer appears to suggest that the ACCA applied the actual prejudice standard to a presumed prejudice claim. The record refutes this suggestion: the appeals court clearly understood and applied the correct legal standard for a presumed prejudice claim. Mr. Spencer also contends that the ACCA "decision is an

unreasonable determination of the facts in the state record because it refused to consider Mr. Spencer's evidence about presumed prejudice, absent evidence of actual juror bias." *Id.* at 30.

The origins of the presumed prejudice standard are found in *Rideau v. Louisiana*, a Supreme Court case from 1963 in which the Court held that due process requires a trial court to grant a defendant's motion for a change of venue if prejudicial pretrial publicity precludes seating an impartial jury. *See* 373 U.S. at 726–27. In that case, Wilbert Rideau's confession to multiple crimes, including murder, was broadcast three times on television stations across the Lake Charles, Louisiana area. *Id.* at 724. The Court held that this rendered any trial in the Lake Charles area "a hollow formality" and violative of Mr. Rideau's due process rights. *Id*. at 726. Today, the standard for a presumed prejudice claim is: "where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, '(jury) prejudice is presumed and there is no further duty to establish bias.'" *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980)[6] (quoting *United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir. 1979)).

---

[6] *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) ("We hold that the decisions of the United States Court of Appeals for the Fifth Circuit . . . , as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.").

As the old Fifth Circuit explained, this standard is demanding:

> To satisfy his burden even in such sensational cases, the petitioner must, therefore, demonstrate that the populace from which his jury was drawn was widely infected by a prejudice apart from mere familiarity with the case. Where, as here, the petitioner relies solely upon the inflammatory details and tenor of particular newspaper articles as the seeds of that prejudice, he must evince some indication of the ambit of the dissemination of this poisonous palaver. Without such, no measure of the taint alleged to have derived from it can be deduced, and certainly the pervasive prejudice required to trigger Rideau will not have been proved.

*Mayola*, 623 F.2d at 999.

The ACCA carefully applied the controlling standard to its analysis. *See Spencer R.32*, 201 So. 3d at 591–92. For instance, the ACCA found that Mr. Spencer had "merely pleaded" that an objection to prejudicial victim impact clothing would have resulted in a different result in his case and concluded that his petition was a "bare" conclusory allegation that did not entitle him to relief. *Id.* at 590. Implicit in that finding is a determination that Mr. Spencer's pleadings fall far short of alleging a "poisonous palaver," *Mayola*, 623 F.2d at 999, and do not allege that Mr. Spencer's trial was just a "hollow formality," *Rideau*, 373 U.S. at 726.

The ACCA likewise upheld the dismissal of Mr. Spencer's venue arguments, finding that his petition "failed to identify any juror who was biased based on the pretrial publicity." *Spencer R.32*, 201 So. 3d at 591. The ACCA relied in part on the fact that the trial court had personal knowledge of the venire and their respective

64

dispositions during *voir dire* and concluded that the facts pled by Mr. Spencer fell far short of suggesting an irredeemably prejudiced jury. *See id.* at 591–92.

This court cannot say that the ACCA's application of the prejudice standards "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Indeed, the ACCA correctly analyzed whether Mr. Spencer's petition pled that his jury was incapable of rendering a fair verdict in his case, which it did not, and it dismissed his claim on that ground. Nor was the state court's determination of this issue "based on an unreasonable determination of the facts in light of the evidence presented in State court proceedings." *Id.* § 2254(d)(2). The potential jurors who indicated that they had formed opinions about the case based on information they received from the media were either (1) struck for cause, Doc. 17-21 at 135–368; Doc. 17-22 at 70–71, or (2) clarified that they could follow the court's instructions, *id.* at 56–80. So even if the court had presumed prejudice because of the publicity surrounding this case, that prejudice was cured because the jurors in Mr. Spencer's case pledged to follow the law as the court explained it to them. Accordingly, Mr. Spencer is due no relief on this claim.

### v. Failure To Conduct Adequate Voir Dire

Next, Mr. Spencer contends that his trial counsel was ineffective during *voir dire*. Doc. 1 at 30.

#### a. Failure to object to venire members seeing Mr. Spencer in handcuffs

Mr. Spencer argues that his counsel was ineffective during *voir dire* because "counsel failed to articulate legal arguments detailing the prejudice inherent in restraining a defendant or in allowing the jurors to see him in restraints." *Id.* ¶ 68. Mr. Spencer alleges that he "remained in handcuffs, which were visible to the jury, for the duration of group and individual voir dire." *Id.* More particularly, Mr. Spencer alleges that he "sat in a chair, in handcuffs, throughout the entire voir dire process with an officer standing beside him. He was not sitting behind a desk, a table, or anything else that would have obstructed the venire's view of him." *Id.* Mr. Spencer contends that the failure to object "undercut the presumption of innocence and made him appear exceptionally dangerous." *Id.* ¶ 70.

The ACCA addressed the claim as follows:

> First, Spencer argues that his trial counsel was ineffective for failing to object when venire members "*were likely* to see Mr. Spencer being escorted out . . . handcuffed and possibly shackled." (C. 195) (emphasis added).

> The circuit court made the following findings concerning this claim:

66

> "Spencer does not allege or specify that any person who actually served on his jury saw him in handcuffs. This Court took great pains to ensure that [Spencer] was not seen by potential jurors during the trial and during jury selection. [Spencer] was brought to the Courtroom each day by a jail elevator which opens to a small holding room where the shackles were removed prior to [Spencer] entering the Courtroom. The door from the holding area looks just like any other door in the courtroom so the jury doesn't know where it leads to. This claim is not sufficiently pleaded, therefore, Spencer's request for an evidentiary hearing on this claim is denied."

> (C. 91–92.)

> Spencer made only a bare claim of "possible prejudice" and failed to plead sufficient facts regarding the prejudice prong of the *Strickland* test—he failed to identify any jurors who observed him in handcuffs. *See* Rule 32.6(b), Ala. R. Crim. P. This claim was correctly summarily dismissed pursuant to Rule 32.6(b), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 593.

As an initial matter, this recitation of the facts is at odds with the above-described allegations in Mr. Spencer's habeas petition. *Compare* Doc. 17-40 at 41–42 *and* Doc. 1 ¶ 68, *with Spencer R.32*, 201 So. 3d at 593. This court presumes the facts found in the state court proceedings are true. *See Boyd*, 592 F.3d at 1292 (quoting 28 U.S.C. § 2254(e)(1)).

And on its deferential AEDPA review, the court cannot say that the ACCA ruling was based on an unreasonable interpretation of the facts, for two reasons.

*First,* Mr. Spencer's counsel did, in fact, object to members of the venire potentially seeing him in handcuffs:

> Mr. Boudreaux: I have a concern. Some of these jurors may or may not — are you going to keep the doors locked?
>
> The Court: No. The doors will be open.
>
> Mr. Boudreaux: What if some of the jurors come back at 1 and the defendant is coming out of the jail door?
>
> The Court: What do you want me to make them do?
>
> Mr. Barber [the prosecutor]: Just take the handcuffs off.
>
> The Court: They know he's in jail anyway. Just like she said she's followed this case, they'd have to be morons or living on another planet not to know he's in custody. Besides they don't know what's through that door. I just don't want 70 people congregating out there in the hall.
>
> . . .
>
> Mr. Boudreaux: I guess just please use caution in the handling of Mr. Spencer.
>
> The Court: Use as much caution as you can given the physical limitations of this building.
>
> The Bailiff: Yes, Sir.

Doc. 17-21 at 140–41.

*Second*, Mr. Spencer cannot establish that even if some potential jurors saw him in restraints during *voir dire*, that visual prejudiced him at trial, for the reasons stated by the trial court on the record. Numerous potential jurors stated during *voir*

*dire* that they had heard at least something about Mr. Spencer's case, meaning they may have known (or inferred or expected) that he was in custody. *Id.* at 164. And during trial, Mr. Spencer confessed to the murders, which would have aligned with that knowledge, or those inferences or expectations. Doc. 17-27 at 188–93. Accordingly, the court sees no factual basis for habeas relief on Mr. Spencer's claim that his counsel was ineffective in connection with the possibility that potential jurors might have observed him in restraints.

Further, Mr. Spencer argues that the ACCA unreasonably interpreted *Deck v. Missouri*, 544 U.S. 622, 626 (2005), when it denied his petition on this ground. *See* Doc. 1 ¶¶ 69–70. In *Deck*, the Supreme Court held that due process "prohibit[s] the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." 544 U.S. at 629. The *Deck* Court reversed a state court conviction where the defendant was visibly shackled during *voir dire* and during sentencing. *See id.* at 624–25, 634–35.

Here, the ACCA did not unreasonably interpret *Deck* because it correctly understood that Mr. Spencer's allegations were that potential jurors likely saw him in shackles during *voir dire*. *See Spencer R.32*, 201 So. 3d at 593. *Deck* did not address a likelihood allegation. *Deck*, 544 U.S. at 624–25. Therefore, this court cannot say that the ACCA unreasonably interpreted *Deck*.

b.    Failure to elicit complete responses during *voir dire*

Mr. Spencer next contends that trial counsel was ineffective during *voir dire* "because their questioning was inadequate to elicit the types of responses from venire members that would allow the selection of a fair and impartial jury." Doc. 1 ¶ 71. Specifically, Mr. Spencer asserts that trial counsel "failed to adequately question jurors about the interracial nature of this crime, and any resulting bias, questions that they were entitled to ask under the law," and that "there was discussion from white jurors wanting to impose the death penalty because Mr. Spencer was a black man who killed three white police officers." *Id.* ¶ 72. Mr. Spencer does not specifically identify the jurors who had this discussion. *See id.* But, he says that according to one juror, "even prior to deliberations, racial tension regarding the death penalty was immediately evident." *Id.* He asserts that "[w]ithin the first few days of trial, some white jurors started talking about imposing the death penalty whenever they went back to the jury room." *Id.* Mr. Spencer contends that "failure to conduct voir dire on racial bias resulted in [these] racially-charged deliberations which directly contributed to a guilty verdict." *Id.*

The ACCA addressed this issue, writing:

> Spencer argues that his trial counsel was ineffective during voir dire because counsel failed to inquire into a discussion among three prospective jurors concerning Spencer's guilt.

70

The circuit court stated the following concerning this claim:

> "While Spencer identifies a juror who recalls a discussion between white jurors who wanted to impose the death penalty because Spencer killed three white police officers, he does not identify the jurors who were engaged in this conversation. In addition, Spencer does not identify specifically how this alleged bias changed the outcome of the guilt phase of his trial. This is especially necessary where the evidence of Spencer's guilt is overwhelming and where Spencer has not specifically plead[ed] how he was prejudiced by his attorney's failure to question potential jurors about racial bias. Because this claim is not specifically pleaded, Spencer's request for an evidentiary hearing on this claim is denied."

(C. 92.)

When pleading a claim that a prospective juror was biased, the petitioner must plead the identity of the allegedly biased prospective juror.

> "The circuit court correctly summarily dismissed this claim because Washington failed to identify specific jurors by name; he failed to plead what should have been done during voir dire examination; and he failed to plead how he was prejudiced by counsel's performance during the voir dire examination. *See* Rule 32.6(b), Ala. R. Crim. P."

*Washington v. State*, 95 So. 3d 26, 64 (Ala. Crim. App. 2012).

Spencer failed to plead the identity of the allegedly biased prospective jurors; therefore, according to *Washington*, this claim was correctly summarily dismissed because

> Spencer failed to plead sufficient facts that would entitle
> him to relief. *See* Rule 32.6(b), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 593.

In his reply in support of his habeas petition, Mr. Spencer argues that the ACCA misunderstood his arguments on this issue, which he did not intend to be a claim about a discussion between three jurors. Doc. 21 at 34. Mr. Spencer clarified on reply that his argument is "that as an African-American capital defendant accused of murdering three white police officers, he was entitled to have his counsel question prospective jurors about racial bias, and identified the controlling precedent, *Turner v. Murray*[, 476 U.S. 28 (1986)]. . .'" *Id.* at 34–35.

Out of an abundance of caution, this court reviews this claim without AEDPA deference, assuming *arguendo* that if the ACCA misunderstood Mr. Spencer's claim, its determinations about it were "based on an unreasonable determination of the facts in light of the evidence presented in State court proceedings." 28 U.S.C. § 2254(d).

To prevail on this claim under *Strickland*, Mr. Spencer must show that his trial counsel's performance was deficient and that he was prejudiced by it. 466 U.S. at 687. Mr. Spencer cites *Turner* for the proposition that defendants have a right to question potential jurors about racial bias in the context of interracial capital cases, such as this one. Doc. 1 ¶ 72. But *Turner* does not mandate such questioning as a categorical requirement for counsel's effectiveness; it simply establishes a

defendant's right to engage in such questioning and leaves the strategic decision whether to do that up to the defendant and his counsel. *See Turner*, 476 U.S. at 36 n.10 ("Should defendant's counsel decline to request *voir dire* on the subject of racial prejudice, we in no way require or suggest that the judge broach the topic *sua sponte*."). Further, *Turner* holds that "a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry." *Id.* at 37.

There is no indication in the record that Mr. Spencer or his trial counsel thought it important or necessary to ask such questions during *voir dire*. *See* Doc. 17-21 at 125–202; Doc. 17-22 at 3–129. *Turner* does not comment one way or the other whether Mr. Spencer's counsel was deficient in this regard, and it is not a basis for Mr. Spencer to now "establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315. And Mr. Spencer supplies no other basis for the court to make such a finding. Accordingly, the court cannot say that Mr. Spencer's counsel was deficient on this ground.

In any event, even if Mr. Spencer could establish deficient performance on this issue, Mr. Spencer has not shown that the result of the trial would have been different if his trial counsel had asked questions about racial bias. Mr. Spencer confessed to murdering three police officers, and his attempts to prove an affirmative defense were not fruitful. The jury had overwhelming evidence of Mr. Spencer's

guilt and convicted him of the murders and the attempted murder of Officer Collins. Additionally, the jury's decision to spare Mr. Spencer's life reflects a favorable decision for him on any question in their minds whether his shootings were racially motivated. Ultimately, Mr. Spencer makes no arguments that the jury convicted him because of racial bias, nor does he explain how questions about racial bias could have resulted in a different or better outcome in his case. Accordingly, Mr. Spencer is due no habeas relief on this claim.

c.     Failure to follow up on indications of bias in venire

Mr. Spencer next contends that trial counsel was ineffective during *voir dire* because "counsel failed to move to remove biased venire members for cause" and "did not adequately follow-up with several jurors who demonstrated bias." Doc. 1 ¶¶ 73, 74. Specifically, one venire member "stated that he had a fixed opinion about the case and that it was 'going to be an uphill battle' for the defendant." *Id.* ¶ 73. And another venire member "stated that she was 'leaning 70 percent towards' Mr. Spencer's guilt based on what she knew about the case prior to trial, and was related to police chief Johnson[.]" *Id.* Finally, another potential juror "indicated that he had read extensively about the case—even though he knew that he might be called to serve on the jury—and that Mr. Spencer appeared to be very guilty." *Id.* ¶ 74. Mr. Spencer contends that "[c]ounsel failed to question the identified jurors at all or questioned them only minimally about their fixed opinions on guilt, and counsel

should have questioned them probingly to determine whether these jurors had irrevocably fixed opinions about Mr. Spencer's guilt[.]" *Id.* ¶ 73.

The ACCA addressed this issue, writing:

> Third, Spencer argues that his trial counsel was ineffective for failing to ask follow-up questions to several prospective jurors who indicated biases during the voir dire examination. Specifically, Spencer pleaded that his trial counsel failed to ask follow-up questions of prospective jurors R.H., J.J., and J.W. after they indicated biases against Spencer.
>
> The circuit court stated the following concerning this claim:
>
>> "Jurors [R.H.], [J.J.] and [J.W.] unequivocally indicated during voir dire that they would base their verdicts on the evidence presented during trial and would follow the trial court's instructions and would not base their verdicts on what they had read about the crime. Counsel were not ineffective for failing to conduct a more thorough voir dire on these jurors because they stated that they could set aside their opinions and follow the trial judge's instructions. Because no material issue of fact or law exists concerning this claim Spencer's request for an evidentiary hearing is denied."
>
> (C.R. 92–93.)
>
> Spencer pleaded in his postconviction petition that prospective juror R.H. stated during voir dire examination that he had a fixed opinion about Spencer's guilt. However, a review of the record of the voir dire examination shows that R.H. said that he did *not* have a fixed opinion about Spencer's guilt and that he could follow the court's instructions on the case. (Trial R. 547–48.) Spencer also pleaded that prospective juror J.J. was

75

biased because she said that she was leaning 70% toward guilt, that she was related to a police chief, and that she was familiar with the facts of the case. However, J.J. indicated that she could render a decision based on the jury instructions. Spencer further pleaded that prospective juror J.W. indicated that he had read extensively about the case. However, the record shows that trial counsel moved that J.W. be removed for cause based on his answers to voir dire questions but that that motion was denied. (Trial R. 569.)

More importantly, Spencer failed to plead, and could not show, any prejudice in regard to his trial counsel's failure to more adequately question prospective jurors R.H., J.J., and J.W. Indeed, the trial record shows that none of the challenged prospective jurors served on Spencer's jury. (Trial R. 628; Trial C. 3251–3404.) "[T]he Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike. *Bethea v. Springhill Mem'l Hosp.,* 833 So. 2d 1 (Ala. 2002)." *Pace v. State,* 904 So. 2d 331, 341 (Ala. Crim. App. 2003). "Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue." *Lee v. State,* 44 So. 3d 1145, 1173 (Ala. Crim. App. 2009).

The circuit court correctly found that this claim was due to be summarily dismissed because no material issue of fact or law existed that would entitle Spencer to relief. *See* Rule 32.7(d), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 593–94.

Mr. Spencer's claim fails because his counsel, the prosecution, and the trial court thoroughly followed up on indications of bias in the venire, as noted by the ACCA. *See* Doc. 17-21 at 158–202; Doc. 17-22 at 3–43, 56–116. As such, the

ACCA did not unreasonably decide that Mr. Spencer was provided a fair and impartial jury. *See Morgan v. Ill.*, 504 U.S. 719, 729 (1992); *Rosales-Lopez v. United States*, 451 U.S. 182, 188–92 (1981). Nor, on these facts, did the ACCA unreasonably conclude that Mr. Spencer's counsel effectively represented his interests in this respect.

> d.     Failure to challenge for cause venire-members whose views on death penalty infected their impartiality

Mr. Spencer next contends that trial counsel was ineffective during *voir dire* because "counsel failed to adequately challenge for cause venire members whose views on the death penalty substantially impaired their ability to be fair jurors." Doc. 1 ¶ 75. Mr. Spencer points to "venire member Garner, who twice stated that if he found Mr. Spencer guilty, he would impose the death penalty." *Id.* According to Mr. Spencer, "[t]hough he subsequently stated that he could 'weigh' the two options, this statement was insufficient to overcome his prior expressions of bias." *Id.* Mr. Spencer also mentions the venire member who made the "uphill battle" comment and the one who "stated that she was 'leaning 70 percent towards' Mr. Spencer's guilt . . . , and was related to police chief Johnson[.]" *Id.* ¶ 73.

The ACCA addressed this issue, writing:

> Spencer next argues that his trial counsel was ineffective for failing to adequately challenge venire members who expressed fixed opinions in favor of the death penalty. In his second amended petition, Spencer identifies only one prospective juror by name. Spencer pleaded that counsel

was ineffective for failing to adequately question prospective juror K.G. because K.G. indicated that if Spencer were found guilty he would vote for the death penalty.

The circuit court stated the following concerning this claim:

> "Spencer requests an evidentiary hearing on his claim that counsel were ineffective because they failed to challenge for cause prospective juror [K.G.]. This request is denied because the claim is insufficiently pleaded because, with one exception, Spencer does not identify which jurors had views on the death penalty that substantially impaired their ability to be fair jurors.
>
>> "In addition, while juror [K.G.] indicated that he was in favor of the death penalty the trial court then explained the process that would occur during the penalty phase of the trial and asked juror [K.G.] whether he could decide what punishment to impose based on the process of weighing aggravating and mitigating circumstances. Juror [K.G.] responded that he could base his decision using this process. There is no evidence in the record that juror [K.G.'s] views on the death penalty 'would prevent or substantially impair' the performance of his duties as a juror in accordance with his instructions and his oath. Spencer's request for an evidentiary hearing on this claim is denied because no material issue of fact or law exists which would entitle Spencer to relief."

(C. 94.) Spencer failed to plead any prejudice in regard to prospective juror K.G. Indeed, the trial record shows that prospective juror K.G. did not serve on Spencer's jury. (Trial R. 628; Trial C. 3251–3404.) In affirming a circuit court's summary dismissal of a similar claim in a

postconviction petition, this Court in *Lee v. State,* 44 So. 3d 1145 (Ala. Crim. App. 2009), stated:

> "The circuit court correctly found that this claim was not sufficiently pleaded because Lee failed to plead how he was prejudiced by counsel's failure to use his peremptory strikes to remove these three jurors. *See Beckworth v. State,* [190 So. 3d 527 (Ala. Crim. App. 2009)]. Lee did not allege that any of the jurors were actually biased against him and, unlike [*State v.*] *Terry,* [601 So. 2d 161 (Ala. Crim. App. 1992),] the record of the voir dire examination shows that the three jurors indicated that they had no bias against Lee nor were they biased in favor of the State. As the Mississippi Supreme Court stated in *Le v. State,* 913 So. 2d 913 (Miss. 2005):
>
> > "'The Fifth Circuit Court of Appeals considers an attorney's actions during voir dire to be a matter of trial strategy, which "cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates that entire trial with obvious unfairness.'" *Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir. 1995) (quoting *Garland v. Maggio,* 717 F.2d 199, 206 (5th Cir. 1983)). Federal courts have held that an attorney's failure to exercise peremptory challenges does not give rise to a claim of ineffective assistance of counsel absent a showing that the defendant was prejudiced by the counsel's failure to exercise the challenges. *United States v. Taylor,* 832 F.2d 1187 (10th Cir. 1987). See also *Mattheson v. King,* 751 F.2d 1432, 1438 (5th Cir. 1985).'
>
> "913 So. 2d at 954."

*Lee,* 44 So. 3d at 1164–65.

> This claim was correctly summarily dismissed because Spencer failed to meet his burden to plead the full factual basis of his claim. *See* Rules 32.6(b) and 32.7(d), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 594–96.

As the ACCA correctly explained, Mr. Spencer cannot establish that his counsel was ineffective, because his counsel, the prosecution, and the trial court extensively questioned Mr. Garner on his beliefs. Doc. 17-21 at 189–98. Mr. Garner responded to the court's questions and affirmed that he could "[a]bsolutely" "base [his] verdict on what [he] hear[d] in the court room." *Id.* at 190. Mr. Spencer's counsel, still not satisfied by Mr. Garner's response, followed up with Mr. Garner and asked, "would you automatically vote for the death penalty [if you found Mr. Spencer guilty]?" After Mr. Garner responded, "Yes," the trial court again questioned Mr. Garner, who again affirmed that he could be fair and reasonable, and decide the case based on the evidence presented. *Id.* at 192–93. Mr. Spencer's counsel then moved to strike Mr. Garner from the venire for cause. *Id.* at 196–97. Accordingly, Mr. Spencer's counsel acted reasonably in his defense, was attentive to the issues that Mr. Garner's jury service might pose, and was not ineffective in this regard.

What's more, even though the trial court denied defense counsel's request to strike Mr. Garner from the jury for cause, Mr. Garner did not serve on the jury, so Mr. Spencer cannot establish that he was prejudiced by any alleged deficiencies in

his counsel's performance in this respect. *Spencer R.32*, 201 So. 3d at 595. Accordingly, Mr. Spencer is due no habeas relief on this claim.

e. Failure to adequately object to death qualification of jurors

Mr. Spencer contends that trial counsel was ineffective during *voir dire* because "counsel failed to adequately object to the pretrial death-qualification of jurors." Doc. 1 ¶ 76. He argues that "social scientific evidence shows" problematic outcomes when jurors are death qualified, namely, "death qualified juries are significantly more prone to convict than ordinary juries[,]" "the process of pretrial death qualification . . . conditions the jury towards guilt[,]" and "death qualification disproportionately excludes minorities and women." *Id.* And he argues that in his case "counsel failed to adequately question and marshal arguments that the trial court erred in removing venire members Andrews and Dillard based on their views about the death penalty." *Id.* ¶ 77. He alleges that "counsel should have used the readily available Colorado method of voir dire to life-qualify these jurors[.]" *Id.*

The ACCA addressed this issue, writing:

> Spencer next argues that his trial counsel was ineffective because he failed to object to the pretrial death qualifications of the prospective jurors. Specifically, Spencer argues that his trial counsel failed to object when prospective jurors E.A. and C.D. were removed for cause based on their opposition to the death penalty.
>
> The circuit court stated the following concerning this claim:

> "Spencer [is not] entitled to an evidentiary hearing on his claim that his attorneys should have questioned prospective jurors [E.A.] and [C.D.] more thoroughly concerning their views on the death penalty. Both jurors were questioned extensively about their views on the death penalty and both stated that they could not impose the death penalty. There was nothing more counsel could have done. The opposition of these jurors to the death penalty would have prevented or substantially impaired their ability to perform their duties as jurors. No material issue of fact or law exists concerning this claim; therefore, Spencer's request for an evidentiary hearing is denied."

(C. 70–71.)

The circuit court did not summarily dismiss this claim based on the insufficiency of the pleadings; instead, the circuit court found that, based on the record, this claim presented no material issue of fact or law that would entitle Spencer to relief. *See* Rule 32.7(d), Ala. R. Crim. P. This Court has reviewed the transcript of the voir dire examination and agrees. Prospective jurors E.A. and C.D. were properly excused for cause after they indicated during voir dire that they were opposed to the death penalty. Any further action by counsel would not have changed the prospective jurors' responses.

The circuit court correctly found that this claim was due to be summarily dismissed because there was no material issue of fact or law that would entitle Spencer to relief. *See* Rule 32.7(d), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 596.

Mr. Spencer contends that the ACCA "absolved counsel from any duty to rehabilitate [prospective jurors E.A. and C.D.] or raise reasonable objections to their

82

dismissal[,] and that doing so was improper because counsel has "a duty to thoroughly question prospective jurors in order to ensure a fair and impartial jury capable of considering a life sentence." Doc. 21 at 36. And, Mr. Spencer contends, excluding a juror simply because of an opposition to the death penalty is improper if the juror would still be able to impose the death penalty if the law required. *Id.* at 36–37. According to Mr. Spencer, "E.A. and C.D. were not wholly opposed to capital punishment," even though they both expressed opposition to it. *Id.* at 37. Rather, E.A. said, "I would think that I could follow the instructions." *Id.* Mr. Spencer contends that "E.A.'s personal views against the death penalty did not substantially impair his ability to follow the court's instructions, [so] he was subject to rehabilitation and should not have been removed for cause." *Id.* And as to potential juror C.D., "counsel made only a shallow effort to rehabilitate her, resulting in premature excusal." *Id.* at 38. According to Mr. Spencer, excluding these two jurors violated *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and *Wainwright v. Witt*, 469 U.S. 412 (1985). *See* Doc. 21 at 36. Mr. Spencer contends that those cases "impose upon counsel a duty to thoroughly question prospective jurors in order to ensure a fair and impartial jury capable of considering a life sentence." *Id.*

Mr. Spencer's arguments run headlong into controlling Supreme Court precedent, *see Lockhart v. McCree*, 476 U.S. 162 (1986), in which the Supreme Court ruled:

> Does the Constitution prohibit the removal for cause, prior to the guilty phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of trial? We hold that it does not.

*Id.* at 165 (citations omitted).

The ACCA did not unreasonably interpret this holding or the evidentiary record in Mr. Spencer's case. *See* Doc. 17-21 at 167–77 (excusing juror Andrews after he expressed strong opposition to the death penalty); *id.* at 186–89 (excusing juror Dillard after she expressed strong opposition to the death penalty). Mr. Spencer is thus due no relief on this claim.

### vi. *Failure To Investigate And Present Viable Defense Theory*

Mr. Spencer contends that trial counsel was ineffective because "[c]ounsel failed to conduct an independent investigation, despite the obvious weaknesses in the prosecution's case and the ample, and readily available, sources of exculpatory evidence." Doc. 1 ¶ 78. According to Mr. Spencer, trial counsel continued to pursue a self-defense theory despite numerous warnings from the trial court that doing so would be "at their own peril." *Id.* ¶ 81. Mr. Spencer contends that trial counsel should have "presented more viable defenses of provocation manslaughter, and voluntary intoxication." *Id.* ¶ 82. Because counsel did not "investigate an alternative legal theory, and instead focus[ed] on a legal theory that had been explicitly rejected by the judge," *id.* ¶ 84, Mr. Spencer alleges "counsel was unable to provide a

84

concrete way for the jury to give effect to any doubts it had about Mr. Spencer's guilt," *id.* ¶ 83.

Specifically, Mr. Spencer alleges that counsel was ineffective when it failed to utilize the testimony of two witnesses, Markesha Williams and Tyran "Bubba" Cooper, "who could have offered proof supporting the provocation defense," *id.* ¶¶ 87, 88, which "defense attorneys asserted . . . , but failed to offer additional proof of[,]" *id.* ¶ 86. But "the testimony of [these] two witnesses was critical to explain the nature of the imminent threat that Mr. Spencer faced on [the day of the shootings]." *Id.*

Ms. Williams allegedly "could have offered substantial corroboration for a provocation manslaughter defense" because Ms. Williams allegedly saw an exchange of "protection money" between Officer Owen and Mr. Cooper, "the individual who was supplying the drugs that Mr. Spencer and Mr. Woods sold from the apartment." *Id.* ¶ 87. "Before the shooting, Ms. Williams also saw the police enter the apartment by 'snatching the door off the hinges,' with their guns drawn." *Id.*

Mr. Cooper allegedly would have offered testimony about a scheme between himself and Officers Owen and Chisolm, in which he paid the officers to protect his drug activities and to "warn[] [Mr.] Cooper in advance about imminent police raids and narcotic task force activities that might impact his business[.]" *Id.* ¶ 88. Mr.

Cooper allegedly would have explained that he had stopped paying the officers "and that Officers Owen and Chisolm had threatened [Mr.] Cooper, [Mr.] Woods and [Mr.] Spencer when he stopped paying them." *Id.* Further, "[Mr.] Cooper would have also testified that . . . the case agent for Mr. Spencer's case[] had threatened 'to bury' [Mr.] Cooper if he revealed information about his arrangement with police[.]" *Id.* Mr. Spencer alleges that "counsel's failure to present this evidence ensured that the court would decline to instruct the jury on provocation manslaughter[,]" which meant that "jurors were unable to render a not guilty verdict on evidence that trial counsel did present, tending to show that Mr. Spencer shot the officers because he had been threatened[,]" and "enabled the prosecution to argue repeatedly that Mr. Spencer committed a premeditated crime." *Id.* ¶ 89.

The ACCA addressed this issue:

> First, Spencer argues that his trial counsel was ineffective for failing to investigate and to gather evidence to support counsel's theory of the case. Specifically, Spencer pleaded that his trial counsel was ineffective for failing to present a viable defense based on provocation manslaughter because counsel failed to present the testimony of Tyran "Bubba" Cooper and Markesha Williams.
>
> Attached to Spencer's postconviction petition was an affidavit executed by Cooper. Cooper stated that he paid two Birmingham police officers so that police would not interfere with the drug business that he was conducting at the location where the officers were killed. According to Cooper, the officers threatened him when he stopped making payments. Spencer did not plead in his amended petition, nor did Cooper state in his affidavit, that he was

present or witnessed the shootings. Spencer also pleaded that Williams witnessed Cooper hand a police officer a bundle of money several days before the shootings.

> "Alabama courts have, in fact, recognized three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative."

*Rogers v. State,* 819 So. 2d 643, 662 (Ala. Crim. App. 2001).

In discussing what constitutes "imminent assault" in regard to provocation manslaughter, this Court has stated:

> """"Mere words, no matter how insulting, never reduce a homicide to manslaughter. Manslaughter is the unlawful killing of a human being without malice; that is, the unpremeditated result of passion—heated blood—caused by a sudden, sufficient provocation. And such provocation can, in no case, be less than an assault, either actually committed, or menaced under such pending circumstances as reasonable to convince the mind that the accused has cause for believing, and did believe, he would be presently assaulted, and that he struck, not in consequence of a previously formed design, general or special, but in consequence of the passion suddenly aroused by the blow given, or apparently about to be given.' ..." *Reeves v. State,* 186 Ala. 14, 65 So. 160, 161 [ (1914) ].' *Easley v. State,* 246 Ala. 359, at 362, 20 So. 2d 519, 522 (Ala.1944). Thus, the mere appearance of imminent assault may be sufficient to arouse heat of passion."

*Cox v. State,* 500 So. 2d 1296, 1298 (Ala. Crim. App. 1986). "What constitutes legal provocation is left to the trial judge's interpretation." *Gray v. State,* 574 So. 2d 1010, 1011 (Ala. Crim. App. 1990) (citing *Shultz v. State,* 480 So. 2d 73, 76 (Ala. Crim. App. 1985)).

Here, the circuit court stated the following concerning this claim:

> "Spencer contends that the testimony of Tyran Cooper and Markesha Williams would have shown that the officers were not at the house for a lawful purpose but were there for the unlawful purpose of bribe—taking and retaliation for unpaid bribes against Mr. Cooper and would have supported a defense that he was assaulted or faced an imminent assault on himself.
>
> "Spencer's request is denied because no 'material issue of fact or law exists' which would entitle him to relief. Rule 32.7(d), Ala. R. Crim. P. While it is true that Spencer has pleaded more facts to support his claim that his attorney should have presented a provocation manslaughter defense, the facts pleaded do not support this defense. The Court of Criminal Appeals discussed the law concerning this defense on direct appeal, as follows:
>
>> "'Section 13A–6–3, Ala. Code 1975, states, in pertinent part:
>>
>>> "'"(a) A person commits the crime of manslaughter if:
>>>
>>> "'"....
>>>
>>> "'"(2) He causes the death of another person under circumstances that would constitute murder under Section 13A–6–2; except, that he causes the death due to a sudden heat of

88

passion *caused by provocation recognized by law,* and before a reasonable time for the passion to cool and for reason to reassert itself."

"'(emphasis added.) It is well settled that even where the defendant commits the killing due to a sudden heat of passion, an instruction on manslaughter is properly refused where there is no evidence that that sudden heat of passion was caused by a provocation recognized by law. *Harrison v. State,* 580 So. 2d 73, 74 (Ala. Crim. App. 1991).

"'"'Alabama courts have, in fact, recognized three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative."

"'*Rogers v. State,* 819 So. 2d 643, 662 (Ala. Crim. App. 2001).'

"*Spencer v. State,* 58 So. 3d 215, 244–45 (Ala. Crim. App. 2008). The Court of Criminal Appeals then found that the evidence presented by Spencer at trial was insufficient to support a heat-of-passion manslaughter defense, as follows:

"'Here, based on the evidence supporting Spencer's theory of events, the events leading up to the shootings, even if creating a sense of passion or mental or emotional imbalance, did not constitute a legally recognized provocation. It is apparent that neither the first (accused witnesses his spouse committing adultery) nor the third (accused witnesses an assault on a

family member or close relative) legally recognized provocation is applicable in this case. As to whether the second legally recognized provocation (whether Spencer was assaulted or faced with an imminent assault on himself) is applicable under the facts of this case, we have reviewed the evidence and answer that question in the negative.

"'Even assuming, without finding as true, Spencer's contentions that the officers made remarks during the earlier encounter that caused Spencer to fear that the officers would hurt or kill him, those comments were made hours before the final encounter where the officers were killed. Additionally, the initial arguments were between Woods and officers; Spencer willingly joined in the verbal jousting, and again continued his verbal sparring with a second officer even though the first officer had, according to Spencer, made threatening comments. Further, the first two officers Spencer encountered during the final and fatal engagement were shot repeatedly in the back while attempting to exercise a lawful arrest on Woods. The evidence also indicates that Spencer made statements following the earlier encounters with the officers that if the officers returned he would 'bust 'em' (R. 913), and that 'they was gonna get' the officers if they returned. (R. 1638.) Additionally, Spencer, knowing that the officers had returned because he looked out the window, exacerbated the situation by intentionally grabbing his loaded SKS assault rifle and proceeding toward the commotion in the kitchen. This evidence further militates against any contention that the murders were committed in a sudden passion and thus warranted such a jury instruction. Because the evidence did not support a charge

on heat-of-passion manslaughter, the trial court properly rejected Spencer's request for such a charge.'

"*Id.* at 245.

"Tyran Cooper's testimony does nothing to change the facts set forth above. It does not show that Spencer was assaulted or faced with an imminent assault on himself. As the Court of Criminal Appeals found, Spencer was the aggressor—not the officers. As the Court of Criminal Appeals also noted, Spencer shot the first two officers in the back as they were lawfully arresting Woods, he made statements earlier in the day that he would get the officers if they returned, and when Spencer saw that the officers had returned, he picked up his SKS assault rifle and sought out the officers. *Spencer,* 58 So. 3d at 245. The same is true of Markesha Williams's testimony. As the Court of Criminal Appeals found, the words between Spencer and the officers occurred hours between the initial visit from the officers and their attempt to serve the arrest warrant on Woods. In addition, the earlier confrontation was between Woods and the officers and did not involve Spencer. None of the evidence Spencer now alleges should have been presented would have changed these facts.

"The fact that Tyran Cooper was allegedly in a dispute with the officers concerning bribes does not show that Spencer was assaulted or faced with an imminent assault when the officers entered the house to arrest Woods. Spencer has not shown that counsel was ineffective because he failed to find and present more evidence to support a provocation manslaughter defense. Spencer is not entitled to an evidentiary hearing on this claim because no 'material issue of fact

91

> or law exists' which would entitle him to relief. Rule 32.7(d), Ala. R. Crim. P."
>
> (C. 71–75.)
>
> The evidence that Spencer pleaded should have been presented at trial—evidence of an alleged dispute that Nathaniel Woods was having with police officers—would not have supported a jury instruction on provocation manslaughter. Spencer did not plead in his second amended petition that he was in imminent threat of an assault at the time of the shootings. Spencer ignores the critical and undisputed evidence that two of the police officers were shot in the back with their guns still in their holsters. Indeed, Spencer's own testimony at trial showed that the officers were talking with Woods at the time of the shootings.
>
> This claim was correctly summarily dismissed pursuant to Rule 32.7(d), Ala. R. Crim. P., because, assuming that all the pleaded facts were true, the claim failed to state any material issue of fact or law that would entitle Spencer to relief.

*Spencer R.32*, 201 So. 3d at 596–99.

Mr. Spencer contends that "the state courts made no findings of fact respecting this distinct claim[.]" Doc. 21 at 39. Rather, he argues, "[i]t appears that the Court of Criminal Appeals simply overlooked it." *Id.* But as the foregoing analysis by the ACCA reflects, this is simply not so—that court addressed this claim.

Mr. Spencer also contends that the ACCA's determination of his provocation manslaughter claim was "objectively unreasonable" because his "Rule 32 petition presented sufficient evidence of his belief that he was under an imminent deadly

threat from the police officers when he shot them." *Id.* at 42–43. But as the ACCA ruling makes plain, the ACCA did not unreasonably interpret the facts of Mr. Spencer's case. Mr. Spencer's counsel had limited evidence to support any viable theory of defense, and his pursuit of those theories was, in the end, fruitless. *See Spencer R.32*, 201 So. 3d at 596–99.

Mr. Spencer also contends that "the [A]CCA unreasonably applied *Beck v. Alabama*" and that he was prejudiced because his jury was not given an opportunity to consider a lesser-included offense. Doc. 21 at 43–44. For the reasons discussed above and in Part III.B.2.i., below, the ACCA reasonably applied *Beck* to conclude that Mr. Spencer was not entitled to a jury instruction on a lesser-included offense or self-defense. Indeed, the ACCA ruling is that, even with perfect counsel, Mr. Spencer would not have been entitled to those jury instructions. *See Spencer R.32*, 201 So. 3d at 597–99.

### vii. Failure To Investigate And Present Expert Testimony Supporting Manslaughter Charge Based On Voluntary Intoxication

Mr. Spencer argues that trial counsel was ineffective because counsel "fail[ed] to investigate and present evidence supporting [a cocaine paranoia] defense, despite having specific knowledge that they would not be permitted to pursue a defense of self-defense." Doc. 1 ¶ 96. According to Mr. Spencer, "[a]bundant, readily available evidence demonstrated that Mr. Spencer's intoxication should have been a critical issue at trial." *Id.* ¶ 100.

Mr. Spencer contends that trial counsel contacted and provided material to a "Psychiatric Pharmacy Specialist," Dr. Shannon Lee, to investigate a cocaine paranoia defense, but "counsel did not pursue this line of inquiry and did not present any evidence of this defense at trial." *Id.* ¶ 94. Further, Mr. Spencer asserts, "Despite receiving repeated notice from the trial court that any effort to present a self-defense defense would likely fail, defense counsel did not further investigate the defense of 'cocaine paranoia.'" *Id.* ¶ 96. According to Mr. Spencer, an expert such as Dr. Lee or Dr. Johnathan Lipman (a post-conviction neuropharmacologist) could have testified "that the medications and illegal drugs that Mr. Spencer ingested, in combination with the visual and spatial neurological deficits caused by multiple head injuries, tremendously hindered his ability to react appropriately at the time of the crime." *Id.* ¶ 104.

According to Mr. Spencer, "Dr. Lipman concludes, based on the record, that at the time of the offenses Mr. Spencer's brain and behavior would have been acting under the combined and concerted neuropharmacological influences of chronic cocaine abuse and acute Quetiapine drug action and possibly to some extent alcohol . . . ." *Id.* ¶ 110. Mr. Spencer believes that "[w]ith expert evidence, the jury would have learned that Mr. Spencer's level of cocaine use likely caused severe paranoia and possibly even full psychosis." *Id.* ¶ 103.

Further, Mr. Spencer asserts, several "occupants of the crack house where Mr. Spencer had been living . . . were readily available witnesses who have testified that he was intoxicated when he committed the crime." *Id.* ¶ 101. But he says that "[b]ecause of defense counsel's failure to investigate and present evidence of intoxication, the jurors were effectively prevented from considering why Mr. Spencer acted as he did." *Id.* ¶ 98. And this allegedly led to a "forced guilty verdict[,]" where "the jury was trapped between the only two possible verdicts— acquittal and guilt of capital murder[.]" *Id.* ¶ 112.

The ACCA addressed this issue:

> Spencer also argues that his trial counsel was ineffective for failing to obtain and to present expert testimony on the defense of voluntary intoxication. Specifically, he argues that he should have had an expert testify about the effects of alcohol when mixed with other drugs.
>
> The circuit court stated the following concerning this claim:
>
> > "For a jury to consider the issue of whether a defendant's level of intoxication rises to the level to negate a requisite intent, there must be sufficient evidence to support a reasonable theory of an extreme level of intoxication. *See Ex parte McWhorter,* 781 So. 2d 330, 342–343 [(Ala.2000)]. A jury typically must consider whether a defendant was so intoxicated, at the time of the charged offense, that his mental state amounted to insanity, therefore, finding that his extreme intoxication negated the requisite intent, as charged in the indictment. *See Crosslin v. State,* 446 So. 2d 675, 681–682 (Ala. Crim. App. 1983).

"Spencer argues that an expert should have testified that the effects of Seroquel and cocaine on Spencer's brain would have left him confused and unable to process information logically. In addition, Spencer argues that disorientation, agitation, aggression, hallucinations, and paranoia have been reported with Quetiapine use. Finally, Spencer asserts that '[c]hronic cocaine abuse is known to engender panic, anxiety, and irrational fears.' This evidence is insufficient to show that, at the time he murdered the three police officers, Spencer was intoxicated to the point of insanity. In fact, Spencer does not even allege in the Rule 32 petition that he was suffering from any of these side effects when he murdered the three police officers—just that these are possible side effects from these drugs. Counsel's performance, therefore, was not deficient because they failed to present this evidence at Spencer's trial.

"In addition, Spencer's claim that he was prejudiced by counsel's failure to present this expert testimony does not present a material issue of fact or law because his actions during this crime show that he was not intoxicated to the point of insanity. When Spencer heard a commotion outside, he went to the bedroom window to see what was going on. When Spencer saw the officers in the apartment, he started shooting and did not stop shooting until all the officers were down. He walked to the back door of the apartment and saw Officer Collins. He shot at Officer Collins to make sure that he was not a threat to him. When he left the apartment, he went to a house down the street where he hid in the attic to avoid the police. Spencer's actions during the murders of the police officers clearly reveal that he was not functioning as someone who was intoxicated to

the point of insanity but as someone who understood what he was doing and was aware of the consequences of his actions. Because Spencer's actions during the murders show that he was not intoxicated to the point of insanity, he cannot prove that he was prejudiced by counsel's failure to present expert evidence concerning his cocaine, alcohol, and pill use."

(C. 75–77.)

This Court has held that a petitioner fails to plead sufficient facts regarding a claim that counsel failed to present an intoxication defense when he makes only a bare allegation that the petitioner was intoxicated at the time of the offense. As this Court has stated: "[The appellant] failed to allege how much he had to drink the night of the crime, how long before the crime he had been drinking, or any fact indicating that his alleged intoxication amounted to insanity." *Connally v. State,* 33 So. 3d 618, 623 (Ala. Crim. App. 2007).

> "[The appellant] failed to plead sufficient facts to indicate that voluntary intoxication would have been a viable defense or that he would have been entitled to a jury instructions on voluntary intoxication ...; thus, he failed to plead sufficient facts indicating that his trial counsel were ineffective in this regard."

*Mashburn v. State,* 148 So. 3d 1094, 1126–27 (Ala. Crim. App. 2013). This claim was insufficiently pleaded.

Moreover, recently in *Wiggins v. State,* 193 So. 3d 765 (Ala. Crim. App. 2014), this Court stated:

> "Some courts have found that expert testimony on the effects of alcohol is not necessary because it concerns an issue within the common knowledge of a juror. As the Washington Court of Appeals stated

in *State v. Thomas,* 123 Wash. App. 771, 98 P.3d 1258 (2004):

"'A voluntary intoxication defense allows the jury to consider "evidence of intoxication" to determine whether the defendant acted with the requisite intent. But unlike diminished capacity, it is not necessary to present expert testimony to support an involuntary intoxication defense. The effects of alcohol are commonly known and jurors can draw reasonable inferences from testimony about alcohol use. *State v. Kruger,* 116 Wash. App. 685, 692–93, 67 P.3d 1147, rev. denied 150 Wash. 2d 1024, 81 P.3d 120 (2003); *State v. Smissaert,* 41 Wash. App. 813, 815, 706 P.2d 647 (1985).'

"123 Wash. App. at 781–82, 98 P.3d at 1263. See also *State v. Frank,* 364 N.W. 2d 398, 400 (Minn.1985) ('Most jurors have some experience with the effects of excessive alcohol consumption and therefore, in an ordinary case, will not need expert assistance.')."

193 So. 3d at 802.

Furthermore, the trial record shows that trial counsel filed a pretrial motion for funds to hire a pharmacologist. (Trial C. 380.) In the motion, counsel stated:

"[D]efendant needs to have an expert testify at trial as to whether or not habitual use of cocaine may lead to episodes of paranoia that create a fear that has no actual basis. This testimony may be used to negate the State's argument of the specific intent to kill by the Defendant."

(Trial C. 380.) That motion was granted. Postconviction counsel admitted in the second amended petition that trial counsel had hired Dr. Shannon Lee, a psychiatric

pharmacy specialist, "to investigate and prepare material for a 'cocaine paranoia' defense. For some reason, counsel did not pursue this line of inquiry and did not present any evidence of this defense at trial." (C. 659.)

> "[T]rial counsel had no reason to retain another psychologist to dispute the first expert's findings. 'A postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial.' *State v. Combs,* 100 Ohio App. 3d 90, 103, 652 N.E. 2d 205, 213 (1994). See also *State v. Frogge,* 359 N.C. 228, 244–45, 607 S.E. 2d 627, 637 (2005). 'Counsel is not ineffective for failing to shop around for additional experts.' *Smulls v. State,* 71 S.W. 3d 138, 156 (Mo. 2002). 'Counsel is not required to "continue looking for experts just because the one he has consulted gave an unfavorable opinion." *Sidebottom v. Delo,* 46 F.3d 744, 753 (8th Cir. 1995).' *Walls v. Bowersox,* 151 F.3d 827, 835 (8th Cir. 1998)."

*Waldrop v. State,* 987 So. 2d 1186, 1193 (Ala. Crim. App. 2007).

Testimony presented at trial indicated that the night before the shootings Spencer ingested cocaine. Testimony further indicated that the next morning between 9:00 a.m. and 10:00 a.m. Spencer drank one beer, took one Seroquel pill, and ingested a small amount of cocaine. *Spencer,* 58 So. 3d at 256. The circuit court found in its amended sentencing order that "'more than sufficient time had elapsed between the time the last drugs or alcohol were ingested and the shooting[s].'" 58 So. 3d at 256. There was no evidence at trial indicating that Spencer's intoxication at the time of the shootings rose to such a level that it amounted to insanity. *See Connally v. State,* supra.

> For the reasons stated above, this claim was correctly summarily dismissed pursuant to Rule 32.6(b), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 599–601 (footnotes omitted).

According to Mr. Spencer, the ACCA ruling was "[in]consistent with a reasonable application of relevant precedent[]" and an "[un]reasonable factual determination[]." Doc. 21 at 47. Mr. Spencer contends that "it's no answer for the CCA to agree that not much evidence was presented at trial." *Id.* at 48–49. "The crux of Mr. Spencer's claim is that trial counsel should have presented evidence about cocaine paranoia and the like because it was relevant and readily available to support a defense that counsel actually pursued." *Id.* at 49. So, Mr. Spencer argues, "the CCA's reliance on the inadequate evidence in the trial record actually supports Mr. Spencer's post-conviction claim." *Id.* According to Mr. Spencer, had counsel provided adequate representation, a retained expert like "Dr. Lipman would have corroborated what counsel argued[.]" *Id.* at 46. And "[w]hile the CCA derides this new evidence as insufficiently specific, Mr. Spencer's post-conviction expert would testify that his cocaine intoxication persisted during the crime and that its psychotoxic impacts would have included behavioral symptoms that mirror psychosis[.]" *Id.* at 47. Mr. Spencer contends that his "Rule 32 petition contains a much more detailed account of his intoxication than was found sufficient to warrant

such a[ voluntary intoxication instruction]" by the ACCA in previous cases. *Id.* at 48.

At the outset, the court cannot consider Mr. Spencer's factual allegations that "are not before the [c]ourt because they were not presented to the state court at trial or on direct appeal when the instant claim was raised." Doc. 18 at 39. Those facts are: "The effects of chronic high dose cocaine abuse mimic in many ways the symptoms and signs of psychosis in mental patients. The preferred pharmacological term for this drug-induced psychotic-like condition is psychotomimesis." Doc. 1 ¶ 107. And:

> Mr. Spencer's last use of cocaine was about three hours prior to the shootings. Although the subjective "rush" from cocaine lasts at most an hour, and commonly less, cocaine actually has a half-life of up to 1.5 hours. Dr. Lipman opines, that even if Mr. Spencer had not been using cocaine repeatedly and continuously for days, he would on the basis of cocaine kinetics alone, still have had an appreciable blood level of the drug at the times of the shooting. Since Mr. Spencer was also constantly drinking alcohol, he would have had, routinely, a measurable blood concentration of both alcohol and cocaine simultaneously. When consumed together, the kinetics of cocaine are altered (the half-life is extended) and cocaine blood levels are raised above the level expected from cocaine alone.

*Id.* ¶ 109. Under controlling precedent, the court cannot consider these factual allegations because they were not presented to the state courts. *See Cullen*, 563 U.S. at 181; *Snowden*, 135 F.3d at 735.

Separately, Mr. Spencer cites two Supreme Court cases to support his legal argument, *Harrington v. Richter*, 562 U.S. 86 (2011), and *Hinton v. Alabama*, 571 U.S. 263 (2014). *See* Doc. 21 at 45–49. But he analyzes only *Hinton*, which he says the ACCA incorrectly applied when it ignored his newly introduced expert testimony about his intoxication. *See id.* at 47–48.

Mr. Spencer's argument fails because in *Hinton*, the Supreme Court decided that "the inadequate assistance of counsel [there] . . . d[id] not consist of the hiring of an expert who, though qualified, was not qualified enough." 571 U.S. at 274–75. The court expressly did not "launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired" but instead ruled only on "the unreasonable failure to understand the resources that state law made available" to counsel, resulting in ineffective assistance. *Id.* at 275. And that's what Mr. Spencer asked the state court to do here—his petition invited the state court to examine the potential testimony of a different expert who his previous counsel might have obtained. *See* Doc. 21 at 46; *Spencer R.32*, 201 So. 3d at 600–01. Indeed, Mr. Spencer's counsel sought and received funds to hire a pharmacologist. *Spencer R.32*, 201 So. 3d at 601. So the ACCA ruling was not an unreasonable interpretation of *Hinton*.

Separately, the record supplies no indication that the ACCA unreasonably interpreted the facts that were adduced at Mr. Spencer's trial. *See id.* Mr. Spencer

testified that he did drugs the night before the murders and that he took a Seroquel the morning of the murders. Doc. 17-27 at 157, 161–62, 186. But he did not testify that he was high during the murders; he testified that he was asleep until the officers entered the apartment while chasing Mr. Woods. *See id.* at 179–88. The ACCA reasonably interpreted these facts.

Accordingly, Mr. Spencer is due no habeas relief on this claim.

### viii. Failure To Have Thorough Mental Evaluation By Competent Expert

Mr. Spencer contends that trial counsel was ineffective during the guilt phase "by failing to have Mr. Spencer evaluated by any competent mental health expert prior to his trial." Doc. 1 ¶ 113. According to Mr. Spencer, "[s]uch an expert was necessary to testify that Mr. Spencer has post-traumatic stress disorder, a mental health condition which either negated the specific intent for capital murder or lessened his culpability for that crime." *Id.*

Mr. Spencer acknowledges that before trial, "defense counsel requested funds to have Mr. Spencer evaluated for competence to stand trial," and he was evaluated by Dr. Kimberly Ackerson, a forensic psychologist. *Id.* ¶ 114. She "concluded that 'there is nothing to indicate this defendant has ever suffered from a serious mental illness such as a formal thought disorder, psychotic disorder, or major affective disorder.'" *Id.* But Mr. Spencer maintains that Dr Ackerson's evaluation was "only for the limited purpose of determining competence" and "relied on limited

103

information from only a few sources," so her "report contained 'red flags,' . . . which should have alerted counsel that a more detailed inquiry into Mr. Spencer's mental health was warranted." *Id.*

According to Mr. Spencer, trial counsel should have retained a competent expert, such as Dr. Donna Schwartz-Watts, whom "post-conviction counsel has retained to evaluate Mr. Spencer[.]" *Id.* ¶ 116. Dr. Schwartz-Watts "would have testified that the accumulated trauma that he experienced prior to the crime for which he was convicted caused him to develop post-traumatic stress disorder[,]" *id.*, which would have allegedly bolstered his self-defense theory when she explained that Mr. Spencer suffered from "super hyper-vigilance and . . . an active startle response[,]" *id.* ¶ 118. His previous head injuries also allegedly caused "brain damage, including visual and spatial defects which, in combination with his drug intoxication, would have affected his ability to see and to process accurately what he saw at the time of the crime." *Id.* ¶ 119.

The ACCA addressed this issue:

> Spencer next argues that counsel was ineffective for failing to have him evaluated by a competent mental-health expert. Specifically, Spencer pleaded in his second amended petition that counsel should have hired Dr. Donna Schwartiz–Watts—a psychiatrist—to evaluate Spencer.
>
> Spencer pleaded that Dr. Schwartiz–Watts evaluated Spencer for the postconviction proceedings and that it was her opinion that Spencer suffered from post-traumatic

stress disorder and that he "demonstrates super hyper-vigilance ... and an active startle response." (C. 671.) Spencer also pleaded that Dr. Schwartiz–Watts found that Spencer had brain injuries from his childhood.

The circuit court stated the following concerning this claim:

> "Spencer fails to explain how the guilt phase of his trial would have been different had he presented the evidence that he suffers from post-traumatic stress disorder or is brain damaged. The evidence is overwhelming that Spencer indicated that he would kill the officers if they returned to the apartment and that he followed through on this threat. No material issue of fact or law exists concerning this claim, therefore, the request for an evidentiary hearing is denied."

(C. 94–95.)

The State asserts that this claim was not sufficiently pleaded because Spencer did not "proffer any specific facts that would show how his post-traumatic stress syndrome or brain damage caused him to kill the victim[s]." (C. 878.) This Court agrees. Spencer also failed to plead how he was prejudiced by this expert's failure to testify. Therefore, this claim was correctly summarily dismissed pursuant to Rule 32.6(b), Ala. R. Crim. P.

Moreover, the trial record shows that trial counsel moved that Spencer be evaluated to determine his competency to stand trial and that Spencer was evaluated by Dr. Kimberly Ackerson, a forensic psychologist. The record also shows that trial counsel moved for funds for a mitigation expert and that that motion was granted. (C. 1582.) Dr. Allen E. Shealy, a psychologist, conducted a psychological evaluation of Spencer, administered intelligence tests to Spencer, administered the "Bender–Gestalt" screening for gross brain damage to Spencer, examined Spencer's

105

medical records, and conducted numerous interviews. (Trial C. 3468.) Dr. Shealy compiled a report, which was admitted at the judicial sentencing hearing. In the report, Dr. Shealy stated:

> "I found Mr. Spencer to be cognitively intact as indicated by a WAIS–III Verbal IQ of 97 which is in the range of average intelligence, relative to the general U.S. population. He reads at the Grade Level of 10.8. There is no evidence of major brain dysfunction as measured by the Bender–Gestalt, a screening of gross neuropsychological intactness. These findings are consistent with the conclusions reached by Dr. Ackerson in her psychological evaluation of trial competency. Therefore, his level of intelligence is not considered of mitigating value. Also his medical history including the history of treatment during incarceration provides no evidence of a major mental disorder which might have mitigating value.

> "One of the mitigating factors that is present is the absence of a history of previous violent behavior. This is reflected in the absence of arrests for violent offenses and is consistent with reports from collateral sources and with his behavioral history since incarceration at the Jefferson County jail since February 2005. At the time of my evaluation, he was residing in the general population without violent incidents.

> "A second mitigating factor is Mr. Spencer's social and family history. Even though he grew up with deficits of paternal parenting, according to all reports he has been a devoted father to his two children. In support of this, he was able to provide me with immediate and exact date of birth of both of his children. Other evidence of positive character traits include reports from his minister at St. Luke's Baptist Church that he has attended church

regularly with his family for most of his life. His pastor has known him for 17 years and further characterizes him as a devoted father and says, 'He's a top-of-the-line, superb father. He's crazy about them (his two children) and they're crazy about him.' He states that Mr. Spencer was active in the Youth Ministry of his church and the pastor has ongoing visitation with Mr. Spencer at the jail.

> "A further mitigating factor is that most of the evidence supports the premise that the offense he is charged with occurred under extreme emotional duress in which the defendant feared for his life. This may have been exacerbated by the influence of drugs that he was under at the time of the offense."

(Trial C. 3468–69.)

Spencer was evaluated by two mental-health experts before his trial, and trial counsel was privy to Dr. Ackerson's and Dr. Shealy's findings. Again,

> "[t]rial counsel had no reason to retain another psychologist to dispute the first expert's findings. 'A postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial.' *State v. Combs,* 100 Ohio App. 3d 90, 103, 652 N.E. 2d 205, 213 (1994). See also *State v. Frogge,* 359 N.C. 228, 244–45, 607 S.E. 2d 627, 637 (2005). 'Counsel is not ineffective for failing to shop around for additional experts.' *Smulls v. State,* 71 S.W.3d 138, 156 (Mo. 2002). 'Counsel is not required to "continue looking for experts just because the one he has consulted gave an unfavorable opinion." *Sidebottom v. Delo,* 46 F.3d 744, 753 (8th Cir. 1995).' *Walls v. Bowersox,* 151 F.3d 827, 835 (8th Cir. 1998)."

> *Waldrop,* 987 So. 2d at 1193.

> Spencer failed to plead the full facts in regard to this claim, and, thus, it was correctly summarily dismissed pursuant to Rule 32.6(b), Ala. R. Crim. P. Moreover, assuming all the pleaded facts are true, there was no material issue of fact or law that would entitle Spencer to relief; therefore, pursuant to Rule 32.7(d), Ala. R. Crim. P., this claim was also due to be summarily dismissed.

*Spencer R.32*, 201 So. 3d at 601–03.

According to Mr. Spencer, "[t]he CCA's summary dismissal of the mental health expert component of this claim was . . . unreasonable, in that it was premised on a facially deficient pretrial competence evaluation." Doc. 21 at 49. Mr. Spencer argues that *Ake v. Oklahoma*, 470 U.S. 68, 82 (1985), established his right to evaluation by an expert, who would then assist in the preparation of his defense. Doc. 21 at 50. Mr. Spencer further argues that "counsel's decision to merely have Mr. Spencer examined for competence to stand trial was deficient performance" because *Ake* requires more than just an evaluation. *Id.*

Mr. Spencer also argues that the ACCA "finding that Mr. Spencer failed to plead prejudice [is] a[n in]correct statement of the record." *Id.* "Mr. Spencer's Rule 32 petition explained that his post-conviction psychiatric expert . . . would have told the jury what Dr. Ackerson could not – that Mr. Spencer's post-traumatic stress disorder and the residual impacts of brain damage accounted for his belief that the police posed an imminent threat to his life when he shot them." *Id.*

The ACCA did not unreasonably interpret *Ake* in determining that, even "assuming all the pleaded facts" in Mr. Spencer's Rule 32 petition were true, he was not entitled to relief. *Spencer R.32*, 201 So. 3d at 603. As explained above, "the inadequate assistance of counsel . . . does not consist of the hiring of an expert who, though qualified, was not qualified enough." *Hinton*, 571 U.S. at 274–75. The court cannot "launch . . . into examination of the relative qualifications of experts hired and experts that might have been hired" but instead may only examine "the unreasonable failure to understand the resources that state law made available." *Id.* at 275.

Mr. Spencer's counsel hired multiple experts to evaluate his mental health. *Spencer R.32*, 201 So. 3d at 603. One expert, Allen E. Shealy, Ph.D., wrote that he "found Mr. Spencer to be cognitively intact as indicated by a WAIS-III Verbal IQ of 97 which is in the range of average intelligence, relative to the general U.S. population." Doc. 17-19 at 70. He further found that "[t]here [was] no evidence of major brain dysfunction" and "no evidence of a major mental disorder which might have mitigating value." *Id.* at 70–71. Another expert, Dr. Kimberly Ackerson, determined that Mr. Spencer was competent to stand trial. *See id.* at 70.

The State provided Mr. Spencer funds to pay all of these experts, and he was given the benefit of their services. So the State "at a minimum, assure[d] the defendant access to a competent psychiatrist who . . . conduct[ed] an appropriate

109

examination" of Mr. Spencer to assist his defense. *Ake*, 470 U.S. at 83. Accordingly, Mr. Spencer is due no habeas relief on this claim.

### ix.    *Failure To Object To Introducing Evidence of Prior Bad Acts*

Mr. Spencer argues that trial counsel was ineffective because "counsel failed to mount effective arguments" about why evidence of Mr. Spencer's drug dealing, gun possession, and arrest warrants "should have been excluded as not relevant to the guilty/innocence phase determination." Doc. 1 ¶ 120. According to Mr. Spencer, "counsel should have requested that the jury be instructed on the limited purpose for which this evidence could be used." *Id.*

Warden Raybon responds that this claim is "not fully exhausted and [is] therefore procedurally defaulted because [it] was not raised on appeal to the Court of Criminal Appeals or in [Mr.] Spencer's petition for writ of certiorari in the Alabama Supreme Court from the denial of the post-conviction petition." Doc. 19 at 16–17. Mr. Spencer "concedes that [this claim is] procedurally defaulted" because he raised it in his Rule 32 Petition but not "in his appeal challenging the dismissal thereof," so it was "not exhausted before the state appellate courts[.]" Doc. 21 at 4. Mr. Spencer is thus due no habeas relief on this claim.

### x.    *Failure To Subpoena "Key" Witness*

Mr. Spencer next contends that trial counsel was ineffective for failing "to adequately ensure" a key witness's testimony "by properly subpoenaing him, or

contacting [his] attorney to ensure his presence." Doc. 1 ¶ 124. Mr. Spencer argues that this "crucial witness," Tyran ("Bubba") Cooper, could have established why the officers were at the apartment on the day of the shootings. *Id.* ¶ 123. And, Mr. Spencer contends, "in requesting that the court issue an instanter subpoena, counsel failed either to proffer the entirety of Cooper's expected testimony or to assert the legal basis for its materiality when the court inquired whether Cooper's testimony would be admissible." *Id.* ¶ 125. "Thus, compounding the error of failing to ensure Cooper would appear at Mr. Spencer's trial, counsel rendered deficient performance by failing to establish that Cooper's testimony was both favorable and material to Mr. Spencer's defense, which was necessary to obtain either an instanter subpoena or a continuance." *Id.* "Counsel also should have, but did not, argue that Cooper's testimony was admissible because Mr. Spencer had a constitutional right . . . to present a complete defense, which state law does not trump." *Id.*

Mr. Cooper allegedly would have testified that he had an agreement with Officers Owen and Chisolm, in which Mr. Cooper paid the officers not to interfere with Mr. Cooper's drug business and to provide advance notice of impending police raids. *Id.* ¶ 126. Shortly before the shootings, "the price of these officers' cooperation increased from $1000 per week to $1500 per week when Cooper was involved in an attempted murder plot[.]" *Id.* Mr. Cooper allegedly would have explained "that the officers' protection of Cooper's drug business included

111

protection of Mr. Spencer and Mr. Woods, who sold drugs in partnership with Cooper from the green apartment[.]" *Id.* And when Mr. Cooper stopped paying the officers, the officers allegedly threatened Mr. Cooper. *Id.*

Mr. Spencer argues that Mr. Cooper's testimony would have shown that "the presence of the police at the green apartments [on the day of the shootings] was for an unlawful purpose related to retaliation for Cooper's failure to continue paying them[.]" *Id.* ¶ 127. But because defense counsel failed to secure Mr. Cooper's testimony, "defense counsel had no ability to combat the State's evidence that the officers were there to serve a legal arrest warrant." *Id.* ¶ 124.

Mr. Spencer alleges that "[p]ost-conviction juror interviews have confirmed that the jury foreperson . . . , among others, would have been persuaded of lesser culpability during guilt-phase deliberations by evidence that the police were at the green apartments to conduct illegal or corrupt activity." *Id.* ¶ 128 n.119.

The ACCA addressed this issue:

> Spencer next argues that his trial counsel was ineffective for failing to subpoena Tyran "Bubba" Cooper, who Spencer describes as a key witness. Specifically, he argues that Cooper's testimony supported convictions for the lesser offense of provocation manslaughter and that counsel was ineffective for failing to ensure that Cooper testified.
>
> The circuit court made the following findings concerning this claim:

"Spencer cannot prove that he was prejudiced because counsel failed to subpoena Tyran Cooper to establish his provocation manslaughter defense. The fact that Tyran Cooper was allegedly in a dispute with the officers concerning bribes does not show that Spencer was assaulted or faced with an imminent assault when the officers entered the house to arrest Woods. As the Court of Criminal Appeals also noted, Spencer shot the first two officers in the back as they were lawfully arresting Woods, he made statements earlier in the day that he would get the officers if they returned, and when Spencer saw that the officers had returned, he picked up his SKS assault rifle and sought out the officers. *Spencer [v. State ],* 58 So. 3d [215,] 245 [(Ala. Crim. App. 2009)]. As the Court of Criminal Appeals found, the words between Spencer and the officers occurred hours between the initial visit from the officers and their attempt to serve the arrest warrant on Woods. In addition, the earlier confrontation was between Woods and the officers and did not involve Spencer. Tyran Cooper's testimony would not have changed these facts. Spencer is not entitled to an evidentiary hearing on this claim because no 'material issue of fact or law exists' which would entitle him to relief."

(C. 77–78.)

The record of Spencer's trial shows that trial counsel attempted to call Cooper as its last witness. On direct appeal, this Court stated the following facts surrounding this issue:

"In the present case, at approximately 4:45 p.m. on Saturday, June 19, 2005, during the defense's case, the defense called Cooper as its final witness; however, he was not present. Outside the hearing of the jury, defense counsel informed the trial court that the witness had not been subpoenaed because

113

the witness had told defense counsel 'on three or four occasions he didn't need a subpoena.' (R. 1719.) Defense counsel requested a continuance until 8:30 a.m. the following morning, and the trial court recessed until 8:30 a.m. the following morning.

"The following morning, defense counsel informed the trial court that Cooper was again not present. Defense counsel averred that a subpoena had been issued on May 17, 2005, to secure the presence of Cooper as a witness at trial. That subpoena was returned unserved on May 23, 2005, because Cooper had not been located. According to defense counsel, an alias was issued on May 25, 2005, but defense counsel was unaware as to whether that subpoena had been served. Defense counsel informed the trial court that he had spoken with Cooper on the telephone the day before; he stated that Cooper claimed to have been unaware that he was supposed to be in court and that Cooper wanted to speak with his attorney before agreeing to testify at Spencer's trial. Defense counsel averred that members of Spencer's family had spoken with Cooper that morning and provided the trial court with the address of the apartment where Cooper was supposedly located at that time.... Cooper had informed the family members that he did not wish to testify at Spencer's trial. The trial court instructed defense counsel to telephone Cooper at the number they had been given, but that number was the general office number for the apartment complex, rather than the specific apartment where Cooper was allegedly located.

"Defense counsel requested that the trial court issue an attachment to have Cooper picked up and brought to court."

*Spencer,* 58 So. 3d at 235. Trial counsel then asked the trial court to issue an instanter subpoena to Cooper. After a lengthy discussion, the circuit court declined to delay the trial. (Trial R. 1725–33.)

Attached to Spencer's postconviction petition is an affidavit executed by Cooper. Cooper states that he openly sold drugs from the apartment where the shooting occurred, that he had an arrangement with police officers whereby he would pay them not to disturb that business, that, before the shootings, he had stopped paying the officers, and that the officers had been coming by the apartment frequently to try to collect money. Cooper did not state, and Spencer does not allege in his postconviction petition, that Cooper was present at the time of the shooting. The contents of Cooper's affidavit did not establish sufficient facts to support the elements of provocation manslaughter.

Assuming all the facts as pleaded in Spencer's petition are true, "no material issue of fact or law exist[ed] which would entitle [Spencer] to relief" on this claim. Rule 32.7(d), Ala. R. Crim. P. This claim was correctly summarily dismissed.

*Spencer R.32*, 201 So. 3d at 603–05.

Mr. Spencer argues that Mr. Cooper's testimony was critical to his defense, and that he was deprived of his right to put on a "full defense." Doc. 1 ¶ 125; Doc. 21 at 51–55; *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982); *Washington v. Texas*, 388 U.S. 14, 16 (1967). Mr. Spencer argues that the ACCA unreasonably interpreted *Valenzuela-Bernal* or *Washington* by deciding that Mr. Cooper's testimony was immaterial. Doc. 21 at 52. According to Mr. Spencer, "even if Mr. Cooper's testimony did not help to prove provocation, it was admissible

115

as relevant to establishing Mr. Spencer's state of mind – that he lacked intent to commit capital murder[,]" and "Mr. Cooper's testimony was also material because it would have disproved a key facet of the prosecution's case — that police were killed during the lawful course of performing their duties." *Id.* at 53–54. Mr. Spencer argues that Mr. Cooper's testimony also "would have undermined the credibility of a key prosecution witness — Michael Collins, the surviving officer." *Id.* at 54. And finally, "Mr. Cooper's testimony [allegedly] would have dispelled [the prosecution's] myth and established that he, not Mr. Spencer, controlled the drug operation." *Id.* at 54–55.

In *Valenzuela-Bernal*, the Supreme Court described a defendant's burden to establish a violation of compulsory process: "[The defendant] must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." 458 U.S. at 867. Without that showing, there can be "no Sixth Amendment violation." *Id.* at 871.

The crux of the ACCA analysis is that because Mr. Cooper was not present when the shooting occurred, his testimony was not material to Mr. Spencer's defense. *See Spencer R.32*, 201 So. 3d at 604–05. The ACCA concluded that Mr. Cooper's testimony "did not establish sufficient facts to support the elements of provocation manslaughter," *id.* at 605, so Mr. Cooper's Sixth Amendment right to compulsory process was not violated.

That conclusion is not an unreasonable interpretation of the law, nor an unreasonable factual determination. The testimony that Mr. Spencer's counsel proffered when asking the trial court to issue an instanter subpoena closely mirrors the testimony in Mr. Cooper's affidavit. At trial, Mr. Spencer's counsel said that Mr. Cooper would testify that "he was the drug supplier" for Mr. Spencer and Mr. Woods's drug dealing operation, and that he paid Officers Owen and Chisholm to protect the operation from law enforcement. *See* Doc. 17-28 at 35–36. Mr. Cooper's affidavit contains largely the same testimony, albeit with more detail, and Mr. Cooper does not there testify that he was present when these shootings occurred. *See generally* Doc. 1-1. Mr. Cooper's affidavit is not probative regarding whether "(1) [Mr. Spencer] witnesse[d] his . . . spouse in the act of adultery; (2) [Mr. Spencer] was] assaulted or faced with an imminent assault on himself; [or] (3) [Mr. Spencer] witnesse[d] an assault on a family member or close relative." *Spencer I*, 58 So. 3d at 245 (quoting *Rogers v. State*, 819 So. 2d 643, 662 (Ala. Crim. App. 2001)). Therefore, his testimony was not material to Mr. Spencer's attempt to receive a jury instruction on a lesser included offense or self-defense, *see Valenzuela-Bernal*, 458 U.S. at 867, and the ACCA did not err in its review of Mr. Spencer's Rule 32 petition.

117

*xi. Failure To Argue Governmental Interference With Material Defense Witness*

Mr. Spencer argues that trial counsel was ineffective when counsel failed to pursue appropriate relief "when they knew for certain that Cooper would not testify for the defense at Mr. Spencer's trial because he had been threatened by government officials." Doc. 1 ¶ 139. Mr. Spencer contends that "[g]overnment officials threatened Cooper by telling him that he would face enhanced criminal charges and a longer prison sentence in his own case if he testified at trial on Mr. Spencer's behalf." *Id.* ¶ 135.

Before the shootings that form the basis of Mr. Spencer's convictions, Mr. Cooper was involved in a shooting that injured two people. *Id.* ¶ 136. "Birmingham prosecutors charged Cooper with attempted murder . . . , and federal prosecutors subsequently indicted Cooper for being a felon in possession of a firearm." *Id.* But "Cooper had been told that he was facing a probationary sentence." *Id.* "After that, as Mr. Spencer's June 2005 trial approached and prosecutors became aware that [Mr.] Cooper would testify in Mr. Spencer's defense, public officials threatened enhanced punishments for Cooper, including three life terms or sixty five years." *Id.* A detective allegedly told Mr. Cooper's wife "that law enforcement would bury Cooper 'under the jail,' because of his involvement with the murder of [the] police officers[.]" *Id.* And "when Cooper did not testify at Mr. Spencer's trial, . . . state prosecutors ultimately allowed Cooper to plead guilty to assault in the first degree,

a class B felony." *Id.* ¶ 138. Because of his federal and state pleas, "Cooper served relatively little time in prison for his crime and has already been released on probation." *Id.*

According to Mr. Spencer, "[t]rial counsel . . . knew that Cooper had been threatened by Detective Russell because Cooper told him so specifically prior to Mr. Spencer's trial." *Id.* ¶ 137. And "[i]f counsel had presented and proven the claim . . . when it became evident that Cooper would not testify, Mr. Spencer would have been entitled to a mistrial and to a new trial." *Id.* ¶ 139.

The ACCA addressed this issue:

> Spencer next argues that his counsel was ineffective for failing to object to what he says was the State's interference with a material witness. Specifically, Spencer pleaded that a detective threatened Cooper against cooperating with Spencer's trial counsel and warned that he would face a lengthier sentence if he testified at Spencer's trial.
>
> The circuit court stated the following concerning this claim:
>
>> "The facts as pleaded do not entitle Spencer to relief because he cannot prove—with these facts—that he was prejudiced by counsel's alleged ineffectiveness. As the Court of Criminal Appeals found concerning Cooper's testimony: '[A]s the trial court noted, there was some question as to whether the testimony [of Cooper], as proffered, would have even been admissible. The witness did not see the shootings; moreover, there was no indication that the witness was going to testify as to any specific communications between himself and

the accused that would support a self-defense argument.' *Spencer*, 58 So. 3d 215, 239. In addition, the record clearly shows that Spencer was not acting in self-defense when he murdered Officers Owen, Chisolm, and Bennett and when he attempted to murder Officer Collins. The officers were not involved in any unlawful attempt to arrest Nathaniel Woods. In fact, they informed Woods that they had an arrest warrant for him and that he was under arrest based on this outstanding warrant. When Woods turned and ran into the apartment, the officers entered the apartment to arrest him. They did not have their guns drawn when they entered the apartment to arrest him. They did not have their guns drawn when Spencer started firing on them. In fact, the officers' attention was completely on arresting Woods when Spencer began firing the SKS assault rifle at them. There is absolutely nothing in the record that indicates that the officers made Spencer fear for his life when they entered the apartment. Their weapons were not drawn and their attention was focused solely on Woods.

> "They never even attempted to approach Spencer. In fact, the officers did not attempt to use any force against Spencer, much less excessive force. Spencer was asleep on the couch when the officers entered the apartment. When Spencer heard a noise, he got up and looked out the bedroom window to see what was happening. He saw Woods and started firing on the officers. Spencer did not stop firing until all of the officers were down. Because Spencer was not acting in self-defense, he was not prejudiced when his attorney failed to present evidence that the State interfered with the testimony of Tyran Cooper."

(C. 78–80.)

120

The circuit court's findings are supported by the record. In his petition, Spencer failed to plead facts that, if true, would establish prejudice under *Strickland. See* Rule 32.6(b), Ala. R. Crim. P. Accordingly, he failed to meet his burden to plead the full factual basis of his claim and summary dismissal was appropriate. *See id.;* Rule 32.7(d), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 605–06.

According to Mr. Spencer, the ACCA "construed the facts adversely to Mr. Spencer, essentially finding that he could not have acted in self-defense based on the evidence adduced at trial." Doc. 21 at 56. But, Mr. Spencer argues, "[n]one of these reasons justify summary dismissal[]" because Mr. Cooper's testimony was relevant and "Mr. Spencer did allege sufficient prejudice[.]" *Id.* Mr. Spencer contends that "[h]aving alleged precisely how and why the government substantially interfered with Mr. Cooper's willingness to voluntarily testify as a material defense witness, Mr. Spencer demonstrated that he was prejudiced by counsel's error." *Id.* at 57.

Mr. Spencer also argues that the ACCA decision unreasonably applied the law as decided in *Webb v. Texas*, 409 U.S. 95, 97 (1972). Doc. 1 ¶ 139. In *Webb*, the Supreme Court reversed a conviction after the trial judge admonished a defense witness that his testimony could be used against him, and that lying on the stand "would get [the witness] convicted of perjury and that [the conviction] would be stacked onto" the witnesses other criminal charges. 409 U.S. at 96. That admonition caused the witness to refuse to testify, *id.*, and the Supreme Court held that "the

judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment," *id.* at 98.

But the ACCA had no occasion to apply *Webb* in Mr. Spencer's case, as there is no indication that the trial court admonished Mr. Cooper such that he refused to testify. Indeed, Mr. Cooper never appeared in court. Mr. Spencer has identified no other Supreme Court precedent that would support his contention that the government's alleged threats to Mr. Cooper deprived Mr. Spencer of his rights. And in any event, the ACCA found that Mr. Spencer's counsel was not ineffective for failing to object because Mr. Cooper's testimony would not have materially benefitted Mr. Spencer at trial. *See Spencer R.32*, 201 So. 3d at 605–06. This was not an unreasonable determination of the facts in Mr. Spencer's case. For the reasons set forth in Part III.A.1.x, the ACCA reasonably concluded that Mr. Cooper's testimony would not have provided a basis for jury instructions on lesser-included offenses or self-defense, so Mr. Spencer was not prejudiced by his counsel's asserted failures.

    *xii.    Failure To Object To The Trial Court's Failure To Instruct Jury On Both Voluntary Intoxication And Manslaughter Defense*

Mr. Spencer argues that even though trial counsel "requested, and were granted, an instruction on voluntary intoxication and manslaughter[,]" trial "[c]ounsel did not object to the court's lapse" when the court failed to charge the

122

jury on those things. Doc. 1 ¶ 140. Because the court "did not accept Mr. Spencer's self-defense theory[,]" *id.* ¶ 143, voluntary intoxication was Mr. Spencer's "only remaining, viable defense," and "[t]he Court apparently accepted that there was sufficient evidence to instruct the jury of this defense[,]" *id.* ¶ 144. "Yet, with no other defense available, . . . defense counsel inexplicably failed to object when the Court failed to give the requested instruction." *Id.*

And, Mr. Spencer contends, trial counsel "fail[ed] to adequately argue for the appropriateness of lesser included instructions" and "failed to adequately marshal the evidence in support of such . . . instruction[s.]" *Id.* ¶¶ 149, 151. "That failure denied the jury the option of convicting Mr. Spencer of the lesser included offense . . . ." *Id.* ¶ 140. Instead, "the jury were trapped between the only two possible verdicts — acquittal and guilt of capital murder — and used the penalty phase to ameliorate their forced guilty verdict." *Id.* ¶ 148.

Mr. Spencer argues that "[t]here is a reasonable probability that, hearing this evidence, the jury would have found Mr. Spencer was intoxicated at the time of the shootings." *Id.* ¶ 147. "[T]he fact that the trial court granted counsel's request to instruct the jury on this issue indicates that the court—which was able to hear and see, and weigh the credibility of the evidence and witnesses firsthand—found this evidence was sufficient." *Id.*

Further, Mr. Spencer contends that "[c]ounsel was ineffective for failing to obtain lesser included instructions on heat-of-passion manslaughter." *Id.* ¶ 150. "Given the evidence presented at trial, that Mr. Spencer feared for his life and believed that he would be shot and killed, such an instruction was entirely appropriate." *Id.* ¶ 151. "However, trial counsel failed to adequately marshal the evidence in support of such an instruction, and failed to provide the trial court with the proper legal standard governing the decision to submit a lesser included instruction to the jury." *Id.* "Although counsel requested such instructions, and the judge seemed to agree that there was some evidence of intoxication, counsel failed to adequately marshal the totality of the evidence in support of such an instruction . . . ." *Id.* ¶ 152.

The ACCA addressed this issue:

> Spencer next argues that his trial counsel was ineffective for failing to object to the trial court's failure to instruct the jury on voluntary intoxication and on heat-of-passion manslaughter.
>
> The circuit court stated the following concerning this claim:
>
>> "Spencer requests an evidentiary hearing on his claims that counsel were ineffective because they did not object when the trial court failed to instruct the jury on voluntary intoxication and manslaughter and failed to request that the trial court charge the jury on heat of passion manslaughter.

"An evidentiary hearing is denied on this claim because the claim is insufficiently pleaded. Spencer alleges that his attorneys were ineffective because they failed to adequately argue for the lesser-included jury instructions of heat of passion manslaughter and intoxication. However, Spencer failed to set forth what evidence would support these instructions.

"Spencer's request for an evidentiary hearing on these claims is also denied because no material issue of fact or law exists concerning these claims. Spencer raised the underlying claims on direct appeal and the Court of Criminal Appeals rejected the claims. *Spencer,* 58 So. 3d 215, at 230–232, 244–245. In denying relief on Spencer's claims that the trial court failed to instruct the jury on voluntary intoxication and manslaughter, the Court of Criminal Appeals declined to find plain error because Spencer 'failed to establish any evidentiary foundation of intoxication that would warrant an instruction on intoxication.' *Id.,* at 230–232. This Court recognizes that a finding of no plain error on direct appeal does not foreclose Spencer from arguing that he was prejudiced by his counsel's failure to object when the trial court failed to give the jury instructions on intoxication and manslaughter. *Ex parte Taylor,* 10 So. 3d 1075, 1078 (Ala. 2005). Spencer, however, has not pleaded any facts whatsoever in his Rule 32 petition that would show that his is this 'rare case.' The Court of Criminal Appeals also rejected Spencer's claim that the trial court erred when it refused to charge the jury on heat-of-passion manslaughter and on voluntary intoxication. *Id.,* at 230–232, 244–245. The grounds which underlie Spencer's ineffective assistance of counsel claim have already been held to be without merit, and, as a result, this claim should be dismissed as a matter of law and

Spencer is not entitled to an evidentiary hearing on the claim.

"Spencer set forth new facts to establish counsel's ineffectiveness for failing to request these jury instructions. However, the new facts in support of these defenses would not entitle Spencer to jury instructions on these defenses. The new facts are insufficient to show that, at the time he murdered the three police officers, Spencer was intoxicated to the point of insanity. In fact, Spencer does not even allege in the Rule 32 petition that he was suffering from any of the side effects from the combination of drugs he was taking when he murdered the three police officers—just that these are possible side effects from these drugs. Counsel's performance, therefore, was not deficient because they failed to present this evidence to support jury instructions on voluntary intoxication and manslaughter.

"In addition, Spencer's claim that he was prejudiced by counsel's failure to present this evidence and request these jury instructions does not present a material issue of fact or law because his actions during this crime show that he was not intoxicated to the point of insanity. When Spencer heard a commotion outside, he went to the bedroom window to see what was going on. When Spencer saw the officers in the apartment, he started shooting and did not stop shooting until all the officers were down. He walked to the back door of the apartment and saw Officer Collins. He shot at Officer Collins to make sure that he was not a threat to him. When he left the apartment, he went to a house down the street where he hid in the attic to avoid the police. Spencer's actions during the murders of the police officers clearly reveal that he was not functioning as someone who was intoxicated to the point of insanity but as someone who understood what he was doing and was aware

of the consequences of his actions. Because Spencer's actions during the murders show that he was not intoxicated to the point of insanity, he cannot prove that he was prejudiced by counsel's failure to present evidence concerning his cocaine, alcohol, and pill use and to request jury instructions to support this defense.

"For the reasons set forth above, Spencer's request for an evidentiary hearing on these claims is denied because no 'material issue of fact or law exists' which would entitle him to relief."

(C. 96–99.)

*Spencer R.32*, 201 So. 3d at 606–07.

As to Mr. Spencer's claim that trial counsel was ineffective for failing to object to the lack of instructions, the ACCA wrote:

Spencer first argues that the circuit court erroneously dismissed his claim that trial counsel was ineffective for failing to object when the circuit court did not instruct the jury on intoxication as a defense to capital murder. This Court disagrees.

In *Smith v. State,* 756 So. 2d 892 (Ala. Crim. App. 1997), this Court recognized:

"'While voluntary intoxication is never a defense to a criminal charge, it may negate the specific intent essential to a malicious killing and reduce it to manslaughter. § 13A–3–2, Code of Alabama (1975) (Commentary). " 'When the crime charged involves a specific intent, such as murder, and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter.' *Gray v. State,* 482 So. 2d 1318, 1319

127

(Ala. Cr. App. 1985)." [*McNeill] v. State,* 496 So. 2d 108, 109 (Ala. Cr. App. 1986).'

"[*McConnico v. State,*] 551 So. 2d [424,] 426 [(Ala. Crim. App. 1988)]. However, to negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity.

"""In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. *Lister v. State,* 437 So. 2d 622 (Ala. Cr. App. 1983). The same standard is applicable in homicide cases. *Crosslin [v. State,* 446 So. 2d 675 (Ala. Cr. App. 1983)]. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A–3–1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A–3–2. *The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill ....*"

"'*Ex parte Bankhead,* 585 So. 2d 112, 121 (Ala. 1991).'

"*Smith v. State,* 646 So. 2d 704, 712–13 (Ala. Cr. App. 1994)."

*Smith,* 756 So. 2d at 906. Further, on direct appeal, this Court explained the following regarding Spencer's intoxication defense:

"Generally, where there is evidence of intoxication and the charged offense involves specific intent,

such as capital murder, the trial court should instruct the jury on the lesser-included offense of manslaughter. See *Pilley v. State,* 930 So. 2d 550, 562 (Ala. Crim. App. 2005).

> """"A charge on intoxication should be given if '"there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt" 'in the element of intent. *Coon v. State,* 494 So. 2d 184, 187 (Ala. Crim. App. 1986) (quoting *Government of the Virgin Islands v. Carmona,* 422 F.2d 95, 99 n. 6 (3d Cir. 1970)). See also *People v. Perry,* 61 N.Y.2d 849, 473 N.Y.S.2d 966, 966–67, 462 N.E.2d 143, 143–44 (App. 1984) ('[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis'). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting, *Owen v. State,* 611 So. 2d 1126, 1128 (Ala. Crim. App. 1992); *Crosslin v. State,* 446 So. 2d 675, 682 (Ala. Crim. App. 1983), where the defendant denies the commission of the crime, *Coon v. State,* 494 So. 2d at 187; see *Moran v. State,* 34 Ala. App. 238, 240, 39 So. 2d 419, 421, cert. denied, 252 Ala. 60, 39 So. 2d 421 (1949), and where the evidence of intoxication is offered by the State, see *Owen v. State,* 611 So. 2d at 1127–28."

"'*Pilley v. State,* 930 So. 2d 550, 561–62 (Ala. Crim. App. 2005).

"'However, the court should charge on voluntary intoxication only when there is a sufficient evidentiary foundation in the record for a jury to entertain a reasonable doubt as to the element of intent. *Ex parte McWhorter,* 781 So. 2d 330, 342

(Ala. 2000). In *Pilley,* this Court provided guidance as to what evidence would be required to form that evidentiary foundation.

> """"The Alabama Legislature has defined 'intoxication' to include 'a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.' § 13A–3–2(c)(1), Ala. Code 1975. Thus, evidence that the defendant ingested alcohol or drugs, standing alone, does not warrant a charge on intoxication. '[T]here must be evidence that the ingestion caused a disturbance of the person's mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed.' *Lee v. State,* 898 So. 2d 790, 838 (Ala. Crim. App. 2001) (opinion on return to remand), cert. denied, 898 So. 2d 874 (Ala.), cert. denied, 543 U.S. 924, 125 S. Ct. 309, 160 L. Ed. 2d 222 (2004). See also *Maples v. State,* 758 So. 2d 1, 23 (Ala. Crim. App.), aff'd 758 So. 2d 81 (Ala. 1999). Such a holding is consistent with this Court's opinion in *Windsor v. State,* 683 So. 2d 1027, 1037 (Ala. Crim. App. 1994), aff'd, 683 So. 2d 1042 (Ala. 1996), in which we stated:

> """""In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no "reasonable theory" to support an instruction on intoxication because there was no evidence of intoxication. The court did not err in not instructing the jury on intoxication and

manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred.'"

"'*Pilley,* 930 So. 2d at 563.'

"*Harris v. State,* 2 So. 3d [880, 911 (Ala. Crim. App. 2007)]. Thus, '"[u]nder § 13A–1–9(b), Ala. Code 1975, a trial judge is not required to instruct on a lesser-included offense 'unless there is a rational basis for a verdict convicting the defendant of the included offense.'"' *Harris,* 2 So. 3d at 912, quoting *Pilley,* 930 So. 2d at 563.

"Here, Spencer presented evidence indicating that he had ingested narcotics and alcohol the night before the shootings and the morning of the shootings. Spencer testified that at the time of the shootings, he had a cocaine habit of 'about six to seven grams a day.' (R. 1647.) When asked whether he had taken any narcotics on the morning of the shootings, Spencer stated:

"'Yes, I did. You know, I had a little bit of [cocaine] powder left over from the night before. But the night before, we really did a lot of cocaine. And, you know, I probably didn't go to sleep until about 4 in the morning, you know, just dozed off.'

"(R. 1675–76.) Spencer further stated that sometime shortly after 9:00 a.m. on the morning of the shootings, he took a Seroquel tablet and drank a beer to help him go to sleep. (R. 1676.) Finally, in an interview with the police after his arrest, Spencer stated that he was 'high' at the time of his arrest. However, this evidence alone does not constitute evidence indicating that Spencer was intoxicated at the time of the shootings. Spencer did not claim to be intoxicated at the time of the shootings. There

was no evidence concerning the effects, if any, that the amounts of cocaine and other substances allegedly ingested the night before and morning of the shootings had on Spencer at the time of the shootings. Rather, based on the evidence presented at trial, Spencer failed to establish any evidentiary foundation of intoxication that would warrant an instruction on intoxication. There was simply insufficient evidence from which a jury could have found beyond a reasonable doubt that Spencer was unable to form the requisite intent to commit capital murder, because he was experiencing 'a disturbance of mental or physical capacities,' resulting from drug or alcohol use at the time of the murders. Because there was no rational basis for an instruction on voluntary intoxication, we find no plain error in the trial court's failure to instruct the jury on voluntary intoxication or reckless manslaughter as a lesser-included offense."

*Spencer,* 58 So. 3d at 231–32.

In his Rule 32 petition, Spencer failed to meet his burden of pleading facts that, if true, would establish that counsel was ineffective for failing to object to the circuit court's not instructing the jury on intoxication as a defense. Spencer failed to plead the quantity drugs and alcohol he had ingested before the murders. *See Connally,* 33 So. 3d at 622–23 ("Likewise, Connally's bare allegation that he had been 'drinking heavily' on the night of the crime was not sufficient to indicate that intoxication would have been a viable defense to the murder charge.... Connally failed to allege how much he had to drink the night of the crime, how long before the crime he had been drinking, or any other facts indicating that his alleged intoxication amounted to insanity."). Nor did he plead facts that, if true, would establish that he was intoxicated to the point that he could not form the intent to kill, i.e., that his intoxication rose to the level of insanity. *See Ex parte McWhorter,* 781 So. 2d 330, 342–43 (Ala. 2000) (recognizing that

132

intoxication necessary to negate specific intent must amount to insanity). Consequently, Spencer failed to meet his burden to plead the full factual basis of this claim, and the circuit court correctly dismissed it pursuant to Rules 32.3; 32.6(b); and 32.7(d), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 607–10.

As to Mr. Spencer's allegation that his trial counsel failed to argue adequately for the jury instructions, the ACCA wrote:

> Spencer next argues that the circuit court erroneously dismissed his claim that trial counsel was ineffective for failing to argue adequately that he was entitled to a jury instruction on heat-of-passion manslaughter. This Court disagrees.
>
> On direct appeal, this Court stated the following regarding Spencer's claim that he was entitled to an instruction on provocation manslaughter:
>
>> "Spencer next contends that the trial court erred in refusing to instruct the jury on heat-of-passion manslaughter as a lesser-included offense.
>>
>> "Section 13A–6–3, Ala. Code 1975, states, in pertinent part:
>>
>>> "'(a) A person commits the crime of manslaughter if:
>>> "'....
>>> "'(2) He causes the death of another person under circumstances that would constitute murder under Section 13A–6–2; except, that he causes the death due to a sudden heat of passion *caused by provocation recognized by law,* and before a reasonable time for the passion to cool and for reason to reassert itself.'

133

"(emphasis added.) It is well settled that even where the defendant commits the killing due to a sudden heat of passion, an instruction on manslaughter is properly refused where there is no evidence that that sudden heat of passion was caused by a provocation recognized by law. *Harrison v. State,* 580 So. 2d 73, 74 (Ala. Crim. App. 1991).

> """Alabama courts have, in fact, recognized three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative.'

"'*Rogers v. State,* 819 So. 2d 643, 662 (Ala. Crim. App. 2001).

> """"[Section] 13A–6–3(a)(2) is designed to cover those situations where the jury does not believe a defendant is guilty of murder but also does not believe the killing was totally justified by self-defense.' *Shultz v. State,* 480 So. 2d 73, 76 (Ala. Crim. App. 1985). See also *Shiflett v. State,* 507 So. 2d 1056 (Ala. Crim. App. 1987).

> """'To constitute adequate legal provocation, it must be of a nature calculated to influence the passions of the ordinary, reasonable man....'

> """"*Biggs v. State,* 441 So. 2d 989, 992 (Ala. Crim. App. 1983)."

"'*Hafford v. State,* 674 So. 2d 1386, 1390 (Ala. Crim. App. 1995).'

"*Peraita v. State,* 897 So. 2d 1161, 1198 (Ala. Crim. App. 2003).

134

"Here, based on the evidence supporting Spencer's theory of events, the events leading up to the shootings, even if creating a sense of passion or mental or emotional imbalance, did not constitute a legally recognized provocation. It is apparent that neither the first (accused witnesses his spouse committing adultery) nor the third (accused witnesses an assault on a family member or close relative) legally recognized provocation is applicable in this case. As to whether the second legally recognized provocation (whether Spencer was assaulted or faced with an imminent assault on himself) is applicable under the facts of this case, we have reviewed the evidence and answer that question in the negative.

"Even assuming, without finding as true, Spencer's contentions that the officers made remarks during the earlier encounter that caused Spencer to fear that the officers would hurt or kill him, those comments were made hours before the final encounter where the officers were killed. Additionally, the initial arguments were between Woods and officers; Spencer willingly joined in the verbal jousting, and again continued his verbal sparring with a second officer even though the first officer had, according to Spencer, made threatening comments. Further, the first two officers Spencer encountered during the final and fatal engagement were shot repeatedly in the back while attempting to exercise a lawful arrest on Woods. The evidence also indicates that Spencer made statements following the earlier encounters with the officers that if the officers returned he would 'bust 'em' (R. 913), and that 'they was gonna get' the officers if they returned. (R. 1638.) Additionally, Spencer, knowing that the officers had returned because he looked out the window, exacerbated the situation by intentionally grabbing his loaded SKS assault rifle and

> proceeding toward the commotion in the kitchen. This evidence further militates against any contention that the murders were committed in a sudden passion and thus warranted such a jury instruction. Because the evidence did not support a charge on heat-of-passion manslaughter, the trial court properly rejected Spencer's request for such a charge."

*Spencer,* 58 So. 3d at 244–45.

> In his Rule 32 petition, Spencer failed to meet his burden of pleading facts that, if true, would establish that counsel was ineffective for failing to argue adequately that he was entitled to a jury instruction on heat-of-passion manslaughter. In his petition, Spencer argued that "trial counsel failed to adequately marshal the evidence in support of such an instruction," but he failed to plead what evidence supported a heat-of-passion-manslaughter instruction. (C. 690.) Spencer failed to allege facts that, if true, would establish that he was faced with an imminent assault. In fact, Spencer failed to allege any facts that would indicate that he was entitled to a jury instruction on heat-of-passion manslaughter. Consequently, Spencer failed to meet his burden to plead the full factual basis of this claim, and the circuit court correctly dismissed it pursuant to Rules 32.3; 32.6(b); and 32.7(d), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 610–11.

Mr. Spencer argues that these "factual determinations [were] objectively unreasonable" because "the record substantiated the trial court's finding that there was sufficient evidence to warrant giving a voluntary intoxication instruction under Alabama law." Doc. 21 at 59. Specifically, "[t]he Rule 32 petition summarizes Mr. Spencer's trial testimony, in which he acknowledged that he habitually ingested

136

several grams of cocaine, prescription pills, marijuana, and alcohol in the days preceding, and on the day of, the offense." *Id.* And, Mr. Spencer argues, "[s]ince it also required more than some evidence of intoxication (as opposed to overwhelming evidence) to warrant deeming omission of the instruction prejudicial, the CCA's decision was also contrary to, and an objectively unreasonable application of, *Strickland* and *Beck*." *Id.* at 60.

Similarly, as to the heat of passion manslaughter defense, Mr. Spencer contends that "[t]he state court decision was contrary to and an unreasonable application of clearly established federal law because it imposed a more stringent standard than Supreme Court precedent allows." *Id.* at 63. According to Mr. Spencer, his "testimony furnished the evidentiary basis for an instruction on heat of passion manslaughter because he thoroughly explained how the officers' threats throughout the day placed in him fear of an imminent, deadly assault[,]" which "was sufficient to raise the issue under Alabama law." *Id.* Mr. Spencer argues that "the Alabama courts have set the bar higher than *Beck* or *Mullaney* allow by requiring defendants to provide substantial proof of provocation or to affirmatively refute the State's proof of premeditation to get an instruction." *Id.* at 64.

137

Despite Mr. Spencer's request that this court review *de novo* the ACCA ruling on part of this claim,[7] AEDPA deference controls the court's review of the entire claim.

The only Supreme Court caselaw that Mr. Spencer says the ACCA unreasonably applied here is *Beck v. Alabama*, 447 U.S. 625 (1980). But for the reasons discussed in Part III.B.2.i, *Beck* does not help Mr. Spencer. Further, the ACCA did not unreasonably interpret the facts on this issue. Mr. Spencer did not present sufficient evidence to warrant a jury instruction on voluntary intoxication, provocation, or self-defense, for the reasons discussed in Part III.B.2., so he suffered no prejudice from any of his counsel's asserted errors.

Mr. Spencer is thus due no habeas relief on this claim.

> xiii.  *Failure To Ensure Complete Appellate Record*

---

[7] The ACCA extensively discussed its ruling on Mr. Spencer's direct appeal that "[t]here was no evidence concerning the effects, if any, that the amounts of cocaine and other substances allegedly ingested the night before and morning of the shootings had on [Mr.] Spencer at the time of the shootings" before noting that his Rule 32 petition did not "plead facts, if true, [that] would establish that he was intoxicated to the point that he could not form the intent to kill. *Spencer R.32*, 201 So. 3d at 609–10. So that court did address his claims about voluntary intoxication, and it concluded that he would not have been entitled to a voluntary intoxication jury instruction even with an objection from his counsel. And the court similarly discussed its ruling on direct appeal that Mr. Spencer was not entitled to a lesser included instruction, concluding that an objection from counsel would have made no difference because the facts did not entitle Mr. Spencer to such an instruction. *Id.* at 610–11.

Mr. Spencer contends that trial counsel was ineffective because "[c]ounsel failed to guarantee a complete appellate record by ensuring that a transcription of all proceedings in this case were accurately transcribed." Doc. 1 ¶ 154. Specifically, "[t]rial counsel acceded to the omission of juror questionnaires and the strike list from the appellate record." *Id.* This allegedly "made it impossible for Mr. Spencer . . . to present a *Batson* claim on direct appeal or to pursue a colorable ineffective assistance of counsel claim premised on *Batson* in Rule 32." *Id.* ¶ 155.

Warden Raybon responds that this claim is "not fully exhausted and [is] therefore procedurally defaulted because [it] was not raised on appeal to the Court of Criminal Appeals or in [Mr.] Spencer's petition for writ of certiorari in the Alabama Supreme Court from the denial of the post-conviction petition." Doc. 19 at 16–17. Mr. Spencer "concedes that [this claim is] procedurally defaulted" because he raised it in his Rule 32 Petition but not "in his appeal challenging the dismissal thereof," so it was "not exhausted before the state appellate courts[.]" Doc. 21 at 4. Mr. Spencer is thus due no habeas relief on this claim.

### xiv. *Guilt-Phase Error Cumulative Effect*

Mr. Spencer contends that the cumulative effect of trial counsel's allegedly ineffective performance during the guilt phase of his trial violated the Constitution. Doc. 1 ¶¶ 157, 158. According to Mr. Spencer, "the state court evaluated each of the

139

above allegations of ineffectiveness individually" but failed to "review[] the impact of accumulated errors." *Id.* ¶ 158. This is not so.

The ACCA addressed cumulative errors as follows:

> Spencer next argues that the cumulative effect of counsel's errors resulted in prejudice to him.
>
> The circuit court stated the following concerning this claim:
>
>> "Spencer's claim that the cumulative effect of counsel's errors denied him his right to the effective assistance of counsel during the penalty phase of the trial is not sufficiently pleaded, therefore, his request for an evidentiary hearing is denied. Spencer does not specifically identify what errors should be considered cumulatively and does not allege how the cumulative effect of any errors denied him the effective assistance of counsel."
>
> (C. 102.) This Court agrees that Spencer's claim relating to the cumulative effect of counsel's alleged errors was insufficiently pleaded. Because Spencer failed to plead sufficient facts that would entitle him to relief, this claim was correctly dismissed without a hearing. *See* Rule 32.6(b), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 617.

As detailed throughout Part III.A.1., counsel's representation of Mr. Spencer throughout the guilt phase of his trial was objectively reasonable. And even if Mr. Spencer's counsel erred in some specific respect, the evidence adduced at trial foreclosed an instruction on lesser-included offenses under Alabama law. This left the jury with the binary decision whether Mr. Spencer was guilty as charged or not

guilty as charged, and Mr. Spencer admitted his guilt. Accordingly, the record supplies no basis for a finding that Mr. Spencer's counsel accumulated errors, nor that such accumulation prejudiced him. Mr. Spencer is due no habeas relief on this claim.

2.      Penalty Phase And Sentencing Ineffectiveness

Mr. Spencer raises eight issues with his counsel's assistance during the penalty phase of his trial. *See* Doc. 1 at 78–123. The court addresses each in turn.

i.      *Failure To Investigate And Present Mitigation Evidence During Penalty Phase*

Mr. Spencer contends that trial counsel was ineffective because counsel "did not conduct the minimally adequate investigation needed for effective penalty phase representation." *Id.* ¶ 160. Specifically, "counsel failed to interview Mr. Spencer's family members regarding available mitigating evidence" and "failed to procure necessary records documenting Mr. Spencer's life." *Id.* Mr. Spencer concedes that counsel presented two witnesses, Mr. Spencer's mother and Mr. Spencer's uncle, who was also his pastor. *Id.* ¶ 163. But Mr. Spencer argues that this was not enough: "[t]he combined testimony of these witnesses, which only lasted long enough to fill less than ten pages of transcript, . . . did not even begin to explain the complexities of Mr. Spencer's character, his mental and emotional impairments, his troubled upbringing, or his history of alcohol and drug abuse." *Id.* And those two witnesses "confirm that trial counsel did not prepare them in advance of their penalty-phase

141

testimony. They had no idea what questions they would be asked when they were on the witness stand." *Id.* ¶ 163 n.144. "Given that some jurors were inclined to spare Mr. Spencer's life, despite the lack of mitigating evidence that counsel presented, 'it is possible that, if additional mitigating evidence had been presented, more jurors would have voted for life.'" *Id.* ¶ 163 (quoting *Cooper v. Sec.'y, Dep't of Corr.*, 646 F.3d 1328, 1356 (11th Cir. 2011)).

"Dianne, [Mr. Spencer's aunt], recalls that although she wanted to testify as a penalty-phase witness, trial counsel told her that Mr. Spencer's mother should represent the family, even without knowing what [Mr. Spencer's mother] would say." *Id.* ¶ 165. "Dianne recalls that [Mr. Spencer's mother] was adamantly opposed to testifying[,]" and "[s]he omitted many significant details about her own life and Kerry's background[.]" *Id.* Mr. Spencer's uncle "recalls that defense counsel encouraged him to pray prior to his testimony, but did not otherwise prepare him for the questions he would be asked by the defense or prosecution." *Id.* "At the judge-sentencing phase," counsel produced various "documentary evidence" "but did not call a mitigation specialist or mental health expert to testify." *Id.* And "[n]one of the documentary evidence spoke one word about Kerry Spencer's life, his mental impairments, or his background." *Id.* And the court concluded "that the evidence from the defendant's mother and uncle did not constitute mitigating evidence." Doc. 17-35 at 14. But "[h]ad counsel performed effectively . . . , they would have been

142

able to present arguments based on extensive testimony from family members, experts, and medical professionals, who all could have offered critical information about Mr. Spencer, his mental health problems, and the circumstances of his upbringing." Doc. 1 ¶ 171. For numerous pages, Mr. Spencer details the "available mitigating evidence" that his counsel allegedly should have presented. *See id.* ¶¶ 174–219; *see also* Doc. 21 at 68 ("Mr. Spencer's failure-to-investigate claim comprise more than 35 pages of his habeas petition.").

The ACCA addressed this issue:

> Spencer next argues that his trial counsel was ineffective for failing to investigate and present mitigation evidence at the penalty phase. Specifically, he asserts that there was no testimony that he had been using drugs since he was young, that he was raised in impoverished conditions, that he lived in violent neighborhoods, that he had post-traumatic stress disorder, and that he had brain injuries from his childhood.
>
> The circuit court stated the following concerning this claim:
>
> > "Spencer's request for an evidentiary hearing on this claim is dismissed as a matter of law because no material issue of fact or law exists which would entitle Spencer to relief. Spencer cannot prove that he was prejudiced by counsel's failure to call more or different witnesses during the penalty phase of his trial because the jury recommended that he receive a life without parole sentence—the best sentence he could hope for.
>
> > "Moreover, the new evidence does not establish that the outcome of the sentence imposed would have

been different. The four aggravating circumstances far outweigh any new and additional mitigating circumstances offered by Spencer in his Rule 32 petition. As noted in the amended sentencing order of March 30, 2009, the 'officers were gunned down while they attempted to serve a warrant of arrest for one of the occupants of this illegal drug house' to avoid a lawful arrest or to affect an escape under aggravating circumstance 13A–4–59(5). As also noted: 'These officers were acting as agents of the Court to duly serve these warrants and two of the three were gunned down from behind without even an opportunity to draw their weapons.' The capital offense was also committed to disrupt or hinder the lawful exercise of a government function or enforcement of the laws. This Court found as follows concerning this aggravating circumstance:

'The Court places great weight on this factor. If we are to have law and order in a civilized society, then officers like these, who were gunned down trying to perform a government function or enforce the law, must mean something.' This Court also found that Spencer intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct in violation of § 13A–5–49(9).

"The amended sentencing order of March 30, 2009, also states:

"'By their verdicts, the jury found that the defendant had the particularized intent to kill all three of these officers. This court did not believe this defendant's testimony that anyone pointed a weapon at him because the physical evidence refutes this testimony.

"'There was not one shred of remorse from the defendant during his taped statement to the police just after the murders nor his testimony

144

at trial. In fact just to the contrary, he seemed to feel he was justified in killing these three officers who were acting in the line and scope of their sworn duty. This is the most brutal and violent attack on law enforcement officers this Court has seen in its combined thirty years as a prosecutor, defense lawyer, and as judge.'

"The following is also stated in the amended sentencing order:

"'This defendant posed a grave danger to the public. He operated a drug selling operation and maintained this operation in defiance of the law enforcement authorities by use of violence. The defendant made numerous threats that he would kill the police officers if they came back to the house "... to f – – – with us ...". The defendant followed through on these threats.'

"The aggravating circumstances in this case are substantial and clearly outweigh the mitigating circumstances offered at trial and those offered by Spencer in his second amended Rule 32 petition. This is especially so where Spencer followed through on his threats to murder the police officers if they returned to the house. Spencer cannot prove that he was prejudiced by his attorney's failure to present more or different mitigating evidence because death is the appropriate punishment for Spencer. Spencer's request for an evidentiary hearing is denied because there is no material issue of fact or law which exists that would entitle him to relief."

(C. 80–82.)

As this Court stated in *Hooks v. State,* 21 So. 3d 772 (Ala. Crim. App. 2008):

145

"'Appellant's contention that his trial counsel rendered ineffective assistance of counsel during the penalty phase of the trial is repudiated by the fact that the jury recommended life in this case. *Lewis v. State,* 398 So. 2d 432 (Fla. 1981); *Douglas v. State,* 373 So. 2d 895 (Fla. 1979).'"

*Hooks,* 21 So. 3d at 791 (quoting *Buford v. State,* 492 So. 2d 355, 359 (Fla. 1986)). *See also Coleman v. State,* 64 So. 3d 1210, 1224 (Fla. 2011) ("This Court has repeatedly held that a defendant cannot demonstrate prejudice for counsel's failure to present mitigation to the jury, as opposed to the judge, when the jury recommended a life sentence." (emphasis omitted)).

Moreover, according to *Wiggins v. Smith,* 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), in considering whether a postconviction petitioner can establish prejudice in an attorney's failure to present more mitigation evidence at the penalty phase of a capital-murder trial, the court may "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins,* 539 U.S. at 534. Here, the same judge who sentenced Spencer to death reweighed the mitigating evidence presented at trial, the mitigating evidence alleged in the Rule 32 petition, and the aggravating circumstances established at trial and found that there was no probability that the omitted mitigating evidence would have altered Spencer's sentence.

The record shows that at the penalty phase of Spencer's trial, counsel presented the testimony of Spencer's mother, Patricia Spencer, and Spencer's uncle, Fred Pyles. Spencer's mother testified that Spencer was the middle of three children, that he was the peacemaker among the children because the other two were always fighting, that he was not violent, that he had never been a problem, and that Spencer had always been a good boy. Pyles testified that Spencer was raised in a single-parent household, that

his mother had held multiple jobs to support the family, that Spencer was quiet, that Spencer went to church regularly, that Spencer was the peacemaker in his household, that Spencer had no father figure, that he had never seen Spencer act violently, that Spencer was a father, and that Spencer was remorseful for his actions that led to the officers' deaths. At the judicial sentencing hearing, counsel presented the testimony of Dr. Shealy, who had evaluated Spencer for the sentencing hearing. Dr. Shealy said that Spencer had no history of violence, that he was a devoted father to his two children, that he was active in his church, and that he had acted under extreme emotional duress that may have been "exacerbated by the influence of drugs that he was under at the time of the offense." (Trial R. 3469.)

At the judicial sentencing hearing, trial counsel also presented the report compiled by Dr. Shealy about Spencer's mental health. This report is detailed in Part III.C.3. of this opinion.

In Spencer's amended petition, Spencer pleaded that counsel was ineffective for failing to present detailed testimony about the lives of Spencer's mother and father; that Spencer's mother had a tragic and traumatic life; that she was a neglectful mother to Spencer; that Spencer frequently moved in his childhood; that Spencer was raised in poverty; that Spencer's mother received food stamps; that Spencer was raised in an area where there was violence, gang activity, and drugs; that Spencer's life was affected when he witnessed the shooting death of a friend in 1998; that Spencer started using drugs in his early teen years; that Spencer did poorly in school; and that Spencer had been affected by the violence in his life. Dr. Schwartiz–Watts also stated that Spencer suffered from post-traumatic stress disorder and that he had brain injuries that he had suffered as a child.

This Court has reviewed the mitigation evidence that Spencer pleaded should have been presented at his

> penalty-phase hearing, as well as the evidence that was presented at Spencer's trial, and agrees with the circuit court that the omitted mitigating evidence would have had no impact on Spencer's sentence of death. In other words, considering the omitted mitigating evidence with the evidence presented at trial would not have altered a "reasonable decisionmaker ['s]" decision to sentence Spencer to death. *Williams v. Allen,* 542 F.3d 1326, 1345 (11th Cir. 2008). Thus, Spencer could establish no prejudice. This claim was correctly summarily dismissed pursuant to Rule 32.7(d), Ala. R. Crim. P., because it presented no material issue of fact or law that would entitle Spencer to relief.

*Spencer R.32*, 201 So. 3d at 612–14.

Mr. Spencer contends that the ACCA conclusion "implies that the only reasonable sentence for Mr. Spencer was death, a position that is irreconcilable with the jury's decision to impose life." Doc. 21 at 71. And Mr. Spencer further argues that "[u]nder clearly established federal law, whether the same trial judge would nevertheless have overridden the jury verdict and imposed death, despite the additional mitigation summarized above, is not dispositive." *Id.* (citing *Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008)). According to Mr. Spencer, the ACCA "also erred by denying Mr. Spencer's failure-to-investigate claims because it decided that the additional evidence 'would not have altered' Mr. Spencer's death sentence." *Id.* at 73 (quoting *Spencer R.32*, 201 So. 3d at 614). Mr. Spencer contends that to succeed, he did not have to hurdle such a high bar. *See id.*

148

It is well established that defense counsel has "a duty to make reasonable investigations" of potential mitigating evidence or "to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 691). "In any ineffectiveness case," an attorney's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 521–22 (quoting *Strickland*, 466 U.S. at 691). However, counsel's duty to investigate "does not necessarily require counsel to investigate every evidentiary lead." *Williams*, 542 F.3d at 1337. "Under *Strickland*, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690–91) ); *compare Strickland*, 466 U.S. at 699 (stating that counsel's "decision not to seek more character or psychological evidence than was already in hand was . . . reasonable"), *with Porter v. McCollum*, 558 U.S. 30, 40 (2009) (noting that counsel "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service," and "[t]he decision not to investigate did not reflect reasonable professional judgment").

Courts are required to "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas

149

proceeding—in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397–98. "That same standard applies—and will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears v. Upton*, 561 U.S. 945, 955 (2010). Again, where a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

The ACCA did not unreasonably apply federal law to conclude that Mr. Spencer's counsel effectively presented mitigation evidence. Mr. Spencer's counsel presented two witnesses to testify on Mr. Spencer's behalf: Mr. Spencer's mother testified that Mr. Spencer was a "peacemaker" who was "never a violent person" and was "more like a comedian at family functions." Doc. 17-28 at 176. She asked the jury "that as God shows mercy, would you show mercy upon my son and let him have life without parole instead of death?" *Id.* at 177.

Mr. Spencer's uncle and pastor, Fred Pyle, testified that Mr. Spencer was "a very unique young man" who "never had a violent history" and was "very remorseful." *Id.* at 179. Mr. Pyle told the jury that he "fel[t] [Mr. Spencer's] pain when [he] talk[ed] to him" and that Mr. Pyle could see Mr. Spencer's pain "in his eyes." *Id.* He spoke about baptizing Mr. Spencer as a young child, *id.* at 180, and

Mr. Spencer's difficulties growing up with a single mom, *id.* at 181. And he testified that Mr. Spencer was "a great father" who "had love for his kids." *Id.* at 181–82.

This testimony was sufficient mitigation evidence for the jury to recommend a life sentence rather than a death sentence. For murdering Officer Owen, the jury recommended that Mr. Spencer receive a life sentence by a vote of nine to three. Doc. 17-29 at 33. For murdering Officer Chisholm, the jury recommended that Mr. Spencer receive a life sentence by a vote of ten to two. *Id.* at 33–34. For murdering Officer Bennett, the jury recommended that Mr. Spencer receive a life sentence by a vote of nine to three. *Id.* at 34. For the "intentional[] killing of two or more persons during the same course of conduct," the jury recommended that Mr. Spencer receive a life sentence by a vote of seven to five. *Id.*

The trial court ultimately overrode these recommendations to sentence Mr. Spencer to death. But before doing so, the trial court also received additional evidence. Mr. Spencer testified at the judicial-sentencing phase of his trial, *id.* at 103–06, and his counsel presented evidence from a mitigation expert, a psychologist, and a petition with signatures of approximately 325 members of the Ensley and Graysville communities, urging the trial court to spare Mr. Spencer's life. Doc. 17-29 at 106–11; Doc. 17-19 at 45–105. The Equal Justice Initiative also submitted an amicus brief urging the trial court to spare Mr. Spencer's life. Doc. 17-29 at 110; Doc. 17-11 at 157–68.

On these facts, the ACCA did not unreasonably determine that there is no reasonable probability that the judge would have imposed a non-death sentence if counsel had just introduced more evidence of Mr. Spencer's difficult upbringing. *See Hooks v. State*, 21 So. 3d 772, 791 (Ala. Crim. App. 2008) (quoting *Buford v. State*, 492 So. 2d 355, 359 (Fla. 1986)) ("[The defendant's] contention that his trial counsel rendered ineffective assistance of counsel during the penalty phase of the trial is repudiated by the fact that the jury recommended life in []his case."); *Robinson v. Moore*, 300 F.3d 1320, 1347 (11th Cir. 2002) ("While the additional mitigation witnesses procured by Robinson's [post-conviction] counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of Robinson's life, these aspects of his life were nonetheless known to the resentencing jury and trial judge."); *Grayson v. Thompson*, 257 F.3d 1194, 1227–28 (11th Cir. 2001) ("Although the graphic picture of Grayson's home life painted at the state habeas proceedings was not presented at trial, the judge did not wholly disregard Grayson's unfortunate background in sentencing him to death. In light of the horrendous nature of this crime, we find no reasonable probability that the sentence would have been different if the judge and jury had possessed detailed information regarding Grayson's history."). The trial court received substantial mitigation evidence, all based on counsel's efforts

152

throughout their representation of Mr. Spencer. Mr. Spencer is thus due no relief on this claim.

### ii. Failure To Challenge Aggravating Factors

Mr. Spencer next argues that trial counsel was ineffective during the penalty and sentencing phases for failing to challenge the aggravating factors the State presented. More particularly, Mr. Spencer argues that "[o]nly one of these aggravating factors was supported by the underlying guilty verdicts. Nevertheless, counsel failed to present any evidence or adequately argue that these circumstances were inapplicable to this case." Doc. 1 ¶ 221. According to Mr. Spencer, "[h]ad counsel argued and adequately presented evidence at either phase that Mr. Spencer lacked the necessary intent to commit capital murder because he was too intoxicated to form the requisite intent either to knowingly create a risk or death or to kill, they could have rebutted" two of the aggravating factors relied upon by the State. *Id.* ¶ 223. And "[i]f counsel had secured the presence of Tyran Cooper at either stage of trial, he would have testified in refutation of" two other aggravating factors. *Id.*

The ACCA addressed this issue:

> First, Spencer argues that his trial counsel was ineffective for failing to challenge the aggravating factors relied on by the State to support a sentence of death.

> When sentencing Spencer to death, the circuit court found the existence of four aggravating circumstances: 1) that Spencer knowingly created a great risk of death to many persons in the commission of the crime, § 13A–5–49(3),

153

Ala. Code 1975; 2) that the capital offenses were committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, § 13A–5–49(5), Ala. Code 1975; 3) that the capital offenses were committed to disrupt or hinder the lawful exercise of a government function or the enforcement of laws, § 13A–5–49(7), Ala. Code 1975; and 4) that Spencer intentionally caused the death of two or more persons during one act or course of conduct, § 13A–5–49(9), Ala. Code 1975.

The circuit court stated the following concerning this claim:

> "Spencer asserts that counsel should have alleged that he lacked the specific intent to knowingly create a great risk of death during the capital offense (Ala. Code, § 13A–5–47(3)) or to intentionally cause the death of two or more persons by one act or pursuant to one scheme or course of conduct (Ala. Code, § 13A–5–47(9)) because of his intoxication. However, as set forth ... Spencer has yet to plead facts in his Rule 32 petition that he was intoxicated to the point of insanity. Moreover, his actions during the crime clearly show that he knew what he was doing and intended the consequences of his actions. Counsel, therefore, were not ineffective for failing to challenge these aggravating circumstances. No material issue of fact or law exists concerning this claim. Spencer's request for an evidentiary hearing is, therefore, denied.

> "Spencer next asserts that his attorneys should have presented evidence—through the testimony of Tyran Cooper—that the police officers were at the apartment for the illegal purpose of bribe-taking or in retaliation for unpaid bribes which caused him to be in fear for his life which would have negated the aggravating circumstances that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody (Ala. Code, § 13A–5–47(5)) or to

disrupt or hinder the lawful exercise of a government function or the enforcement of laws (Ala. Code, § 13A–5–47(7)). This same argument was made and rejected by the Court of Criminal Appeals on direct appeal. *Spencer v. State,* 58 So. 3d at 240–44. Tyran Cooper's testimony would not entitle Spencer to relief, either. As the Court of Criminal Appeals noted on direct appeal, Cooper was not present during the murders and there was no indication (and there is no indication) that Cooper would testify to any specific communications between himself and Spencer that would support a self-defense argument. *Spencer,* 58 So. 3d at 239.

"Moreover, as the Court of Criminal Appeals found, any fear that Spencer had about the officers was not reasonable. *Spencer,* 58 So. 3d at 244. There is absolutely nothing in the record that indicates that the officers made Spencer fear for his life when they entered the apartment. Their weapons were not drawn and their attention was focused solely on Woods. They never even attempted to approach Spencer. In fact, the officers did not attempt to use any force against Spencer, much less excessive force. As the record reveals, Spencer was asleep on the couch when the officers entered the apartment. When Spencer heard a noise, he got up and looked out the bedroom window to see what was happening. He then saw Woods and started firing on the officers. Spencer testified that he did not stop firing until all of the officers were down. Nor would Tyran Cooper's testimony add to Spencer's argument that the officers had a felonious intent when they entered the apartment because there is no indication that Cooper communicated to Spencer that he was having any problems with the police officers.

> "Spencer used excessive force against Officers Owen, Chisolm, and Bennett. This is especially true where the officers were not attempting to do anything to Spencer. They never spoke a word to Spencer after they entered the apartment and their weapons were holstered. Counsel were not ineffective for failing to have Tyran Cooper available to testify at Spencer's trial. Nor was Spencer prejudiced by this failure. Spencer's request for an evidentiary hearing on this claim is denied because no 'material issue of fact or law exists' which would entitle him to relief. Rule 32.7(d), Ala. R. Crim. P."

(C. 82–85.)

The record of Spencer's trial shows that defense counsel objected to the aggravating circumstance that Spencer knowingly created a great risk of death to many persons. (Trial R. 1849–1854.) However, the trial court stated that, based on the holdings in *Madison v. State,* 718 So. 2d 90 (Ala. Crim. App. 1997), and *White v. State,* 587 So. 2d 1218 (Ala. Crim. App. 1990), there was sufficient evidence to support this aggravating circumstance and that it was going to instruct the jury on this aggravating circumstance. This Court agrees with the court's assessment. The shootings took place in an apartment complex in a residential neighborhood. Officer Collins testified that Spencer fired from the doorway of the apartment to where his patrol car was parked and that bullets ricocheted off the vehicle. Residents were in the apartment complex at the time. This aggravating circumstance was correctly applied based on the holdings in *Madison* and *White.* Moreover, testimony established that police were at the residence to serve an arrest warrant on Woods. Certainly, the aggravating circumstances set out above were proven beyond a reasonable doubt at Spencer's trial and were correctly applied. "Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be

ineffective for failing to raise this issue." *Lee v. State,* 44 So. 3d at 1173. This claim was correctly summarily dismissed because there was no material issue of fact or law that would entitle Spencer to relief. *See* Rule 32.7(d), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 614–16.

Mr. Spencer contends that the ACCA reasoning was wrong because it "ignores that the [aggravating] circumstances were satisfied *because* they went largely unchallenged." Doc. 21 at 79. So according to Mr. Spencer, "[b]y not considering the impact of the additional evidence, which should have been presented, on the reliability of the aggravating circumstances, the Court of Criminal Appeals unreasonably applied the *Strickland* standard." *Id.*

In his petition, Mr. Spencer cites *Green v. Georgia*, 442 U.S. 95, 97 (1979), for the proposition that the trial court erred by excluding Mr. Cooper's testimony, and that error prejudiced Mr. Spencer because he was unable to refute aggravating factors (2) and (3). *See* Doc. 1 ¶¶ 223–24; Ala. Code § 13A-5-49(5), (7). There, the Supreme Court reversed a conviction because the trial court incorrectly excluded alibi testimony on the basis of Georgia's hearsay rule. *Green*, 442 U.S. at 96–97.

AEDPA deference controls this court's review of this claim.[8] The ACCA did not unreasonably apply *Green*. Indeed, Mr. Spencer does not attempt to apply any

---

[8] In his Response, Warden Raybon argues that "Claim I-B-3" (which he characterizes as the "claim that counsel failed to object to the double counting of the murder of two or more police officers as an element of the capital offense and as an

holding from *Green*, which the Supreme Court expressly limited to "the facts of th[at] case," to his case. *Id.* at 97. He instead simply insists that his counsel "failed to present any evidence at sentencing to rebut the aggravating circumstances, or to adequately argue that the circumstances were inapplicable to this case" by failing to present the testimony of Mr. Cooper. Doc. 1 ¶¶ 223–24; Doc. 21 at 78–80. But Mr. Cooper's testimony would not have refuted "that the capital offenses were committed for the purpose of avoiding or preventing a lawful arrest," Ala. Code § 13A-5-49(5), because his proffered testimony does not refute that the officers were killed while executing a valid arrest warrant for Mr. Woods. *See* Doc. 17-28 at 35–42. So even if the officers did have some other reason for visiting the apartment that Mr. Cooper's testimony would have provided evidence of, it would not change the fact that the officers were killed while trying to execute a valid arrest warrant for

---

aggravating circumstance") is not fully exhausted and "therefore procedurally defaulted." Doc. 19 at 16. But as Mr. Spencer explains in his reply, "sub-claim I(B)(3) . . . alleges that trial counsel failed to challenge the aggravating factors relied upon by the State[.]" Doc. 21 at 4. And "that sub-claim was raised on appeal to both the Alabama Court of Criminal Appeals and Alabama Supreme Court, and is therefore fully exhausted and ripe for this Court's review." *Id.* at 4–5. The claim about double counting is found in section I(B)(4), not I(B)(3) as Mr. Raybon alleges. *See id.* at 4; Doc. 1 at 115. In the section of Warden Raybon's reply dedicated to the double-counting claim, he re-raises his argument that the double-counting claim is procedurally defaulted. *See* Doc. 19 at 91–92. But in the section dedicated to the aggravating factors claim, he makes no exhaustion or procedural default argument. *See id.* at 87–91. Accordingly, the court understands Mr. Raybon to argue that I(B)(4) (relating to double-counting) is barred from review, not I(B)(3) (relating to aggravating factors).

Mr. Woods. And Mr. Cooper's testimony is not relevant to the aggravating factor "that the capital offenses were committed to disrupt or hinder the lawful exercise of a government function or the enforcement of laws," Ala. Code § 13A-5-49(7), for those same reasons. So the ACCA did not unreasonably interpret *Green*, or any other federal law, in denying Mr. Spencer's request for relief in this respect.

Likewise, the ACCA decision is not based on an unreasonable factual determination. Mr. Woods had a valid warrant out for his arrest, so the facts reasonably support a finding that the aggravating factors were applicable, as detailed above. Doc. 17-15 at 9–10; *see also* Doc. 19 at 90 ("[T]he evidence offered by [Mr.] Spencer in the post-conviction proceeding does not rebut the aggravating factors offered by the State."). Mr. Spencer is thus due no habeas relief on this claim.

### iii. Failure To Object To Double-Counting As Element Of Charge And In Aggravation

Mr. Spencer argues that trial counsel was ineffective during the penalty and sentencing phase because "counsel failed to object to the double counting of the murder of two or more as both an element of the capital offense and as an aggravating circumstance used to sentence Mr. Spencer to death." Doc. 1 ¶ 225. Specifically, Mr. Spencer contends that "the use of the murder of two or more both as an elevator in the guilt-phase <u>and</u> as an aggravator in the penalty-phase failed to narrow the class of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty." *Id.* And "double counting the multiple homicide

159

factor subjected Mr. Spencer to two punishments as a result of being convicted of a single criminal charge." *Id.* So, Mr. Spencer argues, trial counsel should have objected to this alleged violation of Mr. Spencer's constitutional rights. *Id.*

Mr. Raybon responds that this claim is "not fully exhausted and [is] therefore procedurally defaulted because [it] was not raised on appeal to the Court of Criminal Appeals or in [Mr.] Spencer's petition for writ of certiorari in the Alabama Supreme Court from the denial of the post-conviction petition." Doc. 19 at 16–17.[9] Mr. Spencer "concedes that [this claim is] procedurally defaulted" because he raised it in his Rule 32 Petition but not "in his appeal challenging the dismissal thereof," so it was "not exhausted before the state appellate courts[.]" Doc. 21 at 4. Mr. Spencer is thus due no habeas relief on this claim.

### iv.     Failure To Object To Death Sentence As Disproportionate

Mr. Spencer contends that trial counsel was ineffective during the penalty and sentencing phase because counsel "fail[ed] to object to the imposition of the death penalty on [the] basis" that it is disproportionate based on the facts of this case. Doc. 1 ¶ 226.

---

[9] Warden Raybon refers to this claim as "Claim I-B-3," the "claim that counsel failed to object to the double counting of the murder of two or more police officers as an element of the capital offense and as an aggravating circumstance." Doc. 19 at 16. Mr. Spencer points out that "sub-claim I(B)(3)" is actually the claim "that trial counsel failed to challenge the aggravating factors relied upon by the state." Doc. 21 at 4. Rather, the claim regarding double-counting is Claim I(B)(4), which Mr. Spencer concedes is barred from this court's review. *See id.*

Warden Raybon responds that this claim is "not fully exhausted and [is] therefore procedurally defaulted because [it] was not raised on appeal to the Court of Criminal Appeals or in [Mr.] Spencer's petition for writ of certiorari in the Alabama Supreme Court from the denial of the post-conviction petition." Doc. 19 at 16–17. Mr. Spencer "concedes that [this claim is] procedurally defaulted" because he raised it in his Rule 32 Petition but not "in his appeal challenging the dismissal thereof," so it was "not exhausted before the state appellate courts[.]" Doc. 21 at 4. Mr. Spencer is thus due no habeas relief on this claim.

      *v.*      *Failure To Object To Improper Victim Impact Evidence During Judicial Sentencing*

Mr. Spencer argues that trial counsel was ineffective during the penalty and sentencing phase because counsel "fail[ed] to object to the prosecution's elicitation of improper victim impact evidence during the judicial sentencing phase." Doc. 1 ¶ 227. Specifically, Mr. Spencer contends that "the prosecution explicitly asked six family members of the slain officers to testify about the penalty that Mr. Spencer should receive, invited them to offer comparative judgments about the creditable lives of the slain police officers, and deliberately elicited prejudicial characterizations about Mr. Spencer." *Id.* ¶ 228. But "[t]rial counsel raised no objection." *Id.* Witnesses called Mr. Spencer "a monster" and implored the court to impose the death penalty. *Id.* ¶¶ 228–30. "The prosecution gilded this already damaging evidentiary presentation by arguing that the Court should impose the death

161

sentence because the victims' family members had asked for it and because the jury

. . . 'just couldn't pull the trigger.'" *Id.* ¶ 231. Mr. Spencer argues that "[b]ecause

these impermissible arguments had the tendency to render Mr. Spencer's judicial

sentencing fundamentally unfair, counsel should have objected." *Id.* ¶ 232.

The ACCA addressed this issue:

> Spencer also argues that counsel failed to object to improper victim-impact testimony offered by the State during the judicial sentencing hearing. Specifically, he argues that, at the sentencing hearing before the circuit judge, the State asked six family members of the victims to testify about the sentence that Spencer should receive. All testified that Spencer should be sentenced to death. The circuit court stated the following concerning this claim:
>
> > "This evidence was offered during the judicial sentencing hearing and was not offered to the jury. *Payne v. Tennessee,* 501 U.S. 808 (1991), cited by Spencer, involved introduction of victim impact evidence before the jury and not evidence presented to a judge. This Court did not consider this evidence when it sentenced Spencer to death. Amended Sentencing Order, March 30, 2009, p. 9."
>
> (C. 85–86.)
>
> In the circuit court's amended sentencing order, it specifically stated that it had disregarded pleas for the court to consider the sentence on the basis of passion or prejudice. (Trial C. 98.) "We assume ... that the trial judge knows the law...." *Ex parte Anonymous,* 810 So. 2d 786, 793 (Ala. 2001). This claim is refuted by the judge's holding and the record on direct appeal. *McNabb v. State,* 991 So. 2d 313, 320 (Ala. Crim. App. 2007). Therefore,

162

> this claim was correctly summarily dismissed pursuant to
> Rule 32.7(d), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 616.

Mr. Spencer contends that "[u]nder clearly established federal law, all such testimony is prohibited," and "an admission that the sentencer considered this improper evidence has never been required." Doc. 21 at 81. Instead, Mr. Spencer argues, constitutional rights are violated when the prosecution presents such testimony "and the resultant punishment is death." *Id.*

In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court held that "the Eighth Amendment prohibits a capital sentencing jury from considering victim impact evidence" that did not "relate directly to the circumstances of the crime." *Id.* at 501–02, 507 n.10, *overruled by Payne v. Tennessee*, 501 U.S. 808 (1991). Four years later, in *Payne*, the Court reconsidered the ban on "'victim impact' evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." 501 U.S. at 817. The Court held that *Booth* was wrong—the Eighth Amendment does not require such a ban. *Id.* at 827. But the Court's ruling was "limited to" a particular type of victim impact testimony: "evidence and argument relating to the victim and the impact of the victim's death on the victim's family." *Id.* at 830 n.2. The *Payne* Court recognized that "*Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth

163

Amendment." *Id.* But because "[n]o evidence of the latter sort was presented at the trial in th[at] case[,]" the *Payne* Court did not reconsider that aspect of the *Booth* decision. *Id.*

Several years later, the Supreme Court reversed a state court for "conclud[ing] that *Payne* implicitly overruled *Booth* in its entirety." *Bosse v. Oklahoma*, 580 U.S. 1, 2 (2016). The Court reminded the state court that it "remains bound by *Booth*'s prohibition on characterizations and opinions from a victim's family members about the crime, the defendant, and the appropriate sentence unless th[e Supreme] Court reconsiders that ban." *Id.* The Supreme Court left for the state court on remand to address the State's arguments that any "error did not affect the jury's sentencing determination, and the defendant's rights were in any event protected by the mandatory sentencing review in capital cases required under Oklahoma law." *Id.* at 2–3.

Mr. Spencer contends that based on these cases, "the admission of this testimony is clearly unconstitutional, [so] Mr. Spencer's counsel unreasonably failed to object." Doc. 21 at 81. And Mr. Spencer argues that despite the circuit court's specific reassurance "that it had disregarded pleas for the court to consider the sentence on the basis of passion or prejudice," *Spencer R.32*, 201 So. 3d at 616, "an admission that the sentencer considered this improper evidence has never been required under *Booth*," Doc. 21 at 81. "Instead, a defendant's constitutional rights

are violated when the prosecution 'formally present[s]' this testimony, . . . and the resultant punishment is death." *Id.* at 81–82 (alteration in original). Further, Mr. Spencer contends that this "improper testimony" *did* have an impact because "[a]bsent this evidence, Mr. Spencer's jury voted that he be sentenced to life in prison," and only "after this inflammatory evidence was presented, the trial judgment decided to unilaterally override the jury's life verdict." *Id.* at 82.

There is a "reasonable argument that [Mr. Spencer's] counsel satisfied *Strickland*'s deferential standard" because Mr. Spencer cannot establish that he was prejudiced by his counsel's failure to object to this evidence. *See Harrington*, 562 U.S. at 105. Indeed, the trial court expressly confirmed that it excluded any such improper evidence from its decision making. *Spencer R.32*, 201 So. 3d at 616. So even if the development of such evidence was improper, the trial court's express refusal to consider it forecloses any argument that Mr. Spencer was prejudiced by a failure to object. Accordingly, the ACCA ruling against Mr. Spencer's ineffectiveness claim was not contrary to or an unreasonable application of clearly established federal law, nor an unreasonable factual determination.

### vi. Failure To Object To Improperly Considered Evidence

Mr. Spencer contends that trial counsel was ineffective because "counsel failed to object, to request disclosure, or otherwise to raise any concern" when the trial court referred to various letters from citizens about Mr. Spencer's sentence,

which the court kept in a box in his office rather than in the case file. Doc. 1 ¶ 235.

Mr. Spencer contends that because the letters were not made part of the record, he

was not able to "challenge or explain" them. *Id.* ¶ 238. He also argues that "it is

impossible to know what quantum of *ex parte* information the Court received and

considered in deciding to override Mr. Spencer's jury verdicts[.]" *Id.* ¶ 236. Mr.

Spencer contends that the "president of the Birmingham Fraternal Order of Police

chapter[] hand-delivered to the judge a resolution passed at the national conference

in New Orleans in August with the unanimous vote of 4,000 delegates representing

more than 320,000 police officers across the country" advocating for imposition of

the death penalty. *Id.*

The ACCA addressed this issue:

> Spencer next argues that his trial counsel was ineffective for failing to object to evidence that was considered by the sentencing court that Spencer had no opportunity to hear or rebut. Specifically, he asserts that counsel "failed to object, to request disclosure, or otherwise to raise any concern, when the Court referenced 'all the letters I've received from the citizens pro and con [the death sentence] about this case [that] are not in the file. They are in a box in my office.'" (C. 748.)
>
> The circuit court stated the following concerning this claim:
>
>> "Spencer requests an evidentiary hearing on his claim that counsel failed to object to evidence considered by the Court during the judicial sentencing hearing that he had no opportunity to see or rebut. Spencer's request is denied because this

claim is not sufficiently pleaded. Spencer does not allege that this Court relied on this information when he overrode the jury's life without parole sentence recommendation and sentenced Spencer to death.

"In addition, Spencer's request is denied because the claim can be resolved on the record before the Court. While this Court noted that it had received letters from citizens pro and con about this case, this Court did not consider those letters in making its sentencing determination. In fact, this Court stated in the March 30, 2009, amended sentencing order that it disregarded 'pleas or references to the Court to consider the sentence on the basis of passion or prejudice....' This Court did not rely on any information that Spencer did not see or was not allowed to rebut. Spencer's discovery request on this claim is, therefore, denied."

(C. 101–02.)

The circuit court specifically stated in its amended sentencing order that it did not consider any pleas as they related to the sentence. The circuit court also stated in the postconviction order that it had not considered the challenged documents when determining Spencer's sentence. This claim is refuted by the circuit court and the record on direct appeal. *McNabb v. State,* 991 So. 2d at 320. Therefore, the circuit court did not err by summarily dismissing this claim pursuant to Rule 32.7(d), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 616–17.

Mr. Spencer contends that his sentence violates *Gardner v. Florida*, 430 U.S. 349 (1977), because "the trial judge reviewed confidential information at sentencing that was not disclosed to the defense." Doc. 21 at 83. And, according to Mr. Spencer,

even if the trial court "specifically stated in its amended sentencing order that it did not consider any pleas as they related to the sentence," *Spencer R.32*, 201 So. 3d at 617, "the trial judge need not attest to the significance of the extra-record material in order to maintain a *Gardner* challenge[,]" Doc. 21 at 84. Instead, Mr. Spencer cites an unpublished Eleventh Circuit case for the proposition that "a *Gardner* violation occurs when sentencing information 'was held in confidence by the state court' and withheld from the defense, as in this case." *Id.* (quoting *United States v. Black*, 570 F. App'x 836, 840 (11th Cir. 2014)).

Mr. Spencer's arguments are unavailing. *Gardner* held that a criminal defendant is "denied due process of law when the death sentence [i]s imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." 430 U.S. at 362. That is not what happened here. Mr. Spencer's death penalty was not imposed on the basis of information which he had no opportunity to deny or explain. *See Spencer R.32*, 201 So. 3d at 617.

Here, the trial court "specifically stated in its amended sentencing order that it did not consider any pleas as they related to the sentence." *Id.* The trial court "also stated in the postconviction order that it had not considered the challenged documents when determining Spencer's sentence." *Id.* The trial court emphasized that it "did not rely on any information that Spencer did not see or was not allowed to rebut." *Id.* (quoting Doc. 17-37 at 103). The *Gardner* Court did "recognize the

168

importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases." 430 U.S. at 360. But the Court found the constitutional violation where the court imposed the death sentence "as least in part, on the basis of information "which [the defendant] had no opportunity to deny or explain." *Id.* at 362. This court will take—as courts routinely do—the trial court at its word that it did not base its sentencing decision on improper evidence. Accordingly, Mr. Spencer's sentence was not imposed in a manner violative of *Gardner*.

Because Mr. Spencer's sentence did not violate *Gardner*, there is a "reasonable argument that [Mr. Spencer's] counsel satisfied *Strickland*'s deferential standard" because Mr. Spencer cannot prove that he was prejudiced by the lack of a *Gardner* objection. *See Harrington*, 562 U.S. at 105. Even if the evidence was problematic, the trial court's refusal to consider it forecloses any argument that Mr. Spencer was prejudiced by his counsel's failure to object. Accordingly, the ACCA's rejection of Mr. Spencer's claim under *Strickland* was not contrary to or an unreasonable application of clearly established federal law, nor an unreasonable factual determination.

### *vii.  Penalty-Phase Error Cumulative Effect*

Mr. Spencer next contends that the cumulative effect of trial counsel's alleged ineffective assistance during the penalty and sentencing phase "denied Mr. Spencer his right to a fair trial and accurate sentence determination." Doc. 1 ¶ 239.

The ACCA addressed this issue:

> Spencer next argues that the cumulative effect of counsel's errors resulted in prejudice to him.
>
> The circuit court stated the following concerning this claim:
>
>> "Spencer's claim that the cumulative effect of counsel's errors denied him his right to the effective assistance of counsel during the penalty phase of the trial is not sufficiently pleaded, therefore, his request for an evidentiary hearing is denied. Spencer does not specifically identify what errors should be considered cumulatively and does not allege how the cumulative effect of any errors denied him the effective assistance of counsel."
>
> (C. 102.) This Court agrees that Spencer's claim relating to the cumulative effect of counsel's alleged errors was insufficiently pleaded. Because Spencer failed to plead sufficient facts that would entitle him to relief, this claim was correctly dismissed without a hearing. *See* Rule 32.6(b), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 617.

As detailed throughout Part III.A.2., counsel's representation of Mr. Spencer throughout the penalty and sentencing phase of his trial was objectively reasonable. Mr. Spencer is thus due no habeas relief on this claim.

### 3. Direct Appeal – Ineffective Assistance Of Counsel

Mr. Spencer contends that his appellate counsel was ineffective during his direct appeal. Doc. 1 ¶ 240. Specifically, Mr. Spencer contends that his appellate counsel was ineffective for failing to challenge the "factually inconsistent prosecutorial theories" used in Mr. Spencer and Mr. Woods's trials. *Id.* ¶ 247. Mr. Spencer argues that "the prosecution argued repeatedly at [his] trial that [he] was the leader of a premeditated plan to kill the police officers and that [he] shot Officer Bennett in the face . . . ." *Id.* ¶ 243. "Nevertheless, the prosecutor repeatedly argued during Mr. Woods's subsequent trial that Mr. Woods, not Mr. Spencer, was the leader of a premeditated plot to kill Birmingham police officers and that Mr. Woods shot Officer Bennett in the face . . . ." *Id.* ¶ 244. According to Mr. Spencer, "[e]xamination of the appellate record demonstrates that it is more than 'arguable' that Mr. Spencer's sentencers were swayed by the inconsistent prosecutorial theories." *Id.* ¶ 246 (explaining that in Mr. Spencer's trial, the court credited Mr. Spencer as the "the sole shooter[,]" but at Mr. Woods's sentencing, the court found that there was no evidence as to who shot Officer Bennett). So, Mr. Spencer contends, these "factually inconsistent prosecutorial theories violated Mr. Spencer's rights . . . , and that issue is a meritorious one which warranted appellate review on direct appeal[.]" *Id.* ¶ 247.

The ACCA addressed this issue:

Spencer argues that his appellate counsel was ineffective for failing to raise a cognizable issue on appeal. Specifically, Spencer pleaded that his appellate counsel was ineffective for failing to argue that the State presented inconsistent theories at his June 2005 trial and at his codefendant's, Nathaniel Woods's, October 2005 trial and that the State's actions violated the decision of the Supreme Court of the United States in *Bradshaw v. Stumpf,* 545 U.S. 175, 125 S. Ct. 2398, 162 L. Ed. 2d 143 (2005).

The circuit court stated the following concerning this claim:

> "Spencer asserts that the prosecution argued at his trial that he shot Officer Bennett and argued at [his codefendant's] trial that it was not clear who shot Officer Bennett. The prosecution did not present inconsistent theories at Spencer's trial and at Woods's trial. At Spencer's trial, the prosecution argued that Spencer shot Officer Bennett and at Woods's trial the prosecution argued that it was not clear who actually fired the last shot into Officer Bennett. These are not inconsistent theories ... but are different arguments from the evidence presented at each trial.
>
>> "In addition, the facts in this case are distinguishable from the facts in *Bradshaw v. Stump[f],* 545 U.S. 175 (2005)—the case relied on by Spencer. In *Stump[f],* the defendant maintained at all times that he did not shoot the lone victim and was sentenced to death for his involvement in the murder. In the instant case, Spencer admitted during his trial that he fired the final shot into Officer Bennett and also admitted shooting and killing the other officers. There is no doubt from the record that Spencer was the primary shooter in the deaths of the three police officers. Moreover, in the instant

case, the jury recommended that Spencer be sentenced to life imprisonment without the possibility of parole rather than death. Based on these facts, Spencer cannot prove that he was prejudiced when his appellate counsel failed to argue on appeal that the prosecution allegedly presented inconsistent theories as to who fired the last shot at Officer Bennett. Because no material issue of fact or law exists concerning this claim, Spencer is not entitled to an evidentiary hearing on this claim."

(C. 86–87.)

Initially, this Court notes that appellate counsel was not ineffective for failing to raise this issue on appeal because Spencer was tried months before Woods; therefore, the trial record would have been silent as to the facts surrounding this claim. Counsel cannot be ineffective for failing to raise an issue that has no factual support in the record. *See Ray v. State,* 80 So. 3d 965, 988 (Ala. Crim. App. 2011).

In addressing a similar issue, this Court in *Johnson v. State,* [Ms. CR–05–1805, June 14, 2013] —— So .3d —— (Ala. Crim. App. 2007) (opinion on return to remand), stated:

"Many courts have recognized that the government may argue inconsistent theories in cases involving multiple defendants. In addressing this issue, federal courts have upheld the State's presentation of inconsistent evidence in codefendants' trials. The United States Court of Appeals for the Fifth Circuit has stated:

"'[The defendant] argues that his constitutional due process rights were violated when the government presented inconsistent theories at two criminal trials—namely, at Cooper's

[codefendants'] trial the government argued that Cooper shot Marshall, and at [the defendant's] trial, the government argued that [the defendant] shot Marshall. We have held, though, "a prosecutor can make inconsistent arguments at the separate trials of codefendants without violating the due process clause." *Beathard v. Johnson,* 177 F.3d 340, 348 (5th Cir. 1999); see also *Nichols v. Scott,* 69 F.3d 1255, 1272 (5th Cir. 1995) ("Two things, however, may be said about the rather amorphous doctrine of judicial estoppel. First, there is no indication in the authorities that it is constitutionally mandated. Second, it has apparently never been applied against the government in a criminal case."). In any event, the inconsistencies were immaterial to the conviction since [the defendant] could have been convicted for the same offense, carjacking resulting in death and aiding and abetting the same, under both theories. See *United States v. Paul,* 217 F.3d 989, 998–99 (8th Cir. 2000) ("When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent."); cf. *Bradshaw v. Stumpf,* 545 U.S. 175, 187, 125 S. Ct. 2398, 162 L. Ed. 2d 143 (2005) (upholding a guilty plea where the defendant's assertions of inconsistency related entirely to which individual shot the victim but where "the precise identity of the triggerman was immaterial to [defendant]'s conviction for aggravated murder.").'

"*United States v. Frye,* 489 F.3d 201, 214 (5th Cir.2007).

174

"'Courts presented with situations where there are genuine evidentiary disputes as to who was responsible for a crime among various defendants have shown greater willingness to permit a prosecutor to argue inconsistent theories in separate trials. See *Beathard v. Johnson,* 177 F.3d 340, 348 (5th Cir. 1999) ("The record does not support such a claim. Price had two live eyewitnesses to the crime, both charged with capital murder and both accusing the other of being the most culpable.... Price, as well as every juror involved, knew that both of the stories could not have been true."); *Parker v. Singletary,* 974 F.2d 1562, 1578 (11th Cir. 1992) ("But no due process violation occurred, because there was no necessary contradiction between the state's positions in the trials of the three co-defendants. Given the uncertainty of the evidence, it was proper for the prosecutors in the other co-defendants' cases to argue alternate theories as to the facts of the murder.").'

"*United States v. Ganadonegro,* 854 F. Supp. 2d 1088, 1098 (D.N.M. 2012).

"Other state courts addressing this issue have reached the same conclusion.

"'[W]e are in accord with the courts that hold that a due process violation will only be found when the demonstrated inconsistency exists at the core of the State's case. Discrepancies based on rational inferences from ambiguous evidence will not support a due process violation provided the two theories are supported by consistent underlying facts. We recognize that the evidence presented at multiple trials is going to change to an extent based on relevancy to the particular defendant and other practical matters.

175

The underlying core facts, however, should not change. The few courts that have found due process violations did so in cases where the inconsistencies were inherent to the State's whole theory of the case or where the varying material facts were irreconcilable. It is this type of inconsistency that renders the conviction fundamentally unfair, thus violating due process.'

"*Sifrit v. State,* 383 Md. 77, 106, 857 A.2d 65, 82 (2004).

"'Courts have ... found no due process violation stemming from inconsistent arguments as to who was the killer in the relatively common circumstance where each defendant can be held equally guilty as an aider and abettor upon the same inconclusive evidence.'

"*State v. Poe,* 284 Neb. 750, 768, 822 N.W. 2d 831, 845 (2012).

"There is no due-process violation when the State argues at one trial that one codefendant shot the victim and at the codefendant's trial argues that that codefendant shot the victim.

"'When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecutor's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent. Thus, because there was evidence that supported both theories, and since [the defendant] could have been convicted of aiding and abetting under either theory, we find no error.'

176

"*United States v. Paul,* 217 F.3d 989, 998–99 (8th Cir. 2000).

"Thus, because there is no merit to the legal theory underlying this claim of ineffective assistance, the claim was properly dismissed. See, e.g., *Lee v. State,* 44 So. 3d 1145, 1173 (Ala. Crim. App. 2009) (counsel cannot be ineffective for failing to raise a claim that has no merit)."

––– So. 3d at ––––– So. 3d at –––. Because the substantive claim had no merit, appellate counsel could not be ineffective for failing to raise this issue on appeal. *See Lee,* supra.

Furthermore,

"[c]ounsel need not raise and address each and every possible argument on appeal to ensure effective assistance of counsel. Indeed, the process of 'winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.' *Smith v. Murray,* 477 U.S. 527, 536, 106 S. Ct. 2661, 2667, 91 L. Ed. 2d 434 (1986). See also, *Johnson v. State,* 612 So. 2d 1288, 1303 (Ala. Crim. App. 1992)."

*Brown v. State,* 663 So. 2d 1028, 1035 (Ala. Crim. App. 1995).

This claim was correctly summarily dismissed because there is no material issue of fact or law that would entitle Spencer to relief. *See* Rule 32.7(d), Ala. R. Crim. P.

*Spencer R.32*, 201 So. 3d at 617–20.

Mr. Spencer contends that the ACCA made "an unreasonable determination of the facts, as the record clearly demonstrates that the prosecutors made contrary arguments." Doc. 21 at 89. Mr. Spencer points to three statements from his trial and Mr. Woods's trial that he alleges show this inconsistency. *Id.* at 89–90.

At Mr. Spencer's trial, the prosecution said:

> When [Mr. Spencer] got outside the front door, he wasn't through shooting just yet. He took that SKS rifle and he aimed it to the ground at Officer Bennett who was right there laying on the concrete in the dirt and point blank shot him in the face. Now he was through. He tossed the rifle aside, and he and Nathaniel Woods ran down the street to go hide in the attic of a house nearby.

Doc. 17-22 at 189–90. The prosecution also said:

> Who killed them? Who killed them? Nathaniel Woods? Markesha whatever her name was? No.

Doc. 17-28 at 110–11. And finally, the prosecution said at Mr. Spencer's trial:

> Do you think [Mr. Spencer] cared for a moment that any of those stray bullets would hit anybody in that neighborhood? He did not care. And [Mr. Spencer] shows us how little he cared when he takes that rifle and puts a hole in Rob Bennett's face. He doesn't care. He didn't care then.

*Id.* at 190. But then, Mr. Spencer purports to quote from Mr. Woods's trial transcript where the prosecutor argued:

> Just one more minor point to consider, [Mr. Woods] was the elder of the two. He was in charge. He had Kerry Spencer do the work for him. He told Kerry Spencer, if they come back, we're going to shoot them.

178

Doc. 21 at 89 (quoting "Woods Tr. at 1666-67"). He alleges that the prosecution said in Mr. Woods's case:

> Finally there's one question that remains. There's been no definitive evidence, there's not been one witness who has been able to tell us who shot Officer Bennett when he was lying on that ground crying out to his God for help, who shot him in his face, who put that SKS up to him two inches away from his face. No one saw that. We know Kerry Spencer shot him through the screen door as he was standing in the walkway. But we also know because Blue tells us he was laying on that ground and he was screaming for help. He was saying, "Oh, my God. Oh, my God." And then he was silenced. And there's not been a witness who can tell us who fired that shot into his face that went through his head and Officer White had to go back and dig the bullet out of the ground. Is that why [Mr. Woods] says when he gets to John Prather's house, is that why [Mr. Woods] says, "We shot their asses."? Is that why he says, "We shot their asses."?

*Id.* at 90 (emphasis removed) (quoting "Woods Tr. at 1679-80"). Mr. Spencer also alleges that at Mr. Woods's trial, the prosecution said:

> Who did shoot Rob Bennett in the face? Has anybody other than the guy on the TV [Mr. Spencer] told you who shot Rob Bennett in the head? You've heard [Mr. Spencer's] testimony read, you've had [Mr. Spencer's] statement that he gave to the police, you've got that on tape, you've heard his testimony from his own trial read. In his statement to the police on June 17th, number one, he adamantly denies, ya'll heard him, he adamantly denies taking Carlos Owen's gun. "What did I need with a gun? I've got my nine. I've got my SK." Two or three times they tried to get him -- you know, he's admitted killing three police officers and won't admit taking a gun. And he doesn't say anything about Rob Bennett's arm jerking and hitting him in the leg and that's why he shot him in the

179

face. He doesn't say that. Roughly a year later at Kerry Spencer's trial, "Oh, yeah. I forgot. I did pick up officer Owen's gun because I didn't know whether he was dead or not and I was afraid he would shoot me in the back." Look at that picture and tell me whether or not he had any reason at all to believe that Carlos Owen wasn't dead. And, Oh, by the way, as I was coming out the door, the officer on the ground flinched and hit me on the leg and I shot him in the face. I'm just asking you. I'm not telling you. I'm asking you if from all of that is there a reasonable logical inference that Kerry Spencer has decided, I'm history, I'm toast, but my partner, my partner, I need to take some heat off of him.

*Id.* (quoting "Woods Tr. at 1743-44"). Finally, Mr. Spencer alleges that at Mr. Woods's trial, the prosecution said:

And the State would have you believe that the defendant Nathaniel Woods, somehow he picked up the SKS rifle and shot Mr. Bennett in the face. I don't believe that's what happened.

*Id.* at 91 (quoting "Woods Tr. at 1646, 1706").

Further, Mr. Spencer contends that the ACCA ruling was "contrary to clearly established federal law[]" because "[t]he notion that a defendant cannot challenge due process violations occurring after his conviction directly contradicts" Supreme Court precedent. *Id.* at 91–92.

AEDPA deference controls this court's review of this claim. Mr. Spencer cites *Bradshaw v. Stumpf*, 545 U.S. 175 (2005), and argues that "inconsistent prosecutorial theories could constitute a due process violation" by depriving defendants of "[a] fair trial in a fair tribunal," *Turner v. Louisiana*, 379 U.S. 466,

180

472 (1965), resulting in unfair capital sentencing, Doc. 1 ¶ 240; Doc. 21 at 88–92. *Bradshaw* was decided on June 13, 2005, the same day that Mr. Spencer's trial began. *See* Doc. 17-21 at 108; *Bradshaw*, 545 U.S. at 175.

In *Bradshaw*, the Supreme Court ruled that "it would be premature . . . to resolve the merits" of the petitioner's inconsistent theories claim because the lower court had not yet determined if the prosecutor's conduct constituted a due process violation. 545 U.S. 187–88. Indeed, the Supreme Court explicitly "express[ed] no opinion on whether the prosecutor's actions" there "amounted to a due process violation." *Id.* at 187. So Mr. Spencer cannot rely on *Bradshaw*, which held nothing with respect to the arguments advanced by Mr. Spencer. The ACCA thus did not unreasonably apply the law as decided by the Supreme Court to Mr. Spencer's case.

Likewise, the ACCA decision was also not based on an unreasonable determination of the facts. At Mr. Spencer's trial, he testified that he shot Officer Bennett on his way out the back door after the officer "jumped and touched" him because it was his "automatic reflex." Doc. 17-27 at 199. His jury thus convicted him for Officer Bennett's murder. Doc. 17-29 at 34.

At Mr. Woods's trial, the prosecution argued that Mr. Spencer strategically chose to confess to Officer Bennett's killing "to take some heat off of" Mr. Woods. Doc. 21 at 90. The prosecution attacked Mr. Spencer's testimony and claimed there was "no definitive evidence" of "who shot Officer Bennett" by pointing to Mr.

Woods's statement after fleeing to an apartment down the street that "[w]e shot their asses." *Id.*

The trial court found that the prosecution's arguments were "not inconsistent" but "different arguments from the evidence presented at trial," and the ACCA affirmed that finding. *Spencer R.32*, 201 So. 3d at 618, 620. This was not unreasonable. At Mr. Woods's trial, the prosecution chose to attack Mr. Spencer's confession to prove its case; it did not present definitive evidence that Mr. Spencer had killed Officer Bennett and then attempt to prosecute Mr. Woods for that same crime. It instead allowed the jury to consider Mr. Spencer's testimony along with his apparent interest in preserving his co-conspirator's life. Accordingly, Mr. Spencer is due no habeas relief on this claim.

**B.      Substantive Claims**

Mr. Spencer raises several claims of substantive error. For the reasons explained below, Mr. Spencer is not entitled to habeas relief on any of these claims.

**1.      Alabama's Capital Sentencing Process Does Not Violate *Ring v. Arizona***

According to Mr. Spencer, "Alabama's jury override procedure is fundamentally unfair." Doc. 1 ¶ 250. "As it relegates capital juries to a mere advisory role in sentencing, it is unconstitutional and violates clearly established federal law." *Id.* Mr. Spencer contends that "Alabama's capital sentencing scheme is

182

unconstitutional because it empowers the judge to make the fact-finding necessary to impose the death penalty[,]" in contravention of *Ring v. Arizona*, 536 U.S. 584 (2002), and *Hurst v. Florida*, 577 U.S. 92 (2016). Doc. 1 at 128–34.

In *Ring*, the Supreme Court held that the Sixth Amendment guarantees that "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589. *Hurst* applied *Ring* to Florida's sentencing process. There, the Supreme Court held a petitioner's death sentence unconstitutional because "the judge alone [found] the existence of an aggravating circumstance" that expanded the range of punishment to include the death penalty. *Hurst*, 577 U.S. at 103.

Mr. Spencer asserts that his death sentence violates *Ring* and *Hurst* because the trial court—not the jury—found the specific aggravating factors that authorized his death sentence and found that these aggravating factors outweighed the mitigating circumstances. *See* Doc. 1 at 130–33. After closing arguments in the penalty phase of Mr. Spencer's trial, the trial court instructed the jury on the definition of the four aggravating circumstances presented by the State and instructed the jurors that their duty was to determine "whether the state has proven [the existence of the aggravating circumstances] beyond a reasonable doubt." Doc. 17-29 at 6. He continued: "The defendant does not have to disprove anything

183

about an aggravating circumstance. The burden is wholly upon the State to prove such a circumstance beyond a reasonable doubt." *Id.* at 7. And he admonished the jurors that they could "not consider any aggravating circumstance other than those that [the trial court] instructed [them] on," nor could they "consider an aggravating circumstance unless [they were] convinced beyond a reasonable doubt of the existence of that aggravating circumstance in these cases." *Id.*

The trial court also read the jurors a list of six mitigating circumstances. *Id.* at 8–11. He further instructed the jurors that "a mitigating circumstance does not have to be included in the list that [he] . . . read to [the jury] in order for it to be considered by [the jury]" and that "any aspect of the defendant's character, or record, and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death" should be considered as a mitigating circumstance. *Id.* at 11–12. The jury returned a recommendation that Mr. Spencer receive a sentence of life without the possibility of parole on all four capital charges. *Id.* at 121.

On September 23, 2005, the trial court overrode the jury's recommendation and sentenced Mr. Spencer to death. Doc. 17-1 at 103–04 (Original Sentencing Order); *see also* Doc. 17-1 at 124–25 (First Amended Sentencing Order); Doc. 17-35 at 2–3 (Second Amended Sentencing Order); Doc. 17-35 at 10–11 (Third Amended Sentencing Order).

On direct appeal, the ACCA rejected Mr. Spencer's argument that Alabama's death penalty statute violates *Ring v. Arizona*. *Spencer I*, 58 So. 3d at 248. The ACCA emphasized that both it "and the Alabama Supreme Court have repeatedly denied the very claims now raised by [Mr.] Spencer on appeal." *Id.* The ACCA cited prior cases regarding "the impact of *Ring* on Alabama's capital-murder statute and sentencing scheme" and Mr. Spencer's "contention regarding the weighing of aggravating and mitigating circumstances." *Id.*

In his habeas petition, Mr. Spencer argues that under Alabama's pre-2017 capital sentencing system, "[j]ury override undermine[d] defendants' rights by empowering trial judges to disregard a jury's life verdict." Doc. 1 ¶ 256. And, in Mr. Spencer's case, the sentencing judge "considered impermissible evidence that was never presented to the jury," which was compliant with Alabama law that permitted the jury's recommendation to be overridden "when such information c[ould] properly be used to undermine a mitigation circumstance." *Id.* ¶ 259 (quoting *Ex parte Carroll*, 852 So. 2d 833, 836 (Ala. 2002)).

Mr. Spencer alleges that, contrary to *Ring*, at his sentencing "his trial judge independently found the existence of aggravating factors, independently found that those factors outweighed mitigating factors, and unilaterally sentenced Mr. Spencer to death." *Id.* ¶ 265. Thus, Mr. Spencer maintains that he is entitled to habeas relief because "Alabama's 'hybrid' capital sentencing scheme, and the trial judge's

185

override of the jury's life verdict, violated Mr. Spencer's rights under the Sixth,

Eighth, and Fourteenth Amendments to the United States Constitution." *Id.*¶ 267. [10]

To warrant habeas relief under Section 2254, Mr. Spencer must show that the

state court's ruling was "beyond any possibility for fairminded disagreement."

*Harrington*, 562 U.S. at 103. He cannot meet that standard.

As an initial matter, Mr. Spencer cannot rely on *Hurst*. The Supreme Court

decided *Hurst* after the conclusion of Mr. Spencer's direct appeal and his Rule 32

petition. Doc. 17-36 at 156–57; Doc. 17-37 at 169. Mr. Spencer did not assert a *Hurst*

challenge until he petitioned this court for habeas relief. "*Ring* and *Hurst* do not

apply retroactively on collateral review." *McKinney v. Arizona*, 589 U.S. 139, 145

---

[10] Warden Raybon suggests that Mr. Spencer has a separate claim "that the judicial override was improper in his case because the trial judge considered impermissible evidence when it overrode the jury's life without parole sentence recommendation." Doc. 19 at 18. According to Warden Raybon, "[t]his claim was never presented to the state courts[,]" so it "is therefore procedurally defaulted from this Court's review because it was not properly raised in the state courts." *Id.* Mr. Spencer contends that "[t]his assertion is incorrect." Doc. 21 at 6. Mr. Spencer says that his allegations about the improperly considered evidence are "not a separate claim, but merely form[] part of the argument in support of Claim II." *Id.* That the judge allegedly considered improper evidence is not "the crux of Mr. Spencer's claim." *Id.* "Instead, Mr. Spencer objects to an unfair capital sentencing process which relegated his jury to an advisory role and allowed a judge to impose death based on his own findings." *Id.* Accordingly, Mr. Spencer says, "[t]he substance of [his] claim is the same as presented on direct appeal, when he likewise relied on *Apprendi* and *Ring*." *Id.* The court therefore will not consider separately Mr. Spencer's allegations about improperly considered evidence. And in any event, his allegations about improperly considered evidence do not affect this court's conclusion that under controlling precedent, Alabama's capital sentencing scheme does not violate the Constitution.

(2020) (citing *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004)); *see also Lambrix v. Sec'y, Fla. Dep't of Corr.*, 851 F.3d 1158, 1165 n.2 (11th Cir. 2017) ("*Hurst*, like *Ring*, is not retroactively applicable on collateral review.").

As for *Ring*, nothing there forbids the use of an aggravating circumstance implicit in a jury's unanimous verdict to impose a death sentence. Indeed, *Ring* specifically left open this possibility. *See* 536 U.S. at 609 n.7 ("We do not reach the State's assertion that any error was harmless because a pecuniary gain finding was implicit in the jury's guilty verdict."). Here, the jury found Mr. Spencer guilty of murdering two or more persons. Because there was no argument that those killings were not part of the same course of conduct, the guilty verdict reflects that the jury necessarily found beyond a reasonable doubt the existence of the corresponding aggravating circumstance of "intentionally caus[ing] the death of two or more persons by one act or pursuant to one scheme or course of conduct," specified in Ala. Code § 13A-5-49(9). This jury finding exposed Mr. Spencer to a range of punishment that has the death penalty as its maximum, rendering Mr. Spencer's death sentence compliant with *Ring* because the sentencing judge's findings could not increase the maximum penalty. *See Ring*, 536 U.S. at 589.

Mr. Spencer has not cited any Supreme Court precedent that extends *Ring* to prohibit a trial judge from considering aggravating circumstances implicit within the jury's verdict of guilt or to require the jury to weigh the aggravating and mitigating

circumstances. Thus, Mr. Spencer has not established that the ACCA ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103, nor that the ruling unreasonably applied *Ring*. Mr. Spencer is therefore not entitled to habeas relief on this claim.

2. Trial Court Erred By Refusing To Instruct On Lesser Included Offenses

i. *Refusal To Charge Jury On Voluntary Intoxication And Manslaughter*

"Mr. Spencer requested jury instructions on the lesser included offenses of provocation manslaughter and manslaughter due to voluntary intoxication." Doc. 1 ¶ 270. "The trial court denied the requested instruction on provocation, but agreed to give the charge on intoxication." *Id.* "However, when the trial judge later instructed the jury, he failed to give both instructions." *Id.* This was error, according to Mr. Spencer, because "[e]vidence presented at trial . . . supported the lesser included offense of manslaughter by voluntary intoxication." *Id.* ¶ 276. Mr. Spencer believes that "[t]he evidence of [his] intoxication clearly warranted a jury instruction on the lesser included offense of manslaughter[,]" *id.* ¶ 278, and "[i]n denying Mr. Spencer's requested instruction on the lesser included offense of manslaughter, the trial court deprived the jury of a third option between capital murder and acquittal[,]" *id.* ¶ 279.

Mr. Spencer raised this claim on direct appeal, and the ACCA concluded that "there was no rational basis for an instruction on voluntary intoxication," so the trial court did not err when it declined "to instruct the jury on voluntary intoxication or reckless manslaughter as a lesser-included offense." *Spencer I*, 58 So. 3d at 232. The ACCA noted that "although [Mr. Spencer] requested an instruction on voluntary intoxication, he did not object to the lack of the now requested instructions." *Id.* at 230. So the ACCA reviewed for plain error. *Id.*

The ACCA acknowledged that "[g]enerally, where there is evidence of intoxication and the charged offense involves specific intent, such as capital murder, the trial court should instruct the jury on the lesser-included offense of manslaughter." *Id.* at 231. And "[a] charge on intoxication should be given if there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt in the element of intent." *Id.* (internal quotation marks omitted) (quoting *Coon v. State,* 494 So. 2d 184, 187 (Ala. Crim. App. 1986)).

Mr. Spencer's evidence did not warrant a jury instruction on intoxication. The ACCA considered Mr. Spencer's allegations about his drug use around the time of the shootings:

> Here, Spencer presented evidence indicating that he had ingested narcotics and alcohol the night before the shootings and the morning of the shootings. Spencer testified that at the time of the shootings, he had a cocaine habit of "about six to seven grams a day." (R. 1647.) When

189

asked whether he had taken any narcotics on the morning of the shootings, Spencer stated:

> "Yes, I did. You know, I had a little bit of [cocaine] powder left over from the night before. But the night before, we really did a lot of cocaine. And, you know, I probably didn't go to sleep until about 4 in the morning, you know, just dozed off."

(R. 1675–76.) Spencer further stated that sometime shortly after 9:00 a.m. on the morning of the shootings, he took a Seroquel tablet and drank a beer to help him go to sleep. (R. 1676.) Finally, in an interview with the police after his arrest, Spencer stated that he was "high" at the time of his arrest.

*Id.*

But these allegations did not establish Mr. Spencer's intoxication at the time

of the shootings, as required to warrant such a jury instruction:

> However, this evidence alone does not constitute evidence indicating that Spencer was intoxicated at the time of the shootings. Spencer did not claim to be intoxicated at the time of the shootings. There was no evidence concerning the effects, if any, that the amounts of cocaine and other substances allegedly ingested the night before and morning of the shootings had on Spencer at the time of the shootings. Rather, based on the evidence presented at trial, Spencer failed to establish any evidentiary foundation of intoxication that would warrant an instruction on intoxication. There was simply insufficient evidence from which a jury could have found beyond a reasonable doubt that Spencer was unable to form the requisite intent to commit capital murder, because he was experiencing "a disturbance of mental or physical capacities," resulting from drug or alcohol use at the time of the murders. Because there was no rational basis for an instruction on voluntary intoxication, we find no plain error in the trial

190

court's failure to instruct the jury on voluntary intoxication or reckless manslaughter as a lesser-included offense.

*Id.*

In his habeas petition, Mr. Spencer alleges that he consumed several psychoactive drugs in addition to the cocaine he admittedly used the night before and shortly after the murders. Doc. 1 ¶ 277. But those allegations were not raised in state court, *see* Doc. 18 at 86, so the court does not consider them. *See Cullen*, 563 U.S. at 181; *Snowden*, 135 F.3d at 735.

Mr. Spencer contends that because the court did not instruct the jury on voluntary intoxication, it "deprived the jury of a third option between capital murder and acquittal." Doc. 1 ¶ 279. He contends that this decision was "contrary to clearly established federal law," namely, *Beck v. Alabama*, 447 U.S. 625 (1980). Doc. 1 ¶ 279; Doc. 21 at 98.

In *Beck*, the Supreme Court held that the death penalty may not be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense and the evidence would have supported such a verdict. 447 U.S. at 627, 638. "In the federal courts, it has long been 'beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.'" *Id.* at 635 (quoting *Keeble v. United States*, 412 U.S. 205, 208 (1973)). "Similarly, the state courts that have

addressed the issue have unanimously held that a defendant is entitled to a lesser included offense instruction where the evidence warrants it." *Id.* at 635–36.

But the Supreme Court did not hold that a defendant is invariably entitled to a jury instruction on a lesser included offense. Rather, there must be "evidence [that] would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *See id.* at 635 (quoting *Keeble*, 412 U.S. at 208). In other words, "the evidence [must] warrant[] it." *See id. Beck* bars imposition of the death penalty "when the evidence would have supported such a verdict [on the lesser included offense]" and the jury was not permitted to consider that offense. *Id.* at 627.

The ACCA did not unreasonably apply this rule. The ACCA evaluated all the record evidence of intoxication and concluded that no reasonable jury could find that Mr. Spencer's intoxication inhibited "the requisite intent to commit capital murder." *Spencer I*, 58 So. 3d at 232. Because the court declined the jury instruction on the ground that the "evidence would [not] permit a jury rationally to find [Mr. Spencer] guilty of the lesser offense and acquit him of the greater[,]" its decision does not run afoul of *Beck*. *See Beck*, 447 U.S. at 635 (quoting *Keeble*, 412 U.S. at 208) (alteration added); *see Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls does not require citation of our cases-indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

Nor did the ACCA unreasonably interpret the facts. The court had evidence that Mr. Spencer was a chronic cocaine user and had ingested some amount of substances the night before and the morning of (several hours before) the shootings. *Spencer I*, 58 So. 3d at 232. But "[Mr.] Spencer did not claim to be intoxicated at the time of the shootings" and "[t]here was no evidence concerning the effects, if any, that the amounts of cocaine and other substances allegedly ingested the night before and morning of the shootings had on [Mr.] Spencer at the time of the shootings." *Id.* Rather, the evidence showed that Mr. Spencer ingested an unknown amount of substances, *id.* ("I had a little bit of [cocaine] powder left over from the night before." (alteration in original)), several hours before the shootings, with an entirely unknown impact on his mental state. In the light of Mr. Spencer's imprecise allegations about the substances he consumed and when, the law did not require that the jury be allowed to guess about whether the substances affected him, how they affected him, and whether they were still affecting him at the time of the crime. *Beck* does not mandate a jury instruction when a jury verdict on the issue would be based entirely on conjecture. Accordingly, the ACCA determination that there was insufficient evidence to support a voluntary intoxication jury instruction was not an unreasonable determination in the light of the evidence.

*ii. Refusal To Charge Jury on Provocation Manslaughter*

Mr. Spencer contends that "[t]he evidence presented at trial supported a reasonable theory that [he] was provoked by the officers' assaults and threatening actions, and acting under the heat of passion," so the trial court should have instructed the jury on the lesser-included offense of provocation manslaughter under Ala. Code § 13A-6-3(a)(2). Doc. 1 ¶ 275. According to Mr. Spencer, the trial court's refusal to do so "deprived the jury of a third option between capital murder and acquittal" and was contrary to clearly established federal law. *Id.* ¶ 275.

According to Mr. Spencer, the evidence showed that on the day of the shootings, "the officers approached the apartment where Mr. Spencer lived and sold drugs three separate times[,]" and "[t]heir purpose was to harass and threaten Mr. Spencer and the other occupants[.]" *Id.* ¶ 272. He asserts that during these confrontations, the officers "threatened Mr. Spencer and promised to come back to the apartment later, placing Mr. Spencer in fear for his life." *Id.* Officer Owen allegedly told Mr. Spencer during an earlier altercation that day that Officer Owen had "enough body bags for [Mr. Spencer] too." *Id.* According to Mr. Spencer, when the officers returned the last time, he "was awakened by a loud commotion and a snapping sound[,]" and "[he] heard sounds of a struggle." *Id.* ¶ 273. Mr. Spencer contends that "Mr. Woods then ran into the bedroom holding his face like he was in pain[,]" and while talking to Mr. Woods, Mr. Spencer turned around to find "a gun

194

. . . pointed in his face." *Id.* According to Mr. Spencer, the officers "snatched the screen door off the hinges[,]" and "wrestled Mr. Woods to the floor, and began beating on him." *Id.* ¶ 274.

Mr. Spencer raised this claim on direct appeal. *See Spencer I*, 58 So. 3d at 230. The ACCA recognized as "well settled that even where the defendant commits the killing due to a sudden heat of passion, an instruction on manslaughter is properly refused where there is no evidence that that sudden heat of passion was caused by a provocation recognized by law." *Id.* at 244–45. And under Alabama law, there are "three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his . . . spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative." *Id.* at 245 (quoting *Rogers*, 819 So. 2d at 662).

The ACCA rejected the claim:

> Here, based on the evidence supporting Spencer's theory of events, the events leading up to the shootings, even if creating a sense of passion or mental or emotional imbalance, did not constitute a legally recognized provocation. It is apparent that neither the first (accused witnesses his spouse committing adultery) nor the third (accused witnesses an assault on a family member or close relative) legally recognized provocation is applicable in this case. As to whether the second legally recognized provocation (whether Spencer was assaulted or faced with an imminent assault on himself) is applicable under the

195

facts of this case, we have reviewed the evidence and answer that question in negative.

Even assuming, without finding as true, Spencer's contentions that the officers made remarks during the earlier encounter that caused Spencer to fear that the officers would hurt or kill him, those comments were made hours before the final encounter where the officers were killed. Additionally, the initial arguments were between Woods and officers; Spencer willingly joined in the verbal jousting, and again continued his verbal sparring with a second officer even though the first officer had, according to Spencer, made threatening comments. Further, the first two officers Spencer encountered during the final and fatal engagement were shot repeatedly in the back while attempting to exercise a lawful arrest on Woods. The evidence also indicates that Spencer made statements following the earlier encounters with the officers that if the officers returned he would "bust 'em" (R. 913), and that "they was gonna get" the officers if they returned. (R. 1638.) Additionally, Spencer, knowing that the officers had returned because he looked out the window, exacerbated the situation by intentionally grabbing his loaded SKS assault rifle and proceeding toward the commotion in the kitchen. This evidence further militates against any contention that the murders were committed in a sudden passion and thus warranted such a jury instruction. Because the evidence did not support a charge on heat-of-passion manslaughter, the trial court properly rejected Spencer's request for such a charge.

*Id.*

As explained above, *Beck* does not categorically entitle a criminal defendant to a jury instruction on a lesser included offense; there must be sufficient evidence for a verdict on that offense. Consistent with this rule, the ACCA concluded that the

196

evidence was insufficient to support a verdict on provocation manslaughter, so Mr. Spencer was not entitled to a jury instruction on provocation manslaughter. Having carefully reviewed Mr. Spencer's petition and the evidentiary record, this court cannot conclude that the ACCA unreasonably applied clearly established federal law or made an unreasonable factual determination. Accordingly, Mr. Spencer is entitled to no habeas relief on this claim.

### iii. *Refusal To Charge Jury on Self-Defense*

Mr. Spencer contends that "[i]n denying Mr. Spencer's requested instruction on self-defense, the trial court deprived the jury of critical information and denied Mr. Spencer a fair trial." Doc. 1 ¶ 287. He contends that "this ruling was contrary to clearly established federal law." *Id.* ¶¶ 280, 287. According to Mr. Spencer, "[t]he evidence presented at trial showed that [he] was harassed and threatened by the officers, and at the time of the shootings, faced an imminent deadly assault on himself." *Id.* ¶ 282. Mr. Spencer contends that despite this evidence, "[i]nstead of giving the instruction because there was *some* evidence of self-defense, as the law requires, the judge refused to give the instruction because he decided that other evidence undermined it." *Id.* ¶ 284. "In denying Mr. Spencer's request for a jury instruction on self-defense, the trial judge substituted his judgment of the inferences to be drawn from the evidence for the jury's." *Id.*

197

Mr. Spencer raised this issue on direct appeal. *Spencer I*, 58 So. 3d at 240. The ACCA explained that under Alabama law, "[a]n accused has the right to have the jury charged on any material hypothesis which the evidence in his favor tends to establish." *Id.* (internal quotation marks omitted) (quoting *Williams v. State*, 938 So. 2d 440, 444–45 (Ala. Crim. App. 2005)). But "the court should not instruct on the law of self-defense where there is no evidence to sustain the plea[,]" and "[a] trial judge may properly refuse to charge the jury on self-defense where he determines that the defendant could not set up self-defense under the facts." *Id.* at 241 (internal quotation marks omitted) (quoting *King v. State*, 478 So. 2d 318, 319–22 (Ala. Crim. App. 1985)). The ACCA thoroughly traced Alabama law regarding jury instructions on self-defense, *see id.* at 240–43, and explained that a "citizen [i]s not authorized to kill an officer in resisting the illegal arrest, except in self-defense where the force used against the citizen was felonious rather than merely forcible," *id.* at 243 (citing *Ex parte Edwards*, 452 So. 2d 503 (Ala. 1983)). The ACCA also explained that under Alabama law, "a person was authorized under common law to kill an officer in resisting an unlawful arrest only where necessary to save his own life or to save himself from serious bodily harm, provided that the necessity was real or apparent." *Id.* (citing *Odoms v. State*, 359 So. 2d 1162 (Ala. Crim. App. 1978)).

The ACCA then rejected this claim:

> The undisputed evidence indicated that the officers were at the residence to execute an outstanding arrest warrant

198

on Woods; that Woods refused to comply with the officers' demands to come outside and instead turned and fled into the apartment; and that the officers pursued Woods into the apartment. The undisputed evidence further indicated that Spencer had been asleep at the time the officers arrived; that he awakened, hearing commotion in the other end of the apartment; that he looked outside and saw police vehicles; that he rushed toward the commotion; that when he encountered the officers he fatally shot Officers Owen and Chisolm in the kitchen area of the apartment; that he turned and fatally shot Officer Bennett, who was near the front door of the apartment; and that he shot Officer Collins outside the back door of the apartment and fired additional shots at Officer Collins as Collins took cover behind his police car. The uncontroverted evidence further indicated that Spencer fired a final shot point-blank into Officer Bennett's head, as Officer Bennett lay on the ground outside the apartment. Additionally, although neither witness believed at the time that Spencer was serious, one witness testified that Spencer had made statements about the officers, following the initial encounter the morning of the shooting, indicating that he was going to "bust 'em," which the witness said he interpreted to mean that Spencer was going to shoot the officers if they returned. (R. 913.) Another witness testified that she heard Spencer and Woods remark that "they was gonna get" the officers if they returned. (R. 1638.)

Spencer may indeed have had a fear of the officers, but based on the evidence presented, we cannot say that that fear was reasonable. Further, Spencer's actions contributed to the earlier confrontations with the officers; he made statements between the earlier encounter and the fatal encounter indicating that he would kill the officers if they returned. Additionally, the evidence indicates that, upon hearing the commotion in the kitchen and looking outside and seeing police vehicles, Spencer had time to attempt to retreat by attempting to hide or escape from a window; however, he armed himself and proceeded to

advance toward the commotion and a certain encounter with officers. He shot the first two officers repeatedly in the back and the third officer at point-blank range in the head some period of time after that officer had been mortally wounded by a gunshot to the chest that impacted numerous internal organs and the spinal cord. Finally, Spencer failed to meet his burden of showing that the officers were in the apartment with a felonious intent. Having reviewed the applicable legal authority, the arguments of the parties, and the record before this Court, we cannot say that reversible error occurred as to this claim. Therefore, we conclude that the trial court did not commit reversible error in refusing to instruct the jury on self-defense.

*Id.* at 243–44.

This court cannot say that the ACCA ruling unreasonably applied federal law. The ACCA recited the relevant evidence in great detail (noting that much of it was undisputed) and concluded that Mr. Spencer's evidence could not support a finding of self-defense under the controlling legal standard. *Spencer I*, 58 So. 3d at 244. That determination was not objectively unreasonable.

Mr. Spencer contends that the trial court was simply "substitut[ing] his judgment of the inferences to be drawn from the evidence for the jury's" and ignoring the "however slight" evidence that Mr. Spencer produced about self-defense. Doc. 1 ¶¶ 284–85. But he fails to account for the reality that Alabama law limits the availability of self-defense defense for persons resisting arrest. As the ACCA explained, under Alabama law, a person resisting an arguably illegal arrest may assert self-defense only "where the force used against the citizen was felonious

rather than merely forcible." *Spencer I*, 58 So. 3d at 243. Here, "[t]he undisputed evidence indicated that the officers were at the residence to execute an outstanding arrest warrant on Woods," *id.*, rather than conducting an illegal arrest. And in any event, Mr. Spencer did not develop evidence that the officers executed that warrant with felonious intent. *Id.* at 244. Similarly, Mr. Spencer failed to establish that killing the officers was a "real or apparent" necessity to save his own life; he could have attempted to retreat or escape, but he armed himself and approached the conflict. *Id.*

On this record, this court cannot say that the ACCA made an erroneous factual determination, let alone an unreasonable one. Accordingly, Mr. Spencer is due no habeas relief on this claim.

3. Prosecution's Alleged Interference With Mr. Spencer's Right To Present Evidence In His Defense

Mr. Spencer argues that "[p]ost-conviction investigation has revealed that the prosecution threatened to charge Ms. Williams as an accessory to the instant capital offense, to induce her to testify falsely at Mr. Spencer's trial," Doc. 1 ¶ 293, which "interference . . . infringed on Mr. Spencer's rights," *id.* ¶ 295. According to Mr. Spencer, "[c]ontrary to what she testified, Ms. Williams now denies that Mr. Woods or Mr. Spencer ever plotted to kill police officers or that she ever heard them engage in any conversation on that topic." *Id.* ¶ 193. "Ms. Williams also asserts that prosecutors pressured her not to testify that police entered the apartment with their guns drawn." *Id.* Mr. Spencer contends that if Ms. Williams had not been coerced

into testifying falsely, her testimony "would have been both material and favorable to the defense." *Id.* But without that testimony, "the prosecutor repeatedly used Ms. Williams's false testimony to attack Mr. Spencer's self-defense assertions during closing argument." *Id.* ¶ 294.

The ACCA held that the trial court "correctly found that this claim was procedurally barred based on Rule 32.2(a)(3) and Rule 32.2(a)(5)" because "it could have been raised at trial or on appeal but was not." *Spencer R.32*, 201 So. 3d at 621. And "claims barred under Rule 32.2(a)(3) and (a)(5) are procedurally defaulted from federal habeas review." *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1335 (11th Cir. 2012).

Mr. Spencer contends that "[t]he state procedural rules cited by the Court of Criminal Appeals are inadequate to bar this Court's review of Mr. Spencer's claims, as they were incorrectly and unfairly applied in this case." Doc. 21 at 8. According to Mr. Spencer, his "claims were summarily dismissed, without a hearing or other factual development, on the basis of the procedural bar embodied in Rules 32.3(a)(3) and 32.2(a)(5). This dismissal directly contradicts precedent from Alabama's highest court." *Id.* at 8–11 (citing *Ex parte Beckworth*, 190 So. 3d 571 (Ala. 2013), and *Ex parte Hodges*, 147 So. 3d 973 (Ala. 2011)).

The summary dismissal of Mr. Spencer's claims did not rest on an independent and adequate state ground and thus does not bar this court's review. The

dismissal meets the first two parts of the Eleventh Circuit's three-part test to determine whether the ruling rests on an independent and adequate state rule. *See Ward*, 592 F.3d at 1156–57. The circuit court dismissed the claims—and the ACCA upheld the dismissal—on the ground that Mr. Spencer had not satisfied Rule 32.2's procedural bar. *See Spencer R.32*, 201 So. 3d at 621. The dismissal involved no interpretation of federal law. *See id.* But the state court's application of Rule 32.2 was not "firmly established and regularly followed and not applied 'in an arbitrary or unprecedented fashion.'" *See Ward*, 592 F.3d at 1157 (quoting *Judd*, 250 F.3d at 1313).

Indeed, the ACCA application of Rule 32.2 in this regard contravened Alabama law. *See Ex parte Hodges*, 147 So. 3d at 973. In *Ex parte Hodges*, the Supreme Court of Alabama explained that "[a] claim may not be summarily dismissed because the petitioner failed to meet his burden of *proof* at the initial pleading stage, a stage at which the petitioner has only a burden to *plead*." *Id.* at 976 (quoting *Johnson v. State*, 835 So. 2d 1077, 1079–80 (Ala. Crim. App. 2001)). "Rather, at the pleading state, a petitioner must only provide a clear and specific statement of the grounds upon which relief is sought." *Id.* (internal quotation marks omitted) (quoting *Johnson*, 835 So. 2d at 1079–80). "Once a petitioner has met his burden of pleading so as to avoid summary disposition . . . , he is then entitled to an

opportunity to present evidence in order to satisfy his burden of proof." *Id.* (internal quotation marks omitted) (quoting *Johnson*, 835 So. 2d at 1079–80).

In *Ex parte Hodges*, the petitioner "[i]n his Rule 32 petition . . . asserted the manner in which the answers of six potential jurors allegedly were nonresponsive to specific voir dire questions." *Id.* at 977. "When the State sought a summary dismissal of the claim, [Mr.] Hodges replied that his counsel could not have known about the alleged juror misconduct in time to raise the issue at trial or on appeal." *Id.* And the Supreme Court of Alabama found "[n]othing to the contrary" in the record. *Id.* But the trial court dismissed Mr. Hodges's petition, and the ACCA held that Mr. Hodges's juror misconduct claim was barred by Rule 32.2(a)(5) because it could have been raised at trial or on appeal. *Id.* at 975. The Supreme Court of Alabama reversed on the ground that Mr. Hodges had only a burden to plead, not a burden to prove. *Id.* at 976–77. And because "[Mr.] Hodges ha[d] met his initial burden of pleading a claim of juror misconduct, and the State ha[d] met its burden of asserting a preclusion[,]" and "[t]here being no evidence on the record that [Mr.] Hodges knew or reasonably should have known of the jurors' alleged lack of candor in time to raise the issue on appeal," summary dismissal pursuant to Rule 32.2 was inappropriate. *Id.* at 977.

Despite the apparent likeness to *Ex parte Hodges*, the ACCA upheld the summary dismissal of Mr. Spencer's claims pursuant to Rule 32.2. *Spencer R.32*, 201 So. 3d at 621. The ACCA wrote:

> Spencer first argues that the circuit court's application of the procedural bars contained in Rule 32.2, Ala. R. Crim. P., to several of his claims conflicts with the Alabama Supreme Court's decisions in *Ex parte Beckworth,* 190 So. 3d 571 (Ala. 2013), and *Ex parte Hodges,* 147 So. 3d 973 (Ala. 2011). Specifically, Spencer argues that the circuit court violated Supreme Court precedent in *Beckworth* and *Hodges* by summarily dismissing well-pleaded claims "merely on the basis of the State's suggestion of preclusion...." (Spencer's brief, at 94.)
>
> This Court disagrees with Spencer's characterization of the Supreme Court's holdings in *Beckworth* and *Hodges.* The Supreme Court in *Beckworth* found reversible error in the circuit court's summary dismissal of Beckworth's claim alleging that the State had failed to disclose evidence. The Court framed the issue as follows:
>
> > "In this case, we must decide whether a petition grounded on Rule 32.1(a) must plead facts tending to negate the affirmative defenses of preclusion under Rule 32.2(a)(3) and (5) in order to survive summary disposition under Rule 32.7(d). More specifically, must a petition allege facts indicating that the claim could not have been raised at trial or on appeal in order to 'state a claim' under Rule 32.1(a)?"
>
> *Beckworth,* 190 So. 3d at 573–74. In conclusion, the Court held: "[W]e must conclude that Beckworth's Rule 32 petition should not have been dismissed on the ground that his claim for relief under Rule 32.1(a) lacked allegations negating the preclusive bars of Rule 32.2(a)(3) and (5)." 190 So. 3d at 574. The primary reason for the Supreme

Court's holding in *Beckworth* was that the circuit court dismissed the postconviction petition only three days after the State had asserted preclusion grounds and without affording Beckworth the opportunity to address the State's pleaded grounds of preclusion.

In *Ex parte Hodges,* the Supreme Court considered the summary dismissal of a claim of juror misconduct after Hodges specifically responded to the State's preclusion argument as to why the claim was not procedurally barred. The Supreme Court stated:

> "The State's argument confuses and conflates the requirements of pleading and proof. In his Rule 32 petition Hodges asserted the manner in which the answers of six potential jurors allegedly were nonresponsive to specific voir dire questions. When the State sought a summary dismissal of the claim, Hodges replied that his counsel could not have known about the alleged juror misconduct in time to raise the issue at trial or on appeal. Nothing to the contrary appears on the record. Indeed, it is somewhat disingenuous for the State to fault Hodges for providing no evidence in support of his allegations when it was the State that successfully persuaded the trial court to forgo a hearing at which such evidence could have been presented.
>
> > "In short, Hodges has met his initial burden of pleading a claim of juror misconduct, and the State has met its burden of asserting a preclusion. There being no evidence on the record that Hodges knew or reasonably should have known of the jurors' alleged lack of candor in time to raise the issue on appeal, Hodges is entitled to an evidentiary hearing on his claim."

147 So. 3d at 977 (footnote omitted).

In neither *Beckworth* nor *Hodges* did the Supreme Court reverse long-established law that a claim may be summarily dismissed after the State pleads a ground of preclusion and that preclusion ground is not addressed by the petitioner in his response to the State's assertions. Indeed, such a conclusion would place a heavy burden on trial courts. Here, Spencer pleaded certain claims, the State asserted grounds of preclusion related to those claims, Spencer did not answer the State's preclusion arguments, and the circuit court summarily dismissed those claims based on the preclusion grounds of Rule 32.2(a), Ala. R. Crim. P.

The circuit court did not violate the Supreme Court's holdings in *Beckworth* and *Hodges* by summarily dismissing the following claims even though they were sufficiently pleaded.

*Id.* at 620–21.

The record refutes the distinctions the ACCA drew between *Ex parte Hodges*, *Ex parte Beckworth*, and Mr. Spencer's case. The ACCA acknowledged that in *Ex parte Hodges*, Mr. Hodges "specifically responded to the State's preclusion argument as to why the claim was not procedurally barred." *Id.* at 621. But according to the ACCA, that is not what happened here: "[Mr.] Spencer pleaded certain claims, the State asserted grounds of preclusion related to those claims, [Mr.] Spencer did not answer the State's preclusion arguments, and the circuit court summarily dismissed those claims based on the preclusion grounds of Rule 32.2(a), Ala. R. Crim. P." *Id.* And according to the ACCA, dismissing Mr. Spencer's claims when he failed to respond to the preclusion arguments was materially different from—and

207

allowed by—Alabama precedent. *Id.* But that is not what happened in this case. In Mr. Spencer's reply to his Second Amended Rule 32 Petition for Post-Conviction Relief, he specifically addressed the State's preclusion argument. *See* Doc. 17-42 at 25–26. Just as Mr. Hodges did, Mr. Spencer explained why the issue "could not reasonably have been discovered during trial"—"Ms[.] Williams did not disclose that information to trial counsel. Rather, Ms. Williams revealed the information during post-conviction investigation." *Id.* at 25. Mr. Spencer cited *Ex parte Hodges* and specifically contested that the preclusion defense applied. *Id.* at 25–26.

Because the ACCA erroneously faulted Mr. Spencer for not answering the State's preclusion arguments, this court declines to find that the procedural bar in Rule 32.2 was "not applied 'in an arbitrary or unprecedented fashion.'" *Ward*, 592 F.3d at 1157 (quoting *Judd*, 250 F.3d at 1313). Accordingly, the state court's dismissal of Mr. Spencer's claims under Rule 32.2 does not bar this court's review.

This court thus reviews this claim *de novo. See Williams v. Alabama*, 791 F.3d 1267, 1273 (11th Cir. 2015). The court is "not confined to the state-court record." *Id.* "If § 2254(d) does not bar relief, then an evidentiary hearing may be needed." *Id.* (quoting *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012)).

As recounted above, Mr. Spencer argues that his right to present witnesses in his defense was violated because the prosecutors threatened to charge Ms. Williams as an accessory to the murders. *See* Doc. 1 ¶¶ 288–92. He cites *Webb v. Texas*, 409

U.S. 95 (1972), and *Demps v. Wainwright*, 805 F.2d 1426 (11th Cir. 1986), for the proposition that "[s]ubstantial interference with a defense witness's free and unhampered choice to testify violates due process rights of the defendant" and that "[w]hen such a violation of due process rights occurs, a court must reverse the conviction without regard to prejudice to the defendant." Doc. 1 ¶ 288 (quoting *Demps*, 805 F.2d at 1433).

The State does not respond to Mr. Spencer's arguments in its brief, and when answering Mr. Spencer's petition, the state asserted only that Mr. Spencer's claim in this respect is procedurally defaulted. *See* Doc. 18 ¶¶ 57, 57(a).

Due process requires that "criminal defendants must be afforded the opportunity to present [witnesses and] evidence in their favor." *United States v. Hurn*, 368 F.3d 1359, 1362 (11th Cir. 2004) (citing *Specht v. Patterson*, 386 U.S. 605, 610 (1967)). Government interference with witness testimony thus violates due process when it is substantial, *see Demps*, 805 F.2d at 1433, such that the interference "worked to deprive" the defendant "of a witness who could have testified on his behalf," *United States v. Duperval*, 777 F.3d 1324, 1335 (11th Cir. 2015) (quoting *United States v. Garmany*, 762 F.2d 929, 937 (11th Cir. 1985)).

"Examples of substantial interference include singling out a witness to assure the witness that he would be prosecuted and convicted of perjury, . . . prohibiting a codefendant from testifying in any manner if he accepts a plea agreement, . . . and

209

threatening that the government will retaliate if the defendant continues to testify."

*Id.*

In *Webb*, the Supreme Court reversed a conviction after the trial judge admonished a defense witness that his testimony could be used against him, and that lying on the stand "would get [the witness] convicted of perjury and that [the conviction] would be stacked onto" the witnesses other criminal charges. 409 U.S. at 96. That admonition caused the witness to refuse to testify, and the Supreme Court held that "the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment." *Id.* at 96, 98. In another case, the Supreme Court held that substantial interference could occur where the government deported a material defense witness. *See Valenzuela-Bernal*, 458 U.S. at 872. And in *Demps*, the Eleventh Circuit affirmed a district court finding that there was no substantial interference with a witness's testimony when the trial court determined the petitioner's allegations were not substantiated. *See* 805 F.2d at 1433, 1435.

Mr. Spencer's arguments fail because even if the court assumes the truth of his allegations, they are insufficient to establish actionable interference. Mr. Spencer's allegations are not allegations that the prosecution (or the court) drove Ms. Williams off the stand or deprived Mr. Spencer of her testimony. Indeed, no

judicial or government action drove Ms. Williams off the stand—she testified in Mr. Spencer's defense (after testifying on behalf of the prosecution at a preliminary hearing on July 30, 2024) and was subjected to a lengthy cross-examination by the prosecution. *See* Doc. 17-27 at 134–49, 151.

During that cross-examination, the prosecutor impeached Ms. Williams repeatedly with a statement that she gave the day after the incident. *See id.* at 135 (Q.: "Is that what you told them the very next day?"). And he elicited testimony that, before the shooting, Mr. Spencer and Mr. Woods said that "if [the police] c[a]me back [to the apartment], they was gonna get them." *Id.* at 148.

Ms. Williams chose to testify regardless of what prosecutors said to her. And as the cross examination makes clear, her testimony contradicted what she had told police immediately after the incident. So any alleged threats did not deter Ms. Williams from testifying to a version of events that differed from her previous statements.

Further, any alleged interference falls short of what controlling precedent holds is "substantial." Indeed, the government did not make Ms. Williams inaccessible to Mr. Spencer. Nor did she choose to testify on the prosecution's behalf, as she had previously done in Mr. Spencer's case. Mr. Spencer's counsel was given a full and fair opportunity to examine Ms. Williams, and he did so at trial. Mr. Spencer's due process rights were not violated in this respect.

What's more, the testimony that Ms. Williams would have allegedly given if the prosecution had not threatened her would have made no difference in Mr. Spencer's case. Mr. Spencer asserts that Ms. Williams would now testify that (1) Mr. Spencer never "plotted to kill police officers" and (2) "that Officer Chisholm aimed his weapon" at Mr. Spencer when the officers entered the apartment. Doc. 1 ¶ 293.

But Mr. Spencer's argument is misplaced. As discussed several times throughout this opinion, Mr. Spencer was not entitled to a jury instruction on self-defense, nor any lesser included offenses, because (1) the officers were executing a lawful arrest warrant and (2) there was no evidence that those officers used felonious force in doing so. *See* Part III.B.2., *supra*. Ms. Williams's proffered testimony does not change that—even if Officer Chisholm entered the apartment with his gun drawn, there is no evidence that he had a felonious intent in doing so, and Mr. Spencer has identified no law indicating that it is felonious for an officer to draw his weapon when executing an arrest warrant. Mr. Spencer's argument also ignores that Ms. Williams did testify at trial that an officer had his gun out during the incident. *See* Doc. 17-27 at 130–31. Accordingly, Mr. Spencer is due no habeas relief on this claim.

As explained below, the court finds that Mr. Spencer is not entitled to discovery or an evidentiary hearing on any of his claims. But particularly as to this

claim, Mr. Spencer is not entitled to discovery or an evidentiary hearing because, as explained above, any evidence that Mr. Spencer alleges he may uncover would not change the outcome of his proceedings. Further, the record as a whole makes clear that Mr. Spencer and the State each had ample opportunity to inquire into Ms. Williams's testimony well before Mr. Spencer's post-conviction investigation given that she had previously testified on behalf of the prosecution.

A complete review of Mr. Spencer's legal arguments and the record in this case makes clear that Mr. Spencer is due no habeas relief on this claim.

### 4. Alabama's Method Of Execution

Mr. Spencer contends that "Alabama's lethal injection protocol poses a substantial risk of inflicting unnecessary pain, and therefore . . . constitutes cruel and unusual punishment." Doc. 1 ¶ 296. "Issues sounding in habeas are mutually exclusive from those sounding in a § 1983 action." *McNabb v. Comm'r Ala. Dep't of Corr.*, 727 F.3d 1334, 1344 (11th Cir. 2013). "'An inmate convicted and sentenced under state law may seek federal relief under two primary avenues:' a petition for habeas corpus or a complaint under 42 U.S.C. § 1983." *Id.* (quoting *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006)). "The line of demarcation between a § 1983 civil rights action and a § 2254 habeas claim is based on the effect of the claim on the inmate's conviction and/or sentence." *Hutcherson*, 468 F.3d at 754. "When an inmate challenges the 'circumstances of his confinement' but not the

validity of his conviction and/or sentence, then the claim is properly raised in a civil rights action under § 1983." *Id.* (quoting *Hill v. McDonough*, 547 U.S. 573, 579 (2006)). By contrast, "habeas corpus law exists to provide a prisoner an avenue to attack the fact or duration of physical imprisonment and to obtain immediate or speedier release." *Valle v. Sec'y, Fla. Dep't of Corr.*, 654 F.3d 1266, 1267 (11th Cir. 2011).

"Usually, an inmate who challenges a state's method of execution is attacking the means by which the State intends to execute h[im], which is a circumstance of his confinement." *McNabb*, 727 F.3d at 1344. "It is not an attack on the validity of his conviction and/or sentence." *Id.* So "[a] § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures." *Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1261 (11th Cir. 2009).

Accordingly, the court **DISMISSES WITHOUT PREJUDICE** Mr. Spencer's claim regarding Alabama's method of execution. *See McNabb*, 727 F.3d at 1344 ("Hence, we conclude that the district court did not err in dismissing McNabb's lethal injection challenge in his federal habeas petition. That avenue of relief is still available to him in a § 1983 action.").

5.    The Cumulative Effect Of The Alleged Errors Does Not Entitle Mr. Spencer To Habeas Relief

According to Mr. Spencer, "[t]he cumulative effect of the errors of federal law identified above violates "Mr. Spencer's rights to due process and a fair trial."

Doc. 1 ¶ 303. The ACCA ruled that this claim was procedurally barred under Alabama Rule of Criminal Procedure 32.2. *Spencer R.32*, 201 So. 3d at 623. Mr. Spencer argues that this ruling did not rest on an adequate and independent state ground. Doc. 1 ¶ 303; Doc. 21 at 7–11. But Mr. Spencer has not cited any Alabama law to support this argument, so the court cannot conclude that Alabama's procedural default doctrine was applied arbitrarily. *See Lee v. Kemna*, 534 U.S. 362, 375 (2002); *Ward*, 592 F.3d at 1156–57.

## IV. DISCOVERY & EVIDENTIARY HEARING

Mr. Spencer has not shown an entitlement to habeas relief. Accordingly, the court will not hold an evidentiary hearing or allow discovery. *See Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 763 (11th Cir. 2010); *Cullen*, 563 U.S. at 183–84.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Furthermore, the "broad discovery provisions" of the Federal Rules of Civil Procedure do not apply in habeas proceedings. *Harris v. Nelson*, 394 U.S. 286, 295 (1969).

Rule 6 of the Rules Governing § 2254 Cases states that "[a] judge may, **for good cause**, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Rules Governing § 2254 Cases, Rule 6(a) (emphasis added). The rule embodies the principle that a court must permit

discovery in a proceeding only "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (quoting *Harris*, 394 U.S. at 300). "[G]ood cause for discovery cannot arise from mere speculation." *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006).

Mr. Spencer asserts that he should have been provided an opportunity to engage in discovery. Doc. 1 ¶¶ 15–17; *id.* at 147. Mr. Spencer has not established "good cause" for permitting additional discovery on his claims. Mr. Spencer has not alleged with specificity what he intends to find and prove, and he has not shown that if the facts were more fully developed, he may be able to demonstrate entitlement to relief. Accordingly, he is entitled to no discovery.

"[B]efore a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, [and he must do so] based solely on the state court record." *Landers v. Warden, Att'y Gen. of Ala.*, 776 F.3d 1288, 1295 (11th Cir. 2015). "Once a petitioner has demonstrated such an error or unreasonable determination, 'the decision to grant [an evidentiary] hearing rests in the discretion of the district court.'" *Id.* (citing *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007)). Because the court has

found that Mr. Spencer identified no requisite error or unreasonable determination, Mr. Spencer is not entitled to an evidentiary hearing.

## V. CONCLUSION

For the reasons stated above, the court **DENIES** Mr. Spencer's request for an evidentiary hearing and for discovery, Doc. 1 at 147–48, **DENIES** Mr. Spencer's request for habeas relief, and **DISMISSES** his Section 2254 petition. This court will enter a Final Judgment contemporaneously with this Memorandum Opinion.

Under Rule 11(a) of the Rules Governing Section 2254 Cases in the United States Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the habeas petitioner. This court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citation omitted). For claims rejected without reaching the merits, a petitioner must demonstrate that reasonable jurists would debate whether "the petition states a valid claim of the denial of a constitutional right" and "the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

The court finds that Mr. Spencer's claims do not satisfy these standards for granting a certificate of appealability. Accordingly, this court **DENIES** Mr. Spencer a certificate of appealability.

**DONE** and **ORDERED** this 1st day of April, 2026.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE